## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

In re:

| | |
|---|---|
| Praesum Healthcare Services, LLC,[1] <br> (Jointly Administered) | Case No. 25-19335-EPK |
| Debtors. <br> _____/ | Chapter 11 |

## MOTION TO REJECT EXECUTORY CONTRACT OF CHIEF FINANCIAL OFFICER

Praesum Healthcare Services, LLC (the "Debtor"), pursuant to 11 U.S.C. § 365(a) and Federal Rule of Bankruptcy Procedure 6006, requests that the Court authorize the Debtor's rejection of the executory contract between the Debtor and Curtis J. Berchtold ("Berchtold"), retroactive to August 19, 2025.  In support, the Debtor states as follows:

---

[1] The 28 Debtors in these jointly administered cases are: (1) Praesum Healthcare Services, LLC, Case No. 25-19335-EPK; (2) Evolve Recovery Center, LLC, Case No. 25-19336-EPK; (3) Evolve Recovery Center at Millbury LLC, Case No. 25-19340-EPK; (4) Sunrise Detox Alpharetta, LLC, Case No. 25-19343-EPK; (5) Sunrise Detox Brentwood, LLC, Case No. 25-19346-EPK; (6) Sunrise Detox Cherry Hill, LLC, Case No. 25-19348-EPK; (7) Sunrise Detox Duluth, LLC, Case No. 25-19356-EPK; (8) Sunrise Detox III, LLC, Case No. 25-19359-EPK; (9) Sunrise Detox Millbury, LLC, Case No. 25-19362-EPK; (10) Sunrise Detox Orlando, LLC, Case No. 25-19363-EPK; (11) Sunrise Detox Toms River, LLC, Case No. 25-19365-EPK; (12) The Counseling Center at Cherry Hill, LLC, Case No. 25-19366-EPK; (13) The Counseling Center at Clark, LLC, Case No. 25-19367-EPK; (14) The Counseling Center at Duluth, LLC, Case No. 25-19368-EPK; (15) The Counseling Center at Fair Lawn, LLC, Case No. 25-19337-EPK; (16) The Counseling Center at Freehold, LLC, Case No. 25-19339-EPK; (17) The Counseling Center at Middlesex, LLC, Case No. 25-19341-EPK; (18) The Counseling Center at Robbinsville, LLC, Case No. 25-19342-EPK; (19) The Counseling Center at Roswell, LLC, Case No. 25-19344-EPK; (20) The Counseling Center at Roxbury, LLC, Case No. 25-19345-EPK; (21) The Counseling Center at Brunswicks, LLC, Case No. 25-19347-EPK; (22) The Counseling Center at Toms River, LLC, Case No. 25-19349-EPK; (23) The Counseling Center at West Caldwell, LLC, Case No. 25-19351-EPK; (24) The Counseling Center at Yorktown Heights, LLC, Case No. 25-19352-EPK; (25) Beacon Point Recovery Center LLC, Case No. 25-19354-EPK; (26) Sunrise Detoxification Center, LLC, Case No. 25-19355-EPK; (27) Sunrise Detox II, LLC, Case No. 25-19357-EPK; and (28) The Counseling Center at Millbury, LLC, Case No. 25-19358-EPK.

1. On August 14, 2025 (the "Petition Date"), the Debtor and the 27 other entities listed in Footnote 1 (together, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

2. The Debtors are operating their business and managing their affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3. Debtor Praesum Healthcare Services, LLC provides administrative services to each of the 27 other Debtors, which operate treatment facilities including detox facilities, residential facilities, and outpatient facilities.

4. In the ordinary course of their businesses, each day, Debtor Praesum Healthcare Services, LLC sweeps the cash received by each of the 27 treatment provider Debtors into a bank account maintained by Debtor Praesum Healthcare Services, LLC at the Bank. Debtor Praesum Healthcare Services, LLC pays the operating expenses of each of the 27 treatment provider Debtors from such bank account.

5. In 2023, Debtor Praesum Healthcare Services, LLC received $23,000,000 in financing from the Bank secured by a blanket lien. Each of the other 27 treatment provider Debtors are guarantors of the loan facility, and the guarantees are also secured by blanket liens.

6. In March of 2025, the Debtor and Berchtold entered into the Executive Employment Agreement under which Berchtold was employed by the Debtor as the Debtor's chief financial officer. A copy of the Executive Employment Agreement is attached hereto as **Exhibit A**.

7. In May of 2025, the Bank declared the loan facility in *non-payment* default, initiated a lawsuit in Florida state court against the Debtors, and sought appointment of a receiver.

8. For these reasons, on August 13, 2025, the Debtor (and each of the 27 affiliated Debtors) filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in order to preserve their going concern value and to reorganize.

9. The finances of the Debtor are perilous, and the Debtor is in discussions to engage a chief restructuring officer.

10. Accordingly, the Debtor no longer requires the services of Berchtold. On August 19, 2025, the Debtor's manager, Timothy Doran, informed Berchtold that the Debtor no longer required Berchtold's services.

11. Section 365(a) of the Bankruptcy Code provides that "the trustee [or debtor-in-possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); see 11 U.S.C. § 1107(a) (granting a debtor-in-possession all the rights and powers of a trustee). Although the Bankruptcy Code does not provide a standard for a proposed assumption or rejection, courts have uniformly deferred to the business judgment of the trustee or debtor-in-possession. *See, e.g., In re Gardinier, Inc.*, 831 F.2d 974, 975 (11th Cir. 1987); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Taylor, 913 F.2d 102* (3d Cir. 1990); *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36 (2d Cir. 1989). The business judgment test is not a strict standard and merely requires a showing that either assumption or rejection of the contract at issue will benefit the debtor's estate. *See In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom, Bildisco & Bildisco*, 465 U.S. 513 (1983). As long as a debtor's decision to reject is a reasonable exercise of its business judgment, authorization to reject is appropriate. *Bildisco & Bildisco*, 465 U.S. at 523-24.

12. The Debtor seeks Court authorization to reject the Executive Employment Agreement. Such rejection is beneficial to the estate and a reasonable exercise of the Debtor's business judgment given the state of the Debtor's finances and the fact that Berchtold's services are no longer required.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to reject its Executive Employment Agreement with Curtis J. Berchtold retroactive to August 19, 2025.

Respectfully submitted,

**SHRAIBERG PAGE P.A.**
Proposed Counsel for the Debtors
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
bss@slp.law
ependergraft@slp.law

By:  /s/ *Bradley S. Shraiberg*
   Bradley S. Shraiberg
   Florida Bar. No. 121622
   Eric Pendergraft
   Florida Bar No. 91927

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on August 26, 2025, a true and correct copy of the foregoing was furnished via Notice of Electronic Filing by CM/ECF to all parties registered to receive such service and via U.S. Mail and email to:

Curtis J. Berchtold
13362 NW 1st Street
Unit 103
Plantation, FL 33325
Curt.berchtold@gmail.com

# "EXHIBIT A"

# EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT (**Agreement**) is entered into as of March___, 2025 (**Effective Date**), by Curtis J. Berchtold (**Executive**) and Praesum Healthcare Services, LLC, a Florida limited liability company (**Company**) (collectively, **Parties**).

RECITALS:

A.  The Company provides administrative services in support of certain subsidiaries of Praesum, LLC (**Praesum**) which companies (**Operating Companies**) provide treatment services to individuals suffering from behavioral and/or mental health disorders (**Company Business**) in the states of Florida, Georgia, New Jersey, Texas, New York, Pennsylvania, and Massachusetts (**Territory**) as well as property management services to companies which are affiliated with the Operating Companies and which own the properties from which certain of the Operating Companies conduct the Company Business (**Property Companies**).

B.  The Company desires to employ the Executive, and the Executive desires to be employed by the Company, on the terms and conditions set forth herein.

C.  The Company also provides property management services to certain subsidiaries of Treatment Property, LLC (**Treatment Property**), which companies own the facilities at which certain of the Operating Companies conduct the Company Business. Praesum and Treatment Property are affiliates.

NOW, THEREFORE, in consideration of the mutual covenants, promises and obligations set forth herein, the Parties agree as follows:

1.  Term. The Executive's employment hereunder will commence on March 31, 2025 (**Start Date**) and shall continue for a period of two (2) years unless terminated earlier pursuant to Section 5 of this Agreement; and shall automatically renew annually thereafter for successive one (1) year periods (each such renewal period a **Renewal Date**) unless either party provides to the other at least 90 days' prior to the applicable Renewal Date written notice of its intention not to extend the term of this Agreement. The period during which the Executive is employed by the Company hereunder is hereinafter referred to as the **Employment Term**.

2.  Position and Duties.

    2.1  Position. During the Employment Term, the Executive shall serve as the Chief Financial Officer of the Company. In such position, the Executive will have such duties and authority as are expressed in this Agreement and as may otherwise be determined from time to time by the Board, which such other duties and authority will be consistent with the Executive's position. Moreover, the Executive will, if requested, serve for no additional compensation as a member of the Board of Directors of the Company (**Board**), any advisory board established by the Board and any committee thereof, and as an officer and/or director of any affiliate of the Company. Until the Company shall have designated a Board, the manager of Praesum will function as the Board for the purposes of this Agreement. The manager is presently Timothy M. Doran. The Executive will report to the Company's chief executive officer and Board.

2.2 Duties.

(a) During the Employment Term, the Executive will devote all of his entire business time, skill, and energy to the to the business and affairs of the Company, shall use his best efforts to perform such responsibilities in a diligent, loyal, and businesslike manner to advance the best interests of the Company, and will not without the prior written consent of the Board engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere with the performance of any such services either directly or indirectly.

(b) In particular, the Executive hereby assumes and agrees to perform the responsibilities set forth on attached Schedule 2.2(b).

2.3 Representations of the Executive. The Executive represents and warrants to the Company that:

(a) The Executive's execution of this Agreement, acceptance of employment with the Company and/or performance of his duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract or understanding to which he is a party or is otherwise bound.

(b) The Executive has had an opportunity to consult with his counsel regarding this Agreement.

3. Place of Performance.

3.1 Principal Executive Offices. The Executive will perform his services at the Company's principal executive offices which are presently in Lake Worth Beach, Florida or as otherwise agreed upon between the Executive and the Board. The Executive may be required to travel on Company business during the Employment Term. When the Executive is not present in such offices, he will be connected to his team as well as to other executive officers of the Company as needed to meet the Company's requirements.

3.2 Transition Period. For a period after the Start Date not to exceed 180 days (**Transition Period**), the Executive may elect not to commute to the Company's executive offices from his present home in Plantation, Florida (**Current Home**). The Executive will during the Transition Period move into a new home in Palm Beach County which is conveniently close to the executive offices (**New Home**). Moreover, the Executive will use his best efforts to accomplish the move within 120 days after the Start Date. See Section 4.7 for a description of the Executive's Transition Period expenses for which the Company must reimburse the Executive.

4. Compensation and Benefits.

4.1 Base Salary. The Company shall pay to the Executive an annual base salary (**Base Salary**) of $325,000 in periodic installments in accordance with the Company's customary payroll practices, but no less frequently than monthly.

4.2 Annual Bonus. The Executive will be eligible to receive a performance-based annual cash bonus based on the achievement of the Company and individual performance goals, as determined by the Board (**Annual Bonus**). The target for the Annual Bonus shall be equal to fifty percent (50%) of Executive's Base Salary (prorated for any partial year). The Board will no later than 60 days

2

after the Start Date in respect of fiscal year 2025 and 30 days after the first day of each subsequent fiscal year establish reasonable target business metrics for such fiscal year. The Company will pay the Annual Bonus for any fiscal year to the Executive no later than 90 days after the end of the applicable fiscal year.

4.3     Withholding and Deferrals. The Company shall, in accordance with applicable law, withhold or deduct from all compensation paid to the Executive hereunder any income tax or other legally required withholding, any elective deferrals of amounts as contributions to qualified and non-qualified retirement plans of the Company, if any, and contributions payable by the Executive with respect to the Executive's participation in any employee benefit plans of the Company which the Company or the plan requires contributions by employees to receive benefits thereunder

4.4.    Benefit Plans. During the Employment Term, the Executive shall be eligible to participate in such medical, health, retirement, welfare, and insurance plans generally made available from time to time to senior executives of the Company (subject to the terms of said plans), and to receive other fringe benefits as generally provided to senior executives of the Company at the time such other fringe benefits, if any, are made available to them. The Company has provided to the Executive a benefits summary.

4.5     Vacation; Paid Time-off. During the Employment Term, the Executive shall be entitled to paid vacation time in accordance with the plans, practices, policies and programs applicable to other senior executives of the Company. The Executive shall receive other paid time-off in accordance with the Company's policies for executive officers as such policies may exist from time to time. The Company has provided to the Executive all such plans, practices, policies, and programs.

4.6     Business Expenses. The Company will promptly reimburse the Executive for all reasonable business and travel expenses incurred by him in connection with the performance of his duties hereunder, subject to the presentation of written documentation supporting the expense and compliance with the Company's policies relating to business and travel expenses as in effect from time to time.

4.7     Reimbursable Expenses. The Company will reimburse the Executive for the following expenses he incurs during the Transition Period and until he shall have acquired his New Home: (i) room rental at a hotel reasonably close to the Company's principal office for Monday through Thursday nights of each week (amount to be reimbursed per night not to exceed $300); (ii) the sum required to be paid to the landlord of the lease for the Current Home to terminate the lease (amount not to exceed 3 months' rent); and (iii) the cost of moving the Executive's and his family's possessions from the Current Home to the New Home (amount not to exceed $35,000). To qualify for reimbursement, such expenses must be ordinary and necessary, and each request must be in writing and accompanied by reasonable evidence of payment such as a paid receipt. The Company will in each instance remit payment to the Executive by the 15th of the month following submission of the request for reimbursement. To the extent any such reimbursement expenses would be taxable to the Executive, each such payment will be grossed up by 50% to cover applicable income and payroll taxes.

4.8     Indemnification. In the event that the Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative or investigative (**Proceeding**), other than any Proceeding initiated by the Executive or the Company related to any contest or dispute between the Executive and the Company or any of its affiliates with respect to this Agreement or the Executive's employment hereunder, by reason of the fact that the Executive is or was an officer of the Company or any affiliate of the Company, to the fullest extent of the law the Executive will be indemnified and held harmless by the Company from and against any liabilities, costs, claims

3

and expenses, including all costs and expenses incurred in defense of any Proceeding (including reasonable attorneys' fees and costs)except in respect of any Proceeding arising out of any action by the Executive which is outside the scope of his authority. The right to indemnity shall continue after Executive stops serving in the capacity that initially entitled Executive to indemnification hereunder. The right to indemnification hereunder shall include the right to be paid or reimbursed by the Company for the reasonable expenses incurred in advance of the final disposition of the Proceeding.

4.9 Equity. The Executive has contemporaneously entered into Restricted Unit Grant Agreements (**Grant Agreements**) with Praesum and Treatment Property (**Issuers**) pursuant to which each of the Issuers will issue to the Executive a restricted equity grant consisting of 1.0% equity in it (**Equity**)portions of which vest at different times as set forth in the Grant Agreements.

5. Termination of Employment.

5.1 Generally. The Employment Term and the Executive's employment hereunder may be terminated by either the Company or the Executive as set forth in this Agreement. Upon termination of the Executive's employment during the Employment Term, the Executive shall be entitled to the compensation and benefits described in this Section 5 and shall have no other rights to any compensation or any other benefits from Praesum, the Company, or any of their subsidiaries or affiliates.

5.2 Non-Renewal by Executive without Good Reason and Termination for Cause or without Good Reason.

(a) This Agreement would be terminated upon (i) the Executive's election not to renew this Agreement in accordance with Section 1 without Good Reason as defined herein or (ii) Termination with Cause, as defined herein or (iii) Termination by the Executive without Good Reason, as defined herein. In the event of any such non-renewal by Executive without Good Reason or termination for Cause or without Good Reason, the Executive shall be entitled to receive no later than 10 business days after the Termination Date (hereinafter defined) the following (**Accrued Amounts**):

(i) any accrued but unpaid Base Salary and accrued but unused vacation;

(ii) reimbursement for expenses properly incurred by the Executive as described in Sections 4.6 and 4.7; and

(iii) payment of any Annual Bonus declared and earned but unpaid as of the date of termination for any previously completed calendar year.

(b) The term **Cause** shall apply to the Executive and shall mean that after the Effective Date the Executive (i) engaged in any act of willful malfeasance, gross misconduct, gross negligence, or breach of fiduciary duty owed as an officer, director, manager or member of the Company or Praesum; (ii) committed an act of fraud, material dishonesty, embezzlement, or misappropriation; (iii) refused to perform a specific reasonable directive from the Board that is reasonably consistent with the scope and nature of Executive's responsibilities; (iv) materially or repeatedly failed to perform his duties other than as a consequence of his Disability (hereinafter defined in Section 5.5(c)); or (v) was convicted of or pled guilty or nolo contendere to a crime that constitutes a felony. Any act, or failure to act, based upon authority given pursuant to a resolution or directive duly adopted by the Board or upon the advice

4

of counsel for the Company shall be conclusively presumed to have been committed, or omitted to be done, by the Executive in good faith and in the best interests of the Company.

(c) Termination of the Executive's employment shall not be deemed to be for Cause unless and until the Company shall have delivered to the Executive a copy of a resolution duly adopted by the Board finding that the Executive has engaged in the conduct described in any of items (b)(i)-(v) above. Except for a failure, breach or refusal which by its nature cannot reasonably be expected to be cured, the Executive shall have 10 business days from the delivery of written notice by the Company within which to cure any acts constituting Cause; provided however, that, if the Company reasonably expects irreparable injury from a delay of 10 business days, the Company may give the Executive notice of such shorter period within which to cure as is reasonable under the circumstances, which may include the termination of the Executive's employment without notice and with immediate effect. This latter action would not constitute Good Reason.

(d) The term **Good Reason** shall apply to the Company and shall mean (i) any breach by the Company of any material provision of this Agreement or any material provision of any other written agreement between the Executive and the Company; or (ii) a material, adverse change in the Executive's title, compensation, authority, duties or responsibilities (other than temporarily while the Executive is physically or mentally incapacitated or as required by applicable law).

(e) The Executive cannot terminate his employment for Good Reason unless he has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason within 30 days of the initial existence of such grounds and the Company has had at least 30 days from the date on which such notice is provided to cure such circumstances. If the Executive does not terminate his employment for Good Reason within 60 days after the first occurrence of the applicable grounds, the Executive will be deemed to have waived his right to terminate for Good Reason with respect to such grounds.

5.3 <u>Non-Renewal with Good Reason, Termination Without Cause or for Good Reason.</u>

(a) This Agreement would be terminated by (i) either the election of the Company without Cause or the Executive with Good Reason not to renew this Agreement in accordance with Section 1, (ii) the Termination by Executive for Good Reason or (iii) Termination by the Company without Cause. In the event of any such non-renewal or termination, the Executive shall be entitled to receive the following:

(i) the Accrued Amounts within 10 business days after the Termination Date applicable under this Section 5.3(a); and

(ii) a severance amount equivalent to Base Salary to be paid to the end of the Employment Term but in either event no more than the amount payable over a period of 18 months or less than the amount payable over a period of 12 months paid in accordance with the

5

Company's customary payroll practices during the 18-month period commencing in the month following the month in which the Termination Date occurs.

    5.4    Resignation/Termination without Cause. The Executive may terminate the Executive's employment with the Company other than for Good Reason, and the Company may Terminate without Cause, at any time after August 31, 2025 by providing at least 90 days' prior written notice to the Company.

    5.5    Death or Disability.

    (a)    This Agreement shall terminate automatically upon the Executive's death, and the Company may terminate this Agreement on account of the Executive's Disability.

    (b)    If the Executive's employment is terminated during the Employment Term on account of the Executive's death or Disability, the Executive (or the Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the Accrued Amounts.

    (c)    The term **Disability** shall mean the Executive's inability due to physical, emotional, or mental incapacity to perform substantially his responsibilities under this Agreement for at least 60 days out of any 365-day period. Any question as to the existence of the Executive's Disability as to which the Executive and the Company cannot agree shall be determined in writing by a qualified independent physician selected reasonably by the Company. The determination of Disability made in writing to the Company and the Executive shall be final and conclusive for all purposes of this Agreement.

    5.6    Notice of Termination. A notice of termination must specify (i) the termination provision of this Agreement upon which the electing party is relying; (ii) to the extent applicable, the facts and circumstances claimed to provide a basis for termination of this Agreement under the provision so indicated; and (iii) the applicable Termination Date.

    5.7    Termination Date. The term **Termination Date** shall mean:

    (i)    if this Agreement terminates on account of the Executive's death, the date of the Executive's death;

    (ii)    if this Agreement is terminated on account of the Executive's Disability, the date that it is determined that the Executive has a Disability;

    (iii)    if the Company terminates this Agreement for Cause, the date the notice of termination is delivered to the Executive;

    (iv)    if the Company terminates this Agreement without Cause, the date specified in the notice of termination, which shall be no less than 90 days following the date on which the notice of termination is delivered;

    (v)    if the Executive terminates this Agreement with or without Good Reason, the date specified in the Executive's notice of termination, which shall be no less than 90 days following the date on which the notice of termination is delivered; and

6

      (vi) if this Agreement terminates because either party provides notice of non-renewal pursuant to Section 1, the Renewal Date immediately following the date on which the applicable party delivers notice of non-renewal.

    5.8 <u>Resignation of All Other Positions</u>. Upon termination of this Agreement for any reason, the Executive shall be deemed to have resigned from all positions that the Executive holds as an employee, officer and/or director of the Company and any of its affiliates and as a member of any committee of the Board and any advisory board. The Company shall provide Executive with all necessary documents to effectively resign from all position upon termination of the Agreement.

    5.9 <u>Executive's Duty</u>. When the Executive's employment with the Company terminates, the Executive agrees to notify any subsequent employer of the restrictive covenants contained in this Agreement. The Executive will also deliver a copy of such notice to the Company before the Executive commences employment with any subsequent employer. In addition, the Executive authorizes the Company to provide a copy of the restrictive covenants sections of this Agreement to third parties, including but not limited to, the Executive's subsequent, anticipated, or possible future employers.

    5.10 <u>Disposition of Equity on Termination</u>.

      (a) In the event this Agreement has been terminated by the Company for Cause or by the Executive without Good Reason before September 1, 2025, the Executive will forthwith transfer to Praesum and Treatment Property for the sum of $100 all his right, title and interest in each respective company free and clear of all liens and encumbrances.

      (b) In the event the Company has terminated this Agreement without Cause or the Executive has terminated this Agreement with Good Reason or without Good Reason after August 31, 2025 or the Company or Executive has elected not to renew this Agreement, the Executive will have the prerogative to take one (but not both) of the following actions by delivering notice to the Company no later than the 10th day after the date of such termination: (i) to retain ownership of the Equity (to the extent vested on the Termination Date); or (ii) to require each of Praesum and Treatment Property to purchase the Executive's respective Equity in it (to the extent vested) at a price as determined reasonably by the Board using a model that calculates the average of Praesum's EBITDA for the 2 fiscal years immediately preceding the Termination Date multiplied by 10, payable in equal monthly installments over a period of 30 months commencing on the first day of the month following the date of such termination.

    6. <u>Cooperation</u>. The parties agree that certain matters in which the Executive will be involved during the Employment Term may necessitate the Executive's cooperation in the future. Accordingly, following the termination of the Executive's employment for any reason, to the extent reasonably requested by the Board or the Company's chief executive officer, the Executive will reasonably cooperate with the Company in connection with matters arising out of the Executive's service to the Company; provided that the Company will endeavor to minimize disruption of the Executive's other activities. The Company will reimburse the Executive for reasonable expenses incurred in connection with such cooperation and to the extent that the Executive is required to spend substantial time on such matters will compensate the Executive at an hourly rate based on the Executive's Base Salary on the Termination Date.

7. <u>Confidential Information</u>.

    7.1 <u>Disclosure and Use Restrictions</u>. The Executive agrees (i) to treat all Confidential Information (hereinafter defined in Section 7.2) as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any person or entity whatsoever (including other employees of the Company) not having a need to know and authority to know and use the Confidential Information and in any event not to anyone outside of the direct employ of the Company except as required in the performance of the Executive's authorized employment duties to the Company (only within the limits and to the extent of such duties); and (iii) not to access or use any Confidential Information, not to copy any documents, records, files, media or other resources containing any Confidential Information, and not to remove any such documents, records, files, media or other resources from the premises or control of the Company except as required in the performance of the Executive's authorized employment duties to the Company (only within the limits and to the extent of such duties). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order. The Executive shall promptly provide written notice to the Board of any such order.

    7.2 <u>Confidential Information Defined</u>. The term **Confidential Information** shall mean (i) the terms of this Agreement and (ii) information of or concerning the Company, the Company's affiliates (including Praesum and Treatment Property), and the Company Business which is not generally available to the public and which the Company reasonably considers proprietary, confidential, and/or valuable whether or not such information may be protected by copyright or other means. Confidential Information includes, but is not limited to, trade secrets and other information comprising or related to personnel, financial matters, training, policies and procedures, strategies, trade practices, governance, ownership, purchasing, vendors, marketing, pricing, and referral sources and which is disclosed to or is learned by the Executive as a consequence of or through his employment with the Company regardless of the form or format by which any Confidential Information is kept or stored. In the event of any reasonable doubt as to whether a particular item of information is Confidential Information, it shall be deemed to be Confidential Information for the purpose of this Agreement. The Executive understands and agrees that Confidential Information includes information developed by him in the course of his employment by the Company as if the Company furnished the same Confidential Information to the Executive in the first instance (such as notes, analyses and projections). Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Executive; provided that such disclosure is through no direct or indirect fault of the Executive or person(s) acting on the Executive's behalf.

8. <u>Restrictive Covenants</u>.

    8.1 <u>Non-Competition</u>.

        (a) Because of the Company's legitimate business interests and the good and valuable consideration offered to the Executive, the Executive agrees during the Employment Term and

8

for a period of 24 months following the Termination Date not to engage in any Prohibited Activity in the Territory.

(b) The term **Prohibited Activity** shall mean an activity in which the Executive contributes his knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern or any other similar capacity to a person or entity engaged in any business which is the same or similar to the Company Business. Prohibited Activity also includes any activity that may require or inevitably requires disclosure or use of Confidential Information.

(c) Nothing herein shall prohibit the Executive from purchasing or owning less than 5% of the publicly traded securities of any company provided such ownership represents a passive investment and that the Executive is not a controlling person of, or a member of a group that controls, such company. This Section 8.1 does not in any way restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation or order.

8.2 <u>Non-Solicitation of Employees</u>. The Executive agrees directly or indirectly not to solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company or any of its affiliates for 24 months following the Termination Date.

8.3 <u>Employment Materials</u>. If the Executive is issued by the Company any digital or written materials intended to assist him in performing his services to the Company, such as a computer, printer, tablet, cellular phone, storage media, or written employee manual or training materials, the Executive will return all such employment materials to the Company on or before the Termination Date.

9. <u>Non-Disparagement</u>. The Parties agree that they will not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning each other, the Company's affiliates, or its businesses, or any of its owners, employees, officers, directors, and existing and prospective patients, suppliers, investors and other associated third parties. This Section 9 does not in any way restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency provided such compliance does not exceed that required by the law, regulation or order. The Executive shall promptly provide written notice of any such order to the Board.

10. <u>Executive's Acknowledgements</u>. The Executive acknowledges and agrees that:

(a) The services to be rendered by him to the Company are of a special and unique character; the Executive will obtain knowledge and skill relevant to the Company's industry, methods of doing business and marketing strategies by virtue of his employment; and the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the Company.

(b) The amount of his compensation reflects in part his obligations and the Company's rights under Sections 6, 7, 8 and 9 of this Agreement; he has no expectation of, and releases all claims to, any compensation, royalties, ownership interest, profits interest or other payment of any kind not

9

specified herein; and he will not be subject to undue hardship by reason of his full compliance with the terms and conditions of Sections 6, 7, 8 and 9 of this Agreement or the Company's enforcement thereof.

(c) All writings, works of authorship, technology, inventions, discoveries, ideas and other work product of any nature whatsoever that are conceived or reduced to practice by the Executive individually or jointly with others during the Employment Term and relating in any way to the Company Business and all printed, physical and digital copies, all improvements, rights and claims related to the foregoing, and other tangible embodiments thereof shall be the sole and exclusive property of the Company.

11. <u>Remedies</u>. In the event of a breach or threatened breach by the Executive of Sections 6, 7, 8 or 9 of this Agreement, the Executive hereby consents and agrees that the Company shall be entitled to seek in addition to other available remedies a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

12. <u>Miscellaneous</u>.

(a) This Agreement, for all purposes, shall be construed in accordance with the laws of the State of Florida without regard to conflicts of law principles. Each of the parties irrevocably and unconditionally (i) agrees that any suit, action or other legal proceeding arising out of or relating to this Agreement may, and to the extent permitted by the court of the State of Florida shall, be brought in the courts of record of the State of Florida in Palm Beach County, or the District Court of the United States, Southern District of Florida; (ii) consents to the jurisdiction of each such court in any such suit, action or proceeding; and (iii) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any such court.

(b) Unless specifically provided herein, this Agreement contains all of the understandings and representations between the Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The parties mutually agree that this Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of this Agreement.

(c) No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Executive and another duly authorized officer of the Company. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.

(d) Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a

10

part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

(e) Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

(f) This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Any signature on this Agreement delivered by electronic facsimile transmission shall be deemed the delivery of an original signature.

(g) This Agreement is personal to the Executive and shall not be assigned by the Executive. Any purported assignment by the Executive shall be null and void from the initial date of the purported assignment. This Agreement shall inure to the benefit of the Company and its successors and assigns.

(h) Any notice, request, claim, demand, document, and other communication hereunder to any party shall be effective upon receipt (or refusal of receipt) and shall be in writing and delivered personally or by reputable overnight delivery service (with tracking required), electronic facsimile (provided if confirmed receipt is after 5:00 p.m. ET, delivery shall be deemed to occur the next business day), or certified mail, return receipt requested, at the addresses set forth below:

>If to the Company:
>Praesum Healthcare Services, LLC
>2328 10th Avenue N., Suite 300
>Lake Worth Beach, FL 33461
>Attn: CEO
>Email: dmccartney@praesumhealthcare.com
>
>If to the Executive:
>Curtis J. Berchtold
>13362 NW 1st Street
>Unit 103
>Plantation, FL 33325
>Email: curt.berchtold@gmail.com

(i) Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

(j) The parties agree that each of the covenants and/or provisions contained herein shall be construed as independent of any other covenant and/or provision of this Agreement or any other agreement which the parties may have, and shall, where applicable, survive the termination, expiration, non-renewal or transfer of this Agreement for any reason. It is further understood that the existence of any claim or cause of action by one of the parties herein against another, whether predicated upon another

covenant and/or provision of this Agreement or any other agreement which the parties may have, shall not constitute a defense to the enforcement by one of the parties herein of any other covenant and/or provision contained herein.

IN WITNESS WHEREOF, the Parties hereto have executed and delivered this Agreement as of the Effective Date.

EXECUTIVE:

_____
Curtis J. Berchtold

COMPANY:
Praesum Healthcare Services, LLC

By: _____
Name: John White II
Title: Executive Vice President

Executive Employment Agreement Berchtold 03.27.25 C

## Schedule 2.2(b)

## EXECUTIVE'S RESONSIBILITIES

1) Provide leadership to, and collaborate and partner with, the broader Praesum Healthcare team, to reasonably facilitate decisions and activities across the organization that are aligned with the strategic goal of growing profitability (EBITDA), by increasing revenue and prudently managing expenses.

2) Lead, manage and direct the finance team, to reasonably cause financial reporting, budgets, forecasts, and other ad hoc analyses to be accurate and timely.

   a) Manage and forecast cashflow and the Revenue Cycle Management (RCM) team to be performing efficiently in billing and collections.

3) Lead, manage and direct the accounting team to reasonably apply accounting policies and procedures, and reasonably oversee that the financial books and records, to be accurate, timely and aligned with GAAP.

   a) Support and manage the independent auditors, and the annual financial audit.
   b) Support and manage the tax advisors in preparing and filing various documents.

4) Maintain constructive relationships with bank lenders, and other key business partners.

5) Keep the Executive Team and the Board of Directors apprised of the company's financial situation.

6) Oversee that the IT infrastructure supporting the finance and accounting functions is adequate and appropriate to safeguard data and reporting capabilities.

7) Lead, manage and direct any other personnel that might be within the Executive's scope of responsibilities, and manage any other ad hoc duties and responsibilities as may be assigned, from time to time, by the CEO and Board of Directors.