# Exhibit C

# LEASE AGREEMENT

Landlord:  AC HSS Office Ventures I LLC

Tenant: Beacon Point Recovery Center, LLC

Premises: 3261 Tulip Street, Philadelphia, Pennsylvania 19134

## **TABLE OF CONTENTS**

                                                                                                    Page

1.  Reference Data and Definitions ....................................................................................... 2
2.  Premises ............................................................................................................................ 5
3.  Term .................................................................................................................................. 5
4.  Base Rent .......................................................................................................................... 6
5.  HVAC and Utilities .......................................................................................................... 7
6.  Additional Rent for Operating Expenses and Real Estate Taxes ..................................... 8
7.  Use; Compliance With Law ............................................................................................ 12
8.  Alterations and Tenant's Property .................................................................................. 14
9.  Repairs and Maintenance ................................................................................................ 15
10. Liens ............................................................................................................................... 17
11. Subordination ................................................................................................................. 17
12. Inability to Perform ........................................................................................................ 17
13. Destruction ..................................................................................................................... 18
14. Insurance ......................................................................................................................... 19
15. Eminent Domain ............................................................................................................. 21
16. Assignment; Subleasing .................................................................................................. 21
17. Default ............................................................................................................................ 24
18. Fees and Expenses; Indemnity; Payment ....................................................................... 27
19. Access to Premises ......................................................................................................... 28
20. Notices ............................................................................................................................ 28
21. No Waiver ....................................................................................................................... 28
22. Tenant's Certificates ....................................................................................................... 29
23. Rules and Regulations .................................................................................................... 29
24. Tenant's Taxes ................................................................................................................ 29
25. Signage and Parking ....................................................................................................... 29
26. Miscellaneous ................................................................................................................. 30
27. Other Provisions ............................................................................................................. 33
28. Regulatory Matters ......................................................................................................... 35
29. Lien Waivers ................................................................................................................... 35

## **EXHIBITS**

Exhibit A            Intentionally Omitted
Exhibit B            Intentionally Omitted
Exhibit C            Intentionally Omitted
Exhibit D            Tenant's Work Agreement
Exhibit E            Intentionally Omitted
Exhibit F            Premises and Parking Lot Rules and Regulations
Exhibit G            Description of Parking Lot

## **SCHEDULES**

Schedule 1.25     Description of the Land
Schedule 7.2.4    Prohibited Uses

1

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (as amended, renewed, restated, extended, supplemented, superseded, replaced, substituted or otherwise modified from time to time, this "**Lease**") made as of ~~June~~ _August 28_, 2023, between **AC HSS Office Ventures I** LLC, a Delaware limited liability company or its successors and assigns ("**Landlord**"), and Beacon Point Recovery Center, LLC, a Pennsylvania corporation, or any of its successors and assigns to the extent permitted under this Lease, with a mailing address at 2328 10th Avenue N., Suite 300, Lake Worth Beach, FL 33461 ("**Tenant**").

### BACKGROUND

Landlord has a long-term leasehold interest with full rights as landlord in the Premises (defined below); a parcel of improved property at 2301 E. Allegheny Avenue, Philadelphia, PA 19134 (the "**MOB**"), a parcel across the street from the Premises (the "**Gym Parcel**") (which together with the MOB, the Premises, and the parking lots serving them are collectively referred to in this Lease as the "**Campus**"). The Landlord and Tenant entering into this lease with Tenant in connection with the operation by Tenant of a drug and alcohol rehabilitation facility at the MOB (the "**Facility**").

Tenant desires to lease from Landlord and Landlord desires to lease to Tenant the Premises for use by patients of the Facility as more particularly provided in this Lease.

**FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Landlord and Tenant agree as follows:

1.  <u>Reference Data and Definitions</u>.

    1.1  "**Additional Rent**" means all sums of money or charges required to be paid by Tenant under this Lease other than Base Rent, whether or not sums or charges are designated as "Additional Rent." All Additional Rent is collectible as Rent.

    1.2  "**Advance Rent Payment Amount**" means $50,429.50, representing the first month's Base Rent.

    1.3  "**Alterations**" has the meaning set forth in <u>Section 8.1</u>.

    1.4  "**Assignment**" has the meaning set forth in <u>Section 16.1</u>.

    1.5  "**Base Rent**" means the annual base rent for each Lease Year set forth below.

| Lease Year | Per Sq. Ft. Annual Base Rent | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| 1 | $24.76 | $721,754.00 | $60,146.17 |
| 2 | $25.50 | $743,325.00 | $61,943.75 |
| 3 | $26.27 | $765,770.50 | $63,814.21 |
| 4 | $27.06 | $788,799.00 | $65,733.25 |
| 5 | $27.87 | $812,410.50 | $67,700.88 |
| 6 | $28.71 | $836,896.50 | $69,741.38 |

| | | | |
|---|---|---|---|
| 7 | $29.57 | $861,965.50 | $71,830.46 |
| 8 | $30.45 | $887,617.50 | $73,968.13 |
| 9 | $31.37 | $914,435.50 | $76,202.96 |
| 10 | $32.31 | $941,836.50 | $78,486.38 |
| 11 | $33.28 | $970,091.60 | $80,840.97 |
| 12 | $34.28 | $999,194.34 | $83,266.20 |
| 13 | $35.31 | $1,029,170.17 | $85,764.18 |
| 14 | $36.37 | $1,060,045.28 | $88,337.11 |
| 15 | $37.46 | $1,091,846.64 | $90,987.22 |

1.6    Intentionally Omitted.

1.7    Intentionally Omitted.

1.8    "**Commencement Date**" has the meaning set forth in <u>Section 3.1.1</u>.

1.9    "**Event of Default**" has the meaning set forth in <u>Section 17.1</u>.

1.10   "**Expiration Date**" has the meaning set forth in <u>Section 3.1</u>.

1.11   "**First Lease Year**" means the approximately 12-month period commencing on the Commencement Date and ending at midnight on the day before the first anniversary of the Commencement Date if the Commencement Date is the first day of a calendar month, or ending at midnight on the first anniversary of the first full month following the Commencement Date if the Commencement Date is not the first day of a calendar month.

1.12   "**Governmental Body**" means any:

1.12.1   nation, state, county, city, town, borough, village, district or other jurisdiction;

1.12.2   federal, state, local, municipal or other government;

1.12.3   governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers);

1.12.4   body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, whether local or national; or

1.12.5   official of any of the foregoing.

1.13   "**Guarantor**" means  Praesum Healthcare Services, LLC

1.14   "**Guaranty Agreement**" means the agreement pursuant to which Guarantor agrees to be a guarantor and surety for the obligations and liabilities of Tenant under this Lease.

1.15   "**Hazardous Substance**" has the meaning set forth in <u>Section 7.4.1</u>.

1.16   Intentionally Omitted

3

1.17    **"HVAC"** has the meaning set forth in <u>Section 5</u>.

1.18    **Landlord's Notice Address:**

AC HSS Office Ventures I, LLC
3 Bala Plaza East, Suite 201
Bala Cynwyd, PA 19004

1.19    **"Laws"** means any constitution, law, ordinance, principle of common law, code, rule, regulation, statute, act, treaty or order of general applicability of any Governmental Body, including rules and regulations promulgated thereunder.

1.20    **"Lease Year"** means each consecutive 12-month period commencing on the first day of the calendar month immediately following the preceding Lease Year.

1.21    **"Operating Expenses"** has the meaning set forth in <u>Section 6.1.2</u>.

1.22    **"Parking Lot"** means the surface parking and pedestrian areas adjacent to the Premises, as shown on Exhibit G.

1.23    **"Permitted Transfer"** has the meaning set forth in <u>Section 16.8</u>.

1.24    **"Permitted Use"** means use only for the inpatient and outpatient treatment of individuals suffering from mental and/or behavioral health disorders. The Permitted Use of the Premises is subject to the restrictions set forth in <u>Section 7</u> and <u>Schedule 7.2.4</u>.

1.25    **"Premises"** means the improved parcel of land (the **"Land"**) described on attached <u>Schedule 1.25</u>, together with all improvements on such land, including the Helene Fuld Building, located at 3261 Tulip Street, Philadelphia, PA 19134.

1.26    **"Property"** means the Premises, the Parking Lot and related improvements.

1.27    **"Real Estate Taxes"** has the meaning set forth in <u>Section 6.1</u>.

1.28    **"Rent"** means Base Rent, Additional Rent and all other sums, whether or not they are expressly designated as Additional Rent or Rent, payable by Tenant under this Lease.

1.29    Intentionally Omitted

1.30    Intentionally Omitted.

1.31    **"Sublease"** has the meaning set forth in <u>Section 16.1</u>.

1.32    **"Tenant's Address"** means (a) Tenant's address set forth in the initial paragraph of this Lease prior to Tenant's occupancy of the Premises for the purpose of conducting business, and (b) the Premises after Tenant's occupancy of the Premises for the purpose of conducting business.

1.33    **"Tenant Owned Property"** has the meaning set forth in <u>Section 8.2</u>.

1.34    **"Tenant's Proportionate Share"** means 100%.

1.35    **"Tenant's Work"** has the meaning set forth in <u>Section 2.2</u>.

1.36    **"Tenant's Work Agreement"** has the meaning set forth in <u>Section 2.2</u>.

1.37    **"Term"** has the meaning set forth in <u>Section 3.1</u>.

2.    <u>Premises</u>.

2.1    <u>Premises</u>.

2.1.1    Landlord, for and in consideration of the Rents and covenants of Tenant contained in this Lease, has leased to Tenant, and Tenant does hereby lease from Landlord, the Premises on the terms and conditions set forth in this Lease. . Landlord warrants and represents that Tenant shall have the sole right to occupy the Premises, subject to the terms of this Lease, and that all prior agreements in respect of the Premises have been terminated.

2.1.2    Intentionally Omitted.

2.2    <u>Improvements to the Premises</u>. Tenant will at its expense construct the initial tenant improvements to the Premises (**"Tenant's Work"**) requiring the Approvals substantially in accordance with the plans approved by Landlord pursuant to the Tenant's Work Agreement attached to this Lease as Exhibit D (the **"Tenant's Work Agreement"**). Any and all of the work to be performed in improving the Premises must be performed by Tenant pursuant to all applicable provisions of this Lease including, without limitation, insurance, damage and indemnification provisions, and <u>Section 8</u> (alterations), <u>Section 9</u> (repairs), <u>Section 10</u> (liens), and the Tenant's Work Agreement. Tenant acknowledges that Tenant's Work is being accomplished for its own account, and Landlord has no responsibility or obligation with respect to Tenant's Work other than to cooperate with Tenant in good faith.

2.3    <u>Cost of Tenant's Work</u>. Tenant will be obligated to pay all costs and expenses incurred in connection with Tenant's Work.

2.4    <u>Landlord's Approval</u>. Tenant's Work, Tenant's contractor and all plans, drawings and specifications for the Tenant's Work and the schedule for the performance of the Tenant's Work are subject to Landlord's approval pursuant to the procedures provided in the Tenant's Work Agreement. Tenant will be obligated to proceed with construction of Tenant's Work subject to the requirements of <u>Section 9.2</u> and the Tenant's Work Agreement. Landlord's approval of any plans, specifications or drawings will not constitute a representation by Landlord that such items comply with applicable Laws or other requirements; any deficiency in design or construction, although approved by Landlord, are and will be the sole responsibility of Tenant.

2.5    <u>Completion of Tenant's Work</u>. Tenant will make timely submissions to Landlord for Landlord's approval of any plans, drawings or specifications and will diligently perform and substantially complete Tenant's Work in accordance with the Tenant Work Agreement.

3.    <u>Term</u>.

3.1    <u>Commencement Date</u>.

3.1.1    The term of this Lease (**"Term"**) will commence on the Effective Date (**"Commencement Date"**) and will expire at 11:59 p.m. on the day preceding the fifteenth anniversary of the Commencement Date, unless the Commencement Date is not the first day of a calendar month, in which case the Term will expire on the last day of the month in which the fifteenth

anniversary of the Commencement Date occurs (in either case, the **"Expiration Date"**), unless sooner terminated in accordance with, the terms and conditions of this Lease.

        3.1.2    Intentionally Omitted

        3.1.3    If the Term is renewed, **"Expiration Date"** means the expiration date of the then current renewal term.

        3.1.4    It is Tenant's responsibility to obtain any necessary federal, state or local permits and inspections (including Department of Health inspections) required for Tenant's occupancy of the Premises. Any delay in Tenant's receipt of such permits and approvals will not delay the Commencement Date of the Lease or the date upon which Rent begins to accrue.

        3.2    <u>Renewal</u>. Tenant will have the right to extend the Term for 2 additional, consecutive periods of 5 years each on the same terms and conditions as herein set forth, except as expressly provided herein to the contrary. To exercise this right to extend the Term, Tenant must have provided its notice to Landlord no later than 270 days prior to the last day of the Term, as extended, time being of the essence. As a condition precedent to the extension of the Term, however, there must not be at the time of the exercise any material default by Tenant for which notice has been given and for which the applicable cure period has expired. Such renewal(s) will be on all of the terms and conditions of the Lease except that the Base Rent will increase by 3% per square foot over the Base Rent per square foot for the immediately preceding Lease Year.

        3.3    Landlord and Tenant have executed this Lease, but this Lease will not be deemed delivered and effective until so determined in accordance with this Section 3.3. Ambrosia of Pennsylvania, Inc., a Pennsylvania corporation ("Ambrosia"), the present owner of 100% of the ownership of Tenant, is negotiating an Equity Purchase Agreement ("EPA") pursuant to which it would sell to Praesum Health Allegheny, LLC, a Delaware limited liability company ("Praesum"), its 100% ownership interest in Tenant. Tenant has indicated to Landlord that **the** closing of the purchase and sale under the EPA ("Closing") is conditioned on Praesum's receipt of a fully executed, delivered and enforceable copy of this Lease and of the NDA(s) described in paragraph 11, and Landlord and Tenant agree that the Closing is also a condition to the delivery of this Lease. Tenant will, promptly after Closing has occurred deliver to Landlord by electronic mail to louis.lagios@statesidecp.com notice that Closing has occurred and the Advance Rent Payment Amount by wire transfer in accordance with written instructions provided by Landlord (collectively, "Closing Notice"). Tenant has executed and delivered to Landlord the Guaranty Agreement. The Lease and Guaranty Agreement shall be deemed to have been delivered on the date of the Closing Notice, and upon delivery of the Closing Notice to Tenant, (i) each of Landlord and Tenant will write such date as the Effective Date in the first paragraph of the Lease in its possession and (ii) Landlord will insert such date in the first paragraph and first recital paragraph of the Guaranty Agreement and promptly send to Tenant a photocopy thereof in pdf format by electronic mail. If Tenant has not delivered the Closing Notice by 6 pm ET on August 31, 2023, this Lease and the Guaranty Agreement will, at the option of Landlord or Tenant by written notice to the other party at any time before the Closing Notice has been delivered, be void and of no further force and effect.

    4.    <u>Base Rent</u>.

        4.1    <u>Rent Commencement; Payment</u>. Tenant's obligation to pay Rent commences on the Commencement Date. Base Rent is payable by Tenant in equal monthly installments on or before the first day of each calendar month, in advance. All payments of Base Rent and Additional Rent are obligated to be made without prior demand and without offset, deduction or counterclaim of any kind, in lawful money of the United States of America. Such payments must be made by ACH

or domestic wire to an account designated by Landlord. The payment of Rent is an independent covenant of Tenant under this Lease. Tenant has contemporaneously paid to Landlord the Advance Rent Payment Amount.

        4.2     Late Charges. If Tenant fails to pay any Base Rent or Additional Rent within ten days after the date due and payable, such unpaid amounts will be subject to a late payment charge equal to 5% of the unpaid amounts in each instance. Such late payment charge has been agreed upon by Landlord and Tenant, after negotiation, as a reasonable estimate of the additional administrative costs and detriment that will be incurred by Landlord as a result of any such failure by Tenant, the actual costs thereof being extremely difficult if not impossible to determine. The late payment charge constitutes fair and reasonable compensation to Landlord for its damages resulting from such failure by Tenant to pay timely and the late payment charge must be paid to Landlord together with such unpaid amounts.

        5.     HVAC and Utilities.

        5.1     Utilities. All utility services provided to the Premises are separately metered. Tenant shall pay for all utilities consumed at the Premises, directly to the utility providers.

        5.2     Interruption of Service. Landlord will not be liable for any interruption or delay of electricity or any other utility service or interruption of elevator service for any reason, unless caused by the gross negligence or intentional misconduct of Landlord or its agents. Furthermore, Tenant acknowledges that the services that Landlord has agreed to provide pursuant to this Lease may be subject to certain slowdowns, interruptions and stoppages for various reasons not within the reasonable control of Landlord, including, without limitation, the following: voluntary agreements between Landlord and Governmental Bodies; maintenance, repair, replacement or alteration of any equipment involved in furnishing such services; fire or other casualty, emergency, accident or act of God; strikes, lockouts, labor controversies; fuel or utility shortages or unavailability of parts, material or labor; and other causes not within the reasonable control of Landlord. In furtherance and not in limitation of the foregoing, no such slowdown, interruption or stoppage of services will (a) impose any liability on Landlord or give rise to any claim for damages against Landlord (including, without limitation, any claim for damages by reason of loss of profits, business interruption or other consequential damages); (b) constitute a default by Landlord under this Lease or relieve Tenant from the performance of its obligations under this Lease; (c) entitle Tenant to any abatement or reduction in Rent, or (d) give rise to a claim in Tenant's favor that such absence or services constitutes actual or constructive eviction or renders the Premises untenantable; *provided, however,* Rent shall abate if such disruption occurred due to the gross negligence or intentional misconduct of Landlord or its agents.

        5.3     Remedies for Interruption. Provisions herein to the contrary notwithstanding, (i) if there is a utility or elevator outage issue or material window or roof leaks and continues for more than one day with respect to any utility or two consecutive days for other issues then Rent shall equitably abate in proportion to the interference with Tenant's business; (ii) in the event of any interruption in utility or elevator service, Landlord will endeavor to have the appropriate person in the Premises within 4 hours, if during normal business hours and as soon as possible if outside of normal business hours , of Tenant having given notice to Landlord of such interruption to cause the interruption to be remedied; (iii) in the event of any interruption in HVAC service which has not been remedied within 12 hours of Tenant having given notice to Landlord, Landlord will use its best efforts to provide, at its cost and, install in the Premises portable units in a quantity sufficient for Tenant to continue to conduct its business in the ordinary course for so long as the HVAC system is not working at full capacity so long as the temperature warrants it; and (iv) in the event of any interruption in any utility service or the operation of the elevators, Landlord will promptly, to the extent reasonably

possible, after receiving notice of the interruption engage the persons appropriate to remedy the cause of the interruption and diligently pursue having such cause remedied.

    6.    <u>Additional Rent for Operating Expenses and Real Estate Taxes</u>.

    6.1    <u>Definitions</u>. For purposes of this Lease, the following terms have the following meanings:

    6.1.1    **"Real Estate Taxes"** means all real estate taxes and assessments, general or special, ordinary or extraordinary, foreseen or unforeseen (other than Lease Taxes) assessed or imposed upon the Premises. If, due to a future change in the method of taxation, any franchise, income, profit or other tax, however designated, is levied or imposed in substitution, in whole or in part, for (or in lieu of) any tax or addition to or increase in any tax which would otherwise be included within the definition of Real Estate Taxes, then such other tax will be deemed to be included within Real Estate Taxes. The Premises is a separate tax parcel. Real Estate Taxes shall not include inheritance, gift, transfer, franchise, excise, net income and profit taxes or capital levies imposed on Landlord. If at any time after the date hereof, the methods of taxation should be altered so that in lieu of or as a substitute for the whole or any part of the Real Estate Tax now levied, assessed or imposed on real estate as such, there shall be levied, assessed or imposed (i) a tax on the Rents received from such real estate, (ii) a license fee measured by the Rents receivable by Landlord from Tenant, (iii) a tax or license fee imposed upon Landlord which is otherwise measured by or based in whole or part upon the Premises, or (iv) an income or franchise tax, the same will be included in the computation of Real Estate Taxes, computed as if the amount of such tax or fee so payable were that amount due if the Premises were the only property of Landlord subject thereto.

    6.1.2    **"Operating Expenses"** means the costs and expenses paid or incurred by Landlord (consistently applied during each year and from year to year) in connection with the management, administration, operation, maintenance and repair of the Premises including, without limitation:

    (a)    the cost of maintenance and repair including mechanical, elevator and other building systems and the cost of supplies and equipment and maintenance and service contracts in connection therewith including without limitation all utilities to the Parking Lot;

    (b)    the cost of repairs, replacements and maintenance and trash removal (Tenant will be responsible for cleaning and janitorial services);

    (c)    insurance premiums, including the cost of fire, extended coverage, boiler, sprinkler, apparatus, public liability, property damage, earthquake and other insurance as Landlord carries, and including claims paid within deductible limits, and self-insurance retention levels or loss reserves paid by Landlord;

    (d)    wages, salaries, payroll taxes and other labor costs and employee benefits of all on-site employees, and all off-site employees to the extent engaged in the operation, management, maintenance and repair of the Property including, without limitation, taxes, insurance, retirement, medical and other employee benefits; provided, however, such costs shall only be includable in Operating Expenses to the extent they reflect the proportionate time actually spent providing includable services to the Premises;

(e)　　fees, charges and other costs including, without limitation, property management fees, consulting fees, attorneys' fees and accounting fees of all contractors engaged by Landlord in connection with the Property, and all such fees, charges or other costs charged by Landlord if Landlord performs management services in connection with the Property;

(f)　　the cost of any capital improvements made to the Premises after the date of this Lease intended to effect economies in the operation or maintenance of the Premises (depreciated over the useful life of such capital improvements);

(g)　　the cost of any capital improvements made to the Premises after the date of this Lease that are required under Law that was not applicable to the Premises at the date of this Lease (depreciated over the useful life of such capital improvements);

(h)　　the cost of supplies, materials, equipment and tools used in the management, operation, maintenance and repair of the Property including, without limitation, any rental fees;

(i)　　all costs and fees for licenses, inspections or permits that Landlord may be required to obtain;

(j)　　exterior and interior landscaping, cost to maintain and repair sidewalks, walkways, parking areas and driveways, exterior lighting, paving and striping, snow and ice removal;

(k)　　expenses incurred for maintenance of artwork, streetscaping and similar enhancements of the Property;

(l)　　fees, costs and disbursements incurred in connection with proceedings to contest, determine, or reduce Operating Expenses or Real Estate Taxes;

(m)　　use and occupancy taxes;

(n)　　the Premises Proportionate Share of Parking Lot Costs. The **"Premises Proportionate Share"** shall be a fraction, the numerator of which is the number of rentable square feet in the building that is part of the Premises, which Landlord and Tenant agree is 29,150 rentable square feet, and the denominator of which is the total number of rentable square feet in the building that is part of the Premises and the building on the MOB. **"Parking Lot Costs"** shall mean the costs described in <u>Section 6.1.2</u> (as limited by <u>Section 6.1.3</u>) which are attributable to the Parking Lot; and

(o)　　the cost of other items that under standard accounting practices constitute operating or maintenance costs are allocable to the Property or any portion of the Property. In the cases of those costs that benefit the Property and other property, or benefit portions of a development or campus of which the Property is a part, the amount of such costs to be included in Operating Expenses will be such amounts as Landlord determines to be allocable to the Property.

6.1.3　　Operating Expenses **will not include**:

(a)　　leasing commissions, accountants' or attorneys' fees, costs and disbursements and other expenses incurred in connection with proposals, negotiations or disputes with tenants or other occupants or prospective tenants or other occupants, or associated with the

enforcement of any leases or the defense of Landlord's title to or interest in the Property or any part thereof;

(b)  depreciation except as set forth in Section 6.1.2;

(c)  except as provided in this Lease with regard to capital expenditures and any other expense that under generally accepted accounting principles and practices would not be considered a maintenance or operating expense;

(d)  interest or penalties for late payments;

(e)  Management fees in excess of 4% of Base Rent;

(f)  Wages, salaries, fees and fringe benefits paid to (i) administrative, executive personnel or officers of Landlord and (ii) partners, shareholders, or directors of Landlord or of Landlord's managing agent above the grade of building manager;

(g)  Violations of legal requirements in the construction of the Premises or in the Premises equipment;

(h)  The cost of any repair made by Landlord because of any fire or other casualty or the total or partial destruction or condemnation of any portion of the Premises to the extent Landlord receives compensation therefor through insurance or condemnation proceeds;

(i)  Any cost for which Landlord is reimbursed by insurance proceeds, warranties, service contracts, condemnation proceeds or otherwise;

(j)  Any Operating Expense representing an amount paid to Landlord, any owner or officer of Landlord, or any entity or person which is directly or indirectly related or affiliated to Landlord which is in excess of the amount which would be paid in the absence of such relationship, or which exceeds arms-length competitive prices paid for similar services or goods;

(k)  Costs or expenses necessitated by or resulting from the gross negligence of Landlord, its agents or employees;

(l)  Reserves for repairs, maintenance and replacements;

(m)  Costs incurred to remove any hazardous or toxic wastes, materials or substances from either the Property;

(n)  Acquisition of "Fine Art";

(o)  Costs or expenses incurred in connection with any bankruptcy proceedings;

(p)  Except as set forth in Section 6.1.2, the cost to replace any components of the elevators, HVAC and utility systems, the roof of the building, or any element of the building structure which would be considered capital improvements; and

(q)  Financing costs, including attorneys' fees and costs, title insurance premiums, and recording costs.

10

6.2     Payment of Real Estate Taxes. Landlord shall deliver to Tenant promptly following receipt of the tax bill for the Premises, and Tenant shall pay to Landlord the amount of the tax due within 30 days of receipt of the tax bill, whether or not this Lease has terminated.  To the extent this Lease is in effect for less than the applicable real estate tax period, the amount due from Tenant shall be *pro rated* based on the actual number of days that this Lease is in effect, divided by 360. Tenant may, at its option, upon the receipt of prior written approval of Landlord, such approval not to be unreasonably withheld, contest any Real Estate Taxes against the Premises and attempt to obtain a reduction in the assessed valuation of the Premises for the purpose of reducing any such assessment, provided that Tenant may not contest any such Real Estate Taxes if either Landlord or the fee owner of the Premises is contesting the same.  In the event Landlord approves and upon the request of Tenant, but without expense or liability to Landlord, Landlord shall cooperate with Tenant and execute any document which may be reasonably necessary and proper for any proceeding at no cost to Landlord , provided that Tenant may not contest any such Real Estate Taxes if either Landlord or the fee owner of the Premises is contesting the same In the event Landlord desires to contest the Real Estate Taxes due on the Premises, Tenant agrees to cooperate with Landlord and execute any document which may be reasonably necessary and proper for any proceeding at no cost to Tenant

6.3     Payment of Operating Expenses, Landlord's Books.

6.3.1     Beginning on the Commencement Date and continuing on the first day or each calendar month thereafter during the Term, Tenant will pay to Landlord, as Additional Rent, by ACH or domestic wire to an account designated by Landlord, 1/12th of Tenant's Proportionate Share of Operating Expenses for each calendar year, in advance, in an amount reasonably estimated by Landlord in good faith and billed by Landlord to Tenant. Landlord will have the right to revise such estimate from time to time. Within 120 days after the expiration of each such year, Landlord will furnish Tenant with a statement ("**Landlord's Operating Expense Statement**") setting forth the actual amount of Operating Expenses for such year and Tenant's Proportionate Share of such Operating Expenses. If the actual amount of Tenant's Proportionate Share of Operating Expenses due for such year differs from the estimated amount of Tenant's Proportionate Share of Operating Expenses paid by Tenant for such year, then, if Tenant owes any amounts to Landlord, such amounts must be paid by Tenant (whether or not this Lease has terminated) within 30 days after receipt of Landlord's Operating Expense Statement, and if Landlord owes any amounts to Tenant, such amounts will be credited against the next installments of Base Rent and Additional Rent due from Tenant (or if the Lease has terminated for any reason other than Tenant's default, paid to Tenant within 30 days after delivery of Landlord's Operating Expense Statement).

6.3.2     Landlord will maintain books and records showing Operating Expenses and Real Estate Taxes in accordance with sound accounting and management practices. Landlord will maintain in such books and records for Operating Expenses such books and records for Operating Expenses for the Premises and separately for Parking Lot Costs. Tenant or its representative will have the right, within one hundred eighty (180) days after receipt of an annual statement, to examine Landlord's books and records showing Operating Expenses and Real Estate Taxes once each Lease Year during normal business hours upon reasonable prior notice. Unless the Tenant should take written exception to any item within 60 days after completion of such examination, Tenant will be deemed not to have discovered any issue. However, if such examination uncovers any over-payment or over-charge of Operating by Tenant in excess of 5%, then in addition to prompt remittance of such over-payment, Landlord shall reimburse Tenant for the actual and reasonable costs and expenses of such examination paid to pay a third-party vendor.

11

7.    Use; Compliance With Law.

7.1    Permitted Use. Tenant will use the Premises only for the Permitted Use and for no other purpose. Tenant must comply in all material respects with all Laws relating to the use, condition, access to, and occupancy of the Premises and will not commit waste, overload the structure of the Premises or the systems of the Premises or subject the Premises to use that could damage the Premises. Tenant represents that it is (and at all times during the Term will be) licensed to conduct the business contemplated and carried on in the Premises. Tenant will use its reasonable best efforts to maintain at all times, at Tenant's sole cost and expense, all permits and licenses. The Premises may not be used for any use which is disreputable, creates fire hazards or results in an increased rate of insurance on the Premises or its contents, or for the storage of any Hazardous Materials (other than typical medical or office supplies and then only in material compliance with all applicable Laws). Except as is customary in connection with the conduct of the Permitted Use, Tenant may not suffer, allow or permit any offensive or obnoxious vibration, noise, odor or other undesirable effect to emanate from the Premises, or any machine or other installation in the Premises.  However, if it is determined that Tenant has not complied with any Laws in a material fashion, then, upon notice by Landlord, Tenant will address those issues promptly.

7.2    Prohibited Uses. Anything in this Lease to the contrary notwithstanding:

7.2.1    Tenant may not allow, suffer or permit the Premises or any use of the Premises to constitute a nuisance or interfere with the safety of the Premises or the Parking Lot, or unreasonably interfere with the comfort or enjoyment of the Parking Lot by Landlord or any others lawfully in, upon or about the  Parking Lot or the Premises or its environs.

7.2.2    Tenant may not keep, use or sell or offer for sale on the Premises any article, or conduct any activity that may be prohibited by standard forms of fire and all risk insurance policies or that would likely increase the cost of insurance upon the Premises or the Property. Tenant will be obligated to pay any increased insurance costs as a result of its activities.

7.2.3    Tenant may not place any additional locks upon any doors of the Premises or permit any duplicate keys to the existing locks to be made, except with the prior written approval of Landlord.

7.2.4    The uses set forth in Schedule 7.2.4 attached to this Lease and made a part of this Lease are not permitted in the Premises without Landlord's prior written consent in its sole discretion.

7.3    Compliance with Laws, Lease and Matters of Record.

7.3.1    Tenant, at Tenant's expense, will be obligated to comply with, and to cause all of Tenant's contractors, agents, servants, employees and licensees to comply with, all Laws applicable to the Premises or the use or occupancy of the Premises, and of all matters of record. Without limiting the generality of the foregoing, Tenant must comply with the requirements of: (a) the Occupational Safety and Health Act (and all regulations promulgated thereunder) and (b) the Americans with Disabilities Act (and all regulations promulgated thereunder as the same may be amended from time to time, collectively, the "**ADA**"). The ADA may require, among other things, that the Premises and any fixtures in the Premises be designed to remove architectural barriers that the Premises will be readily accessible to people with disabilities, on the same basis as the Premises are accessible to those without such disabilities. The foregoing obligation of Tenant will not, however, permit Tenant to make, without Landlord's prior written approval, any alterations to the Premises that otherwise would require Landlord's approval under this Lease, and Tenant will be obligated to comply

12

and to bear the expense with all of the requirements of this Lease in making any such alterations. However, if it is determined that Tenant has not complied with any Laws in a material fashion, then, upon notice by Landlord, Tenant will address those issues promptly.

       7.3.2    Notwithstanding the foregoing, Landlord shall be responsible for ensuring that the Premises and Parking Lot are in accordance with the ADA requirements as of the Commencement Date, except where compliance is not legally required, i.e., grandfathered.

      7.4    <u>Hazardous Materials</u>.

       7.4.1    **"Hazardous Substance"** means any hazardous or toxic substance, material or waste which is or becomes regulated by any Governmental Body having jurisdiction. The term **"Hazardous Substance"** includes, without limitation, any material or substance which is: (a) designated as a "hazardous substance" pursuant to Section 311 of the Federal Water Pollution Control Act (33 U.S.C. Section 1317), (b) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.* (42 U.S.C. Section 6903); (c) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 *et seq.* (42 U.S.C. Section 9601); (d) petroleum, (e) asbestos or asbestos-containing materials; or (f) hazardous, chemotherapeutic and infectious waste and other hazardous substances, as such terms are defined in 25 Pa. Code 261.3 and 271.1, and any amendments thereto or successor regulations.

       7.4.2    Tenant will not cause or suffer or allow any Hazardous Substances to be brought upon, kept, used, discharged, deposited or leaked in or about the Premises or the Property by Tenant or any of Tenant's contractors, employees or invitees or by anyone in the Premises (other than Landlord or its agents, employees or contractors), except to the extent such Hazardous Substances are customarily kept or used in connection with the Permitted Use and which are used, stored, handled and disposed of in compliance with applicable Law. If the obligations imposed by the preceding sentence are breached, or if the presence of any Hazardous Substance on the Premises or the Property caused or suffered or permitted by Tenant or any of Tenant's contractors, employees or invitees or by anyone in the Premises (other than Landlord or its agents, employees or contractors) results in contamination of the Premises or the Property, then Tenant will indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities, expenses and losses (including, without limitation, diminution in value of the Premises or the Property, damages for the loss or restriction on use of leasable space or of any amenity of the Premises, damages arising from any adverse impact on marketing of space and sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees) that arise during or after the Term as a result of such contamination. This indemnification will include, without limitation, costs incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work required by any Governmental Body because of any Hazardous Substance present in the soil or groundwater on or under the Premises or the Property. The obligations of Tenant in this <u>Section 7.4.2</u> will not be limited by any other provision of this Lease.

       7.4.3    <u>Red-Bag Waste</u>.

       (a)    Without limiting the provisions of this <u>Section 7</u>, Tenant acknowledges that the terms Hazardous Substances include, without limitation, infectious waste and other such waste materials from medical activities ("**red bag waste**"). It is the responsibility of Tenant at its sole cost and expense, to handle and dispose of red bag waste generated, used, stored, handled or disposed of at or from the Premises. Tenant covenants that its generation, use, storage, handling and disposal of all such red bag waste will be in accordance in all material respects with all applicable

Laws.) However, if it is determined that Tenant has not complied with any Laws in a material fashion, then, upon notice by Landlord, Tenant will address those issues promptly.

(b)    If Tenant disposes of red bag waste in the general trash for the Premises or the Parking Lot or otherwise improperly disposes of red bag waste, then in addition to Landlord's other remedies, Landlord may charge to Tenant all fines, penalties and costs imposed on or incurred by Landlord in connection with such improper disposal.

7.4.4    The provisions of this Section 7 will survive the expiration or earlier termination of this Lease.

7.5    Landlord's Warranty of Use. Landlord warrants and represents, to the best of its knowledge, that there is no provision which would restrict Tenant's conduct of the Permitted Use in the Premises (i) in any lease for premises in the MOB or (i) in any recorded instrument.

8.    Alterations and Tenant's Property.

8.1    Alterations Defined. Tenant may not make or suffer or allow to be made any alterations, additions or improvements in or to the Premises including Tenant's Work ("**Alterations**") without first obtaining Landlord's written consent based on detailed plans and specifications submitted by Tenant, which consent will not be unreasonably withheld. If the Alterations are Tenant's Work, then Tenant's submission must also comply with all Lease requirements specific to Tenant's Work. However, Landlord's consent will not be required if the proposed Alterations (a) would cost less than $250,000 or (b) will not affect the structure or systems of the Premises. In the case of Alterations which affect the structure or systems of the building that is part of the Premises, Landlord may charge Tenant a fee not to exceed $500 to reimburse Landlord for the cost of revisions to Landlord's documentation for the Premises or such building, such fee to be paid by Tenant within 30 days of its receipt of an invoice. Notwithstanding any of the above, if Landlord's ability to provide HVAC or other utilities to the premises is impaired due to non-approved Alterations, Landlord shall have no liability to Tenant for the impaired performance, and Tenant shall pay for any changes that need to be made to accommodate the non-approved Alterations and permit Landlord to provide the required utilities.

8.1.1    For all Alterations where Landlord's consent is not required, Tenant may not undertake any such Alterations without first giving Landlord at least 30 days written notice of Tenant's intent to undertake such Alterations. That notice must include a work schedule, a detailed description of the Alterations (which must consist only of Premises standard materials maintained or prescribed by Landlord) and the names of the contractors who will be installing the Alterations on Tenant's behalf.

8.1.2    Landlord will have the right to approve, but not unreasonably withhold such approval Tenant's contractors for Tenant's Work or Alterations to be approved by Landlord. Landlord may ban from the Premises any contractor who has not been approved by Landlord for the Alterations or Tenant's Work which such contractor is intended to perform based on prior unsatisfactory or poor performance in the greater Philadelphia (Delaware Valley) area. Prior to engaging any contractors for Tenant's Work or Alterations that requires approval by Landlord, Tenant will review Landlord's list of approved contractors for the Campus and reasonably consider utilizing one of such contractors. If Tenant does not wish to utilize any of the approved contractors for the Campus, then Tenant will be obligated to provide to Landlord the identity of its contractor and such other information regarding its contractor(s). Landlord will determine, in its sole but reasonable discretion, whether Tenant's contractor(s) is acceptable to Landlord for performing Tenant's Work or Alterations in the Premises. Tenant may not use a contractor for Tenant's Work or Alterations who

14

has not been approved by Landlord as set forth in this Lease. Furthermore, all contractor(s) and their subcontractors utilized by Tenant for Tenant's Work or Alterations must not create disharmony at the Property. As Landlord has approval rights over Tenant's contractors, Tenant is advised that it should not enter into any agreements with contractors who have not been approved by Landlord for the specific Tenant's Work or Alterations Tenant intends to have such contractor perform. Landlord is not responsible for claims from Tenant or its contractors due to Landlord's disapproval of such contractor(s) for the Tenant's Work or Alterations

8.1.3  All Alterations must comply with all applicable Laws, including changes required to be made to the Premises to conform the Premises to existing code requirements based on the installation of the Alterations.

8.2  <u>Removal of Property</u>. All Alterations will become the property of Landlord and will be surrendered to Landlord upon the expiration or earlier termination of this Lease; *provided, however*, that this provision will not apply to movable equipment, trade fixtures, personal property or furniture which are owned by Tenant ("**Tenant Owned Property**"). Tenant will not be required remove any such Alteration at the expiration or earlier termination of this Lease. Tenant must repair at its sole cost and expense all damage to the Premises, the Parking Lot or Property caused by removal of any Alterations or Tenant Owned Property. Any Tenant Owned Property not removed from the Premises at the expiration or earlier termination of this Lease will, at Landlord's option, become the property of Landlord, or Landlord may remove them and Tenant will be obligated to pay to Landlord the reasonable cost of removal, storage and disposition thereof. Tenant's obligations under this Section will survive the expiration or earlier termination of the Term of this Lease. Notwithstanding anything contained in this <u>Section 8.2</u> to the contrary, under no circumstances will Tenant be obligated to remove any of Tenant's Work performed in connection with Tenant's initial occupancy of the Premises.

9.  <u>Repairs and Maintenance</u>.

9.1  <u>Landlord's Obligations</u>.

9.1.1  Except as specifically set forth in <u>Section 9.1.2</u> or <u>9.1.3</u>, throughout the Term, Tenant, at its sole cost and expense, must keep and maintain the Premises in good order and condition, free of accumulation of dirt and rubbish, and must promptly make all non-structural repairs necessary to keep and maintain such good order and condition. Within a reasonable time after written notice from Tenant, Landlord will repair Premises standard removable items (for example, lights, ballasts, tubes, ceiling tiles, or outlets) within the Premises provided that the necessity for such repair or replacement is not due to Tenant's negligence, willful misconduct or breach of this Lease, in which case the coat of such repairs must be paid by Tenant. Landlord will have no responsibility for non-Premises standard items. If any of the Premises or Parking Lot systems have been altered to accommodate Tenant's Permitted Use or if any specialized systems have been installed into the Premises by or on behalf of Tenant or in connection with Tenant's Permitted Use, then Tenant will be responsible for all costs and expenses necessary or desirable to maintain same. If requested by Tenant, provided Tenant is not in default under this Lease, Landlord will make such repairs to the Premises within a reasonable time of notice to Landlord and will charge Tenant for such services at Landlord's standard rate (such rate to be competitive with the market rate for such services). When used in this <u>Section 9</u>, the term "repair" or "repairs" includes replacements and renewals when necessary. All repairs made by Tenant must utilize materials and equipment that are at least equal in

quality and usefulness to those originally used in constructing the Premises, and Tenant must obtain a waiver of mechanics' liens in connection with all such Alterations.

9.1.2    Landlord, throughout the Term of this Lease and at Landlord's sole cost and expense, will make all necessary repairs to the footings and foundations and the structural steel columns and girders forming a part of the Premises.

9.1.3    Landlord will maintain in good operating condition the elevators, all HVAC, plumbing and electric systems serving the Premises and the Parking Lot. Landlord's cost for HVAC, electric and plumbing service, maintenance and repairs, as limited under Section 6 with respect to capital expenditures, if any, will be included as a portion of Operating Expenses as provided in Section 6.

9.1.4    Landlord, throughout the Term of this Lease, will make all necessary repairs to the outside of the Premises and the Parking Lot, including the roof, walls, exterior portions of the Premises and the Parking Lot, utility lines, equipment and other utility facilities in the Premises and Parking Lot, and to any driveways, sidewalks, curbs, loading, parking and landscaped areas, and other exterior improvements for the Premises or the Parking Lot; *provided, however*, that Landlord will have no responsibility to make any repairs unless and until Landlord receives written notice of the need for such repair from Tenant or Landlord has actual knowledge of the need to make such repair. Tenant will be obligated to pay Tenant's Proportionate Share of the cost of all repairs, as limited under Section 6 with respect to capital repairs, to be performed by Landlord pursuant to this Section 9.1.4, as Additional Rent as provided in Section 6.

9.1.5    Landlord will keep and maintain the Parking Lot, and any sidewalks, parking areas, curbs and access ways of the Property, in a reasonably clean and good condition, free of accumulation of dirt, rubbish, snow and ice, and will keep and maintain all landscaped areas in a reasonably neat and good condition. Tenant will pay Tenant's Proportionate Share of the cost of all work to be performed by Landlord pursuant to this Section 9.1.5, as Additional Rent as provided in Section 6. Landlord's obligation to provide snow removal services will be limited to any exterior parking areas and the sidewalks in the Parking Lot.

9.1.6    Notwithstanding anything in this Lease to the contrary, repairs to the Premises, the Parking Lot or other parts of the Property made necessary by an act or omission of Tenant or any employee, agent, contractor, or invitee of Tenant will be made at the sole cost and expense of Tenant, except to the extent of insurance proceeds received by Landlord.

9.1.7    If any work to be performed in the Premises or the Parking Lot necessitates the shutdown of any portion of the Premises or Parking Lot systems and therefore requires the services of any mechanical maintenance personnel, then Tenant will be obligated to pay to Landlord, within ten days of Landlord's demand, all costs and expenses associated with such mechanical maintenance personnel.

9.2    Conditions Applicable to Repairs and Other Work.

9.2.1    All Alterations made by or on behalf of Tenant must be made and performed: (a) at Tenant's cost and expense; (b) by contractors or mechanics approved by Landlord; (c) at least equal in quality of materials and workmanship to the original work or installation; (d) in accordance with the Premises and Parking Lot Rules and Regulations adopted by Landlord from time to time; (e) in accordance with all applicable Laws applicable to the Premises; and (f) in respect of

16

Tenant's Work and any Alterations requiring Landlord's consent, a requirement that Tenant furnish Landlord with as-built drawings upon completion of the work).

9.2.2    Tenant must immediately remove or cause the removal from the Premises and Property of any of Tenant's contractors or subcontractors if the presence of any such contractors or subcontractors causes or results in picketing, leafleting, physical obstruction, work stoppages, commotions or disturbances in or at, or in any way disrupts the operations of, the Campus (collectively referred to as "**Disruptions**"). Landlord will have all remedies available at law or in equity to end or remove any Disruptions, including, but not limited to, obtaining preliminary and permanent injunctive relief from any court of competent jurisdiction.

10.    <u>Liens</u>. Tenant must keep the Premises and the Property free from any liens arising out of any work performed or material furnished to or for the Premises by or for Tenant. If Tenant does not, within 30 days following notice of the imposition of any such lien, cause such lien to be released of record by payment or posting of a bond satisfactory to Landlord, Landlord, in addition to all other remedies provided under this Lease, at law or in equity, will have the right (but not the obligation) to cause the lien to be released by such means as Landlord deems proper including, without limitation, payment of the claim giving rise to such lien. All such sums reasonably paid by Landlord and all expenses incurred by it in connection therewith will be considered Additional Rent and must be paid by Tenant within ten days after receipt of written demand.

11.    <u>Subordination</u>. Tenant agrees that this Lease is and will be subject and subordinate at all times to: (a) the lien of any mortgage, deed of trust or other security instrument that may now exist or hereafter be executed in any amount for which the Premises or any portion of the Premises or Landlord's interest or estate in the Premises is specified as security; and (b) all modifications, renewals, supplements, consolidations and replacements of any such mortgage, deed of trust or other security instrument; *provided, however,* such subordination will not be effective unless each such mortgage holder shall enter into a non-disturbance agreement ("**NDA**") with Tenant that is reasonably acceptable to Tenant and that states such mortgage holder shall not interfere with this Lease and Tenant's rights therein. If any mortgage, deed of trust or other security instrument is foreclosed or a conveyance in lieu of foreclosure is made for any reason, Tenant, notwithstanding any subordination, will attorn to and become the tenant of the successor-in-interest to Landlord at the option of such successor-in-interest; *provided, however,* such successor in interest shall enter into an NDA with Tenant as stated above. Landlord has contemporaneously provided to Tenant an NDA from all holders of mortgages and other financing instruments encumbering the Campus and Landlord's leasehold interest in form and content acceptable to Tenant and Landlord.

12.    <u>Inability to Perform</u>. If, by reason of any cause or event beyond Landlord's reasonable control, including, by way of example and not limitation, labor disputes or disturbances, or vandalism, acts of God, war or other hostilities, terrorism, civil commotion, fire, explosion, severe weather, flood, earthquake; voluntary or mandatory compliance with any direction, request, or order of any person having or appearing to have authority in that regard whether for defense or other statutory, governmental, or national purpose or any requisition of materials or services apparently or stated to be for the purpose of defense, domestic or foreign governmental acts, orders or regulations, embargoes, inability or difficulty in obtaining supplies or personnel, equipment, fuel, power or components, or interruption of electricity, communication or transportation, Landlord is unable to furnish or is delayed in furnishing any utility or service required to be furnished by Landlord under the provisions of this Lease, or is unable to perform or make or is delayed in performing or making any installations, decorations, repairs, alterations, additions or improvements required to be performed or made under this Lease, no such inability or delay will impose any liability upon Landlord or its agents or provide Tenant with any right to offset, deduction or abatement of Rent by reason of

17

inconvenience or annoyance to Tenant or by reason of injury to or interruption of Tenant's business, or otherwise.

13.    <u>Destruction</u>.

13.1    <u>Repair</u>. Subject to the provisions of <u>Sections 13.2</u> and <u>13.3 below</u>, if any portion of the Premises or the Parking Lot is damaged by fire, earthquake, flood or other casualty to the extent that such damage renders a portion of the Premises untenantable by Tenant, Landlord will proceed to make such repairs in accordance with <u>Section 13.4</u>.

13.2    <u>Tenant's Right to Terminate</u>. If such damage causes all or any material portion of the Premises to be untenantable by Tenant and, in the opinion of a third party professional, either architect or engineer of Tenant's choosing licensed in the Commonwealth of Pennsylvania,, such damage cannot be repaired within 12 months after the date of the casualty (under a normal construction schedule not requiring the payment of overtime or premium) or, if commenced, such repairs are not completed within 12 months after the date of the casualty, Tenant may terminate this Lease by delivery of written notice to Landlord within, as applicable, (a) 30 days after the date on which Tenant has received the above advice or (b) 14 months after the date of the casualty if by such date the repairs are not substantially completed, *provided, however*, that if such repairs are substantially completed within 30 days after the giving of such notice by Tenant, then such notice will be deemed rescinded and this Lease will remain in full force and effect. Upon termination by Landlord or Tenant pursuant to this Section 13, Rent will be apportioned as of the date of the damage and, provided Tenant is not in default, all prepaid Rent will be repaid to Tenant.

13.3    <u>Landlord's Right to Terminate</u>. If (a) the uninsured portion of any damage to or destruction of the Premises equals or exceeds 25% of the replacement cost of the Premises; or (b) the Term will expire within one year from the casualty to or destruction of the Premises and Tenant fails to extend the Term in accordance with any right expressly granted in this Lease within 30 days after the date of the casualty; or (c) if the Premises or any other material portion of the Property is damaged by fire, earthquake, flood or other casualty and such damage cannot, in Landlord's opinion, be repaired within 12 months after the date of casualty (under a normal construction schedule not requiring the payment of overtime or premium); Landlord may terminate this Lease by delivery of written notice to Tenant within 45 days after the date of the casualty. Upon termination, Rent will be apportioned as of the date of the damage and, provided Tenant is not in default, all prepaid Rent will be repaid to Tenant.

13.4    <u>Extent of Repair Obligations</u>. If this Lease is not terminated, Landlord's repair obligation will extend to the structure of the Premises and the Parking Lot and all improvements (except those constructed or installed by Tenant, if any, including without limitation Tenant's Work and Alterations) in the Premises, and Tenant will repair all other portions of the Premises (including, without limitation, Tenant's Work, Alterations, and Tenant Owned Property). All such repairs must be performed in a good and workmanlike manner, with due diligence, and must restore the items repaired to substantially the same usefulness and construction as existed immediately before the damage. All work by Tenant must be performed in accordance with the requirements of <u>Section 9.2</u>. Notwithstanding anything to the contrary in this Lease, Landlord will not be obligated to expend on such repairs more than the amount of insurance proceeds actually received by Landlord on account of the damage. If this Lease is terminated, the proceeds from any insurance paid by reason of damage to or destruction of the Property or any portion thereof, or any other element, component or property insured by Landlord, will belong to and be paid to Landlord.

13.5    <u>Adjustment of Rent</u>. If a casualty renders all or part of the Premises untenantable, Rent will proportionately abate commencing on the date of the casualty and ending

when the Premises are delivered to Tenant with Landlord's restoration obligation substantially complete. The extent of the abatement will be based upon the portion of the Premises rendered untenantable, inaccessible or unfit for use in a reasonable business manner for the purposes stated in this Lease. The abatement will end on the earlier of (a) the date when the Premises are substantially complete and useable by Tenant in the ordinary course of its operations or (b) the date after the casualty after which the Tenant first uses the previously untenantable portion of the Premises for conduct of its business. Tenant's use of the Premises for its business purposes will be deemed an acknowledgement by Tenant that the Premises are suitable for same and therefore no abatement will apply.

13.6    <u>Mutual Waiver of Subrogation</u>. Notwithstanding anything to the contrary in this Lease, Landlord and Tenant mutually waive their respective rights of recovery against each other and each other's officers, directors, shareholders, members, managers, agents and employees, and Tenant waives such rights against each lender under any mortgage or deed of trust or other lien encumbering the Premises or any portion of the Premises or interest in the Premises, to the extent any loss is or would be covered by fire, extended coverage and other property insurance policies required to be carried under this Lease or otherwise carried by the waiving party, and the rights of the insurance carriers of such policy or policies to be subrogated to the rights of the insured under the applicable policy. Each party will cause its insurance policy to be endorsed to evidence compliance with such waiver.

14.    <u>Insurance</u>.

14.1    <u>Insurance on Tenant's Property; Business Interruption Insurance</u>. Tenant is obligated to procure at its cost and expense and maintain throughout the Term insurance coverage for all risks of physical loss or damage insuring the full replacement value of Tenant's Work, Alterations, Tenant's trade fixtures, furnishings, medications and other perishables, equipment, plate glass, signs and all other items of personal property of Tenant, which will waive coinsurance limitations.

14.2    <u>Tenant's Liability Insurance</u>. Tenant is obligated to procure at its cost and expense and maintain throughout the Term commercial general liability insurance applicable to the Premises with a minimum limit of liability of $5,000,000 per occurrence and annual aggregate, which limit may be satisfied by any combination of primary and excess/umbrella policies. Such commercial general liability insurance must include, without limitation, bodily injury including death, personal injury, products and completed operations, contractual liability applicable to all of Tenant's obligations under this Lease and property damage; statutory workers' compensation insurance, and employer's liability insurance with limits of at least $1,000,000 for bodily injury each accident, $1,000,000 bodily injury by disease each employee and $1,000,000 bodily injury by disease policy limit covering all of Tenant's employees. At Landlord's request from time to time after completion of the fifth Lease Year, Tenant must increase such insurance coverage to a level that is reasonably required by Landlord.

14.3    <u>Builder's Risk Insurance; Worker's Compensation</u>. At all times during the period of construction of Tenant's Work and during any other construction or Alterations by Tenant or Tenant's contractors, Tenant is obligated to maintain, or cause to be maintained Builder's Risk insurance, completed value, non-reporting form, against loss or damage by fire, vandalism and malicious mischief and other such risks as are customarily covered by the so-called "broad form extended coverage endorsement." Said Builder's Risk insurance must contain an express waiver of any right of subrogation by the insurer against Landlord, its agents, employees and contractors. However, the above requirements in this Section 14.2 will not apply to the performance of any alterations not requiring the consent of Landlord under Section 8.1. At all times during the period of construction of Tenant's Work or other Alterations or construction, Tenant's contractors and subcontractors are

19

obligated to maintain in effect statutory workers' compensation as required by Pennsylvania. For all Alterations, all contractors utilized by Tenant must carry a general liability policy of at least $1,000,000 per occurrence and name Landlord as additionally insured.

14.4 <u>Form of Policies</u>. Landlord's and Tenant's insurance must be issued by companies of recognized responsibility that are authorized to do business in Pennsylvania, have an AM Best Rating of "A" or its functional equivalent. Tenant will have the right to provide insurance coverage pursuant to blanket policies obtained by Tenant if the blanket policies expressly afford coverage required by this <u>Section 14</u>. All insurance policies required to be carried by Tenant under this Lease (except for workers' compensation insurance) must (a) name Landlord, and any other parties designated by Landlord as additional insureds, (b) as to liability coverages, be written on an "occurrence" basis, (c) provide that Landlord will receive 30 days' written notice before any cancellation or change in coverage, (d) contain a provision that no act or omission of Tenant will affect or limit the obligation of the insurer to pay the amount of any loss sustained and (e) provide for a commercially reasonable deductible. Each such policy must contain a provision that such policy and the coverage evidenced thereby is primary and non-contributing with respect to any policies carried by Landlord. Tenant is obligated to deliver satisfactory evidence of such insurance in the form of insurance certificates including specific required policy endorsements to Landlord on or before the Commencement Date, and thereafter at least 30 days before the expiration dates of expiring policies. At Landlord's request, Tenant must deliver to Landlord copies of policies it is obligated to maintain under this Lease. Notwithstanding the foregoing, if any such insurance required of Tenant expires without having been renewed by Tenant, Landlord will have the option, in addition to Landlord's other remedies, to procure such insurance for the account of Tenant immediately and without notice to Tenant, and the cost of such insurance must be paid to Landlord as Additional Rent. The limits of the insurance required under this Lease will not limit the liability of Tenant.

14.5 <u>Compliance with Insurance Requirements</u>. Tenant will not do anything, or suffer or permit anything to be done, in or about the Premises that invalidates or be in conflicts with the provisions of any property or other insurance policies covering the Premises or the Parking Lot. Tenant, at Tenant's expense, is obligated to comply with, and cause all occupants of the Premises to comply with, all applicable customary rules, orders, regulations or requirements of any board of fire underwriters or other similar body.

14.6 <u>Landlord's Insurance</u>.

14.6.1 Landlord will maintain a standard policy of "special form" property insurance with customary exclusions covering the Premises (including Landlord's improvements in the Premises, if any) for their full replacement value with commercially reasonable limits and deductibles selected by Landlord, but in all events with limits sufficient to prevent Landlord from being deemed a co-insurer under such property insurance.

14.6.2 Landlord will maintain commercial general liability insurance with a minimum limit of liability of at least $5,000,000 per occurrence and annual aggregate.

14.6.3 All costs of insurance carried by Landlord and referred to in this Section or otherwise will constitute Operating Expenses.

14.7 <u>Assumption of Risk</u>. Landlord will not be liable for any damage or damages of any nature whatsoever to persons or property caused by explosion, fire, theft or breakage, vandalism, falling plaster, by sprinkler, drainage or plumbing systems, or air conditioning equipment, by the interruption of any public utility or service, by steam, gas, electricity, water, rain or other substances leaking, issuing or flowing into any part of the Premises, by natural occurrence, acts of the public

enemy, riot, strike, insurrection, war, court order, requisition or order of Governmental Body, or by anything done or omitted to be done by any tenant, occupant or person in the Premises or the Parking Lot, it being agreed that Tenant will be responsible for obtaining appropriate insurance to protect its interests.

15.    <u>Eminent Domain</u>.

15.1    <u>Effect of Taking</u>. If all of the Premises or the Parking Lot is condemned or taken in any permanent manner before or during the Term for any public or quasi-public use, or any permanent transfer of the Premises is made in avoidance of an exercise of the power of eminent domain (each such event a "**taking**"), this Lease will automatically terminate as of the date of the vesting of title as a result of such taking. If a part of the Premises is so taken, this Lease will automatically terminate as to the portion of the Premises so taken as of the date of the vesting of title as a result of such taking. If such portion of the Premises is taken and such taking renders the Premises or the Parking Lot incapable of economically feasible operation as reasonably determined by Tenant, this Lease may be terminated by Tenant, as of the date of the vesting of title as a result of such taking, by written notice to Landlord given within 60 days following notice from Landlord of the date on which said vesting will occur. If this Lease is not terminated as a result of any taking, Landlord will be obligated to restore the Premises and the Parking Lot to an architecturally whole unit; *provided, however,* that Landlord will not be obligated to expend on such restoration more than the amount of condemnation proceeds actually received by Landlord.

15.2    <u>Award</u>. Landlord and Tenant will be entitled in any proceeding for a taking to asset all their respective rights to an award of damages.

15.3    <u>Adjustment of Rent</u>. If a partial taking occurs that does not result in a termination of this Lease as to the entire Premises, Base Rent and Additional Rent will be equitably adjusted in relation to the portions of the Premises taken or rendered untenantable by such taking.

15.4    <u>Temporary Taking</u>. If all or any portion of the Premises is taken for a limited period of time before or during the Term, this Lease will remain in full force and effect; *provided, however,* that Rent will abate during such limited period in proportion to the portion of the Premises taken by such taking. Landlord will be entitled to receive the entire award made in connection with any such temporary taking. Any temporary taking of all or a portion of the Premises which continues for 12 months will be deemed a permanent taking of the Premises or such portion.

16.    <u>Assignment; Subleasing</u>.

16.1    <u>Consent Required</u>. Subject to <u>Section 16.8</u> (Permitted Transfers), neither Tenant nor any sublessee or assignee of Tenant, directly or indirectly, voluntarily or by operation of law, may sell, assign, encumber, pledge or otherwise transfer or hypothecate all or any part of the Premises or Tenant's leasehold estate under this Lease (each such act is referred to as an "**Assignment**"), or sublet the Premises or any portion thereof or permit the Premises to be occupied by anyone other than Tenant (each such act is referred to as a "**Sublease**"), without Landlord's prior written consent in each instance which consent may not be unreasonably withheld, conditioned or delayed. Any Assignment or Sublease that is not in compliance with this <u>Section 16</u> will be void and, at the option of Landlord, will constitute a material default by Tenant under this Lease. The acceptance of Rent by Landlord from a proposed assignee, sublessee or occupant of the Premises will not constitute consent to such Assignment or Sublease by Landlord.

21

16.2    Excess Consideration.

16.2.1    Other than in connection with a Permitted Transfer, 50% of the Excess Assignment Consideration that is attributable to this Lease in connection with any Assignment, and 50% of the Excess Sublease Rent, will be payable to Landlord as Additional Rent.

16.2.2    "**Excess Assignment Consideration**" means an amount, if any, equal to: (a) the consideration whenever paid by any assignee for the assignment, less (b) Tenant's cost of improvements made or paid for by Tenant to satisfy the needs of the assignee, and legal fees, leasing commissions and tenant allowances reasonably incurred by Tenant in connection with such assignment; *provided, however,* Excess Assignment Consideration will not include any amounts received or receivable for the sale of Tenant's business not pertaining to the Assignment of the Lease or any services to be rendered by Tenant.

16.2.3    "**Excess Sublease Rent**" means an amount, if any, equal to: (a)(i) all rent or other consideration for the use of the Premises paid to Tenant by any subtenant, for and during each month less (ii) the portion applicable to such month (when amortized from the date such subtenant commences to pay rent over the remaining Term of the sublease, exclusive of any renewals or extensions) of Tenant's costs of improvements made or paid for by Tenant to satisfy the needs of the subtenant, and legal fees, leasing commissions and tenant allowances reasonably incurred by Tenant in connection with such subletting, less (b)(i) the Monthly Installment of Base Rent for such month plus (ii) such other rent or consideration attributable to such month, which would otherwise be required to be paid by Tenant to Landlord; *provided, however,* Excess Sublease Rent will not include any amounts received or receivable for the sale of Tenant's business not pertaining to the Sublease or any services to be rendered by Tenant. In determining the amount of Excess Sublease Rent with respect to a sublease for less than all of the Premises, the amount of the Monthly Installment of Base Rent to be deducted pursuant to clause (b)(i) of this Section will be determined by multiplying the then applicable square foot rate of the Monthly Installment of Base Rent by the area of the portion of the Premises which has been sublet. The right to such amounts is expressly reserved from the grant of Tenant's leasehold estate for the benefit of Landlord. Tenant will be obligated to use diligent efforts to collect all such amounts. Landlord will have the right from time to time to review Tenant's records relating to any such amounts payable to or received by Tenant.

16.3    Notice. Any request by Tenant for Landlord's consent to a specific Assignment or Sublease must include: (a) the name of the proposed assignee, sublessee or occupant; (b) the nature of the proposed assignee's sublessee's or occupant's business to be carried on in the Premises; (c) a copy of the proposed Assignment or Sublease; and (d) in the event of an assignment requiring Landlord's consent, such financial information (in the event of an Assignment) and such other information as Landlord may request concerning the proposed assignee, sublessee or occupant or its business. Landlord must respond in writing, stating the reasons for any disapproval, within 15 business days after receipt of all information reasonably necessary to evaluate the proposed Assignment or Sublease.

16.4    No Release. No consent by Landlord to any Assignment or Sublease by Tenant, and no specification in this Lease of a right of Tenant to make any Assignment or Sublease, will relieve Tenant of any obligation to be performed by Tenant under this Lease, whether arising before or after (a) the Assignment or Sublease or (b) any extension of the Term (pursuant to exercise of an option granted in this Lease, if any) unless such release is so stated in the Landlord approved assignment document. The consent by Landlord to any Assignment or Sublease will not relieve Tenant or any successor of Tenant from the obligation to obtain Landlord's express written consent to any other Assignment or Sublease.

16.5    Cost of Processing Request; Form of Sublease or Assignment. Tenant will be obligated to pay to Landlord the amount of Landlord's reasonable costs of processing every proposed request for Landlord's consent to an Assignment or Sublease, other than a Permitted Transfer, including, without limitation, legal review fees and expenses, but in any event not more than $1,500 for legal costs and fees for each proposed Assignment or Sublease, provided that there are no unusual legal issues involved and the documents presented do not have the effect of amending this Lease. Tenant will not be obligated to pay any compensation to Landlord in respect of a Permitted Transfer.

16.6    Corporate or Partnership Transfers. Any sale or other transfer including, without limitation, by consolidation, merger or reorganization, individually or in the aggregate of a majority of the voting stock of Tenant or any beneficial interest in Tenant in one or more transactions, if Tenant is a corporation, or any sale or other transfer individually or in the aggregate of a majority of the partnership or membership interests in Tenant or any beneficial interest in Tenant in one or more transactions, if Tenant is a partnership or limited liability company, will be considered an Assignment for purposes of this Lease.

16.7    Assumption of Obligations. Each assignee or other transferee of Tenant's interest under this Lease, other than Landlord, (a) will be obligated to assume all obligations of Tenant under this Lease and (b) will be and remain liable jointly and severally with Tenant for the payment of Base Rent and Additional Rent, and for the performance of all the terms, covenants, conditions and agreements contained in this Lease that are to be performed by Tenant. Each sublessee of all or any portion of the Premises must agree in writing for the benefit of Landlord (i) to comply with and agree to the provisions of this Lease, and (ii) that such sublease (and all further subleases of any portion of the Premises) will terminate upon any termination of this Lease, regardless of whether or not such termination is voluntary. No Assignment or Sublease will be valid or effective unless the assignee or sublessee or Tenant delivers to Landlord a fully-executed counterpart of the Assignment or Sublease and an instrument that contains a covenant of assumption by the assignee or agreement of the sublessee, satisfactory in substance and form to Landlord, consistent with the requirements of this Section 16.7. The failure or refusal of the assignee to execute such instrument of assumption or of the sublessee to execute the agreement described above will not release or discharge the assignee or sublessee from its obligations that would have been contained in such instrument or agreement, all of which obligations will run automatically to such assignee or sublessee.

16.8    Permitted Transfers. So long as there is no uncured default by Tenant under this Lease for which landlord has given notice and the period for cure has expired, if applicable, Tenant may, with reasonable prior written notice to Landlord but without any requirement to obtain Landlord's consent, (a) assign this Lease (including any deemed assignment pursuant to Section 17.6) or sublease or sublicense the Premises to (i) person or entity that controls, is controlled by or is under common control with Tenant that is not an Excluded Person and is not controlled by an Excluded Person, or (ii) any person, firm, corporation or other entity who is the purchaser of all or substantially all of the ownership interests or assets of Tenant or is the successor to substantially all the assets and business of Tenant by virtue of a corporate merger or consolidation of, with or into Tenant, that in each case above is not an Excluded Person and is not controlled by an Excluded Person, and (b) sublease or sublicense the Premises to, or permit the Premises to be occupied by, in whole or in part, any physician practice, that is not an Excluded Person and is not controlled by an Excluded Person, for which Tenant or its affiliate provides business, management, administrative or other support services and to the person or entity described in (a)(i) above (a "**Permitted Transfer**"). A Permitted Transfer will not be subject to the provisions of Section 16.2, but will be subject to all of the other provisions of this Lease. "**Excluded Person**" means a person or entity who is or was a health care provider and who has been identified on the List of Parties Excluded from Federal Procurement and Nonprocurement Programs ("EPLS", located at http://epls.arnet.gov/) by designation of the U.S.

23

Department of Health and Human Services (or its successor agency) or other federal agency declaring that the person or entity is excluded from receiving Federal contracts or certain types of Federal financial and nonfinancial assistance and benefits in any federal health care program including Medicare, Medicaid, CHAMPUS, and any other plan or program that provides health benefits, either directly or through insurance, or otherwise is funded directly in whole or in part by the United States government or a state health care program. Furthermore, **"Excluded Person"** means any person or entity that controls, is controlled by or is under common control with, any Excluded Person as defined in the immediately preceding sentence. No permitted Transfer shall release the Guarantor from its obligations under the Guaranty Agreement.

17.    Default.

17.1    Events Constituting Default. Each of the following constitutes an **"Event of Default"** by Tenant:

17.1.1   If Tenant fails to pay any amount due under this Lease and such failure continues for a period of 5 days after the date of delivery of Landlord's written notice.

17.1.2   If Tenant fails to perform or honor any other covenant, condition or other obligation of Tenant (i.e., other than the obligation to pay amounts due under this Lease) and such failure continues for a period of 30 days after the date of delivery of Landlord's written notice. Notwithstanding the foregoing, Landlord will not be obligated to provide Tenant with notice of defaults or any grace period to cure defaults with respect to (a) the same covenant, condition or obligation more than twice in any 12-month period, or (b) a violation of Tenant's obligation in the first sentence of Section 7.1 more than twice in any 12-month period. Provided, however, if the nature of Tenant's default is such that more than 30 days are reasonably required for its cure, such cure period will be extended for a reasonable period, not to exceed 90 days, if Tenant shall have commenced such cure promptly within said 30 day period and thereafter diligently pursues such cure to completion.

17.1.3   If any representation made by Tenant under this Lease is untrue.

17.1.4   The occurrence of any of the following will, at Landlord's option, constitute an immediate Event of default by Tenant without the right to notice or cure except as expressly set forth in this Section 17.1.4:

(a)    the appointment of a receiver to take possession of all or substantially all of the assets of Tenant or the Premises;

(b)    an assignment by Tenant for the benefit of creditors;

(c)    any action taken or suffered by Tenant under any insolvency, bankruptcy, reorganization, moratorium or other debtor relief act or statute, whether now existing or hereafter amended or enacted;

(d)    the filing of any voluntary petition in bankruptcy by Tenant, or the filing of any involuntary petition by Tenant's creditors, which involuntary petition remains undischarged for a period of 30 days;

(e)    the attachment, execution or other judicial seizure of all or substantially all of Tenant's assets or the Premises, if such attachment, execution or other judicial seizure remains undismissed or undischarged for a period of ten days after the date of the attachment, execution or other judicial seizure;

(f)      the admission of Tenant in writing of its inability to pay its debts as they become due;

(g)      the filing by Tenant of any answer admitting or failing timely to contest a material allegation of a petition filed against Tenant in any proceeding seeking reorganization, arrangement, composition, readjustment, liquidation or dissolution of Tenant or similar relief;

(h)      if within 60 days after the commencement of any proceeding against Tenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future Law, such proceeding has not been dismissed;

(i)      if there is one or more Guarantor, Landlord has not received the Guaranty Agreement within 30 days of execution of this Lease or written demand of Landlord, or

(j)      if there is a default, beyond applicable cure periods, under the Lease between Beacon Point Recovery Center, LLC, an affiliate of Tenant, and Landlord for premises in the MOB which occurs and for which notice has been given to Tenant by Landlord before March 1, 2029.

17.2    <u>Remedies</u>. Upon the occurrence of any Event of Default or at any time thereafter, Landlord may elect to exercise any of its remedies under <u>Section 17</u>, <u>Section 18</u> or any other remedy available at law or in equity. In no event will this Lease be assigned or assignable by operation of law or by voluntary or involuntary bankruptcy proceedings or otherwise, and in no event will this Lease or any rights or privileges under this Lease be an asset of Tenant under any bankruptcy, insolvency or reorganization proceedings. If, upon the occurrence of any Event of Default, under applicable Law Tenant or the trustee in bankruptcy has the right to affirm this Lease and continue to perform the obligations of Tenant under this Lease, Tenant or such trustee, in such time period as may be permitted by the bankruptcy court having jurisdiction, will be obligated to cure all Events of Default of Tenant outstanding under this Lease as of the date of the affirmance of this Lease and provide to Landlord such adequate assurances as maybe necessary to ensure Landlord of the continued performance of Tenant's obligations under this Lease. Notwithstanding anything in this Lease to the contrary, no notice or cure periods for any breach or default of this Lease by Tenant will be given, permitted or required unless expressly provided in this <u>Section 17</u> or Applicable Law.

17.3    <u>Remedies</u>. Upon the occurrence of an Event of Default by Tenant, Landlord will have all of the following rights and remedies in addition to all other rights and remedies available to Landlord at law or in equity:

17.3.1   The right to terminate Tenant's right to possession of the Premises and to recover (a) all Rent that accrued through the date of termination; plus (b) any other amount necessary to compensate Landlord for all the damages caused by Tenant's failure to perform its obligations under this Lease (including, without limitation, attorneys' and accountants' fees, costs of alterations of the Premises, interest costs and brokers' fees incurred upon any reletting of the Premises).

17.3.2   The right to continue the Lease in effect after Tenant's breach and abandonment and recover Rent as it becomes due. Acts of maintenance or preservation, efforts to relet the Premises or the appointment of a receiver upon Landlord's initiative to protect its interest under this Lease will not of themselves constitute a termination of Tenant's right to possession.

25

17.3.3    The right and power to enter the Premises after the expiration of applicable notice periods and under operation of Law, if any, and remove from the Premises all persons and property, to store such property in a public warehouse or elsewhere at the cost of and for the account of Tenant, and to sell such property and apply the proceeds from such sale pursuant to applicable Law. In such event, Landlord may from time to time sublet the Premises or any part of the Premises for such term or terms (which may extend beyond the Term) and at such rent and such other terms as Landlord in its sole discretion may deem advisable, with the right to make alterations and repairs to the Premises. Upon each such subletting, rents received from such subletting will be applied by Landlord, first, to payment of any costs of such subletting (including, without limitation, attorneys' and accountants' fees, costs of alterations of the Premises, interest costs, and brokers' fees) and of any such alterations and repairs; second, to payment of Base Rent and Additional Rent due and unpaid under this Lease; and the residue, if any, will be held by Landlord and applied in payment of future Base Rent and Additional Rent as they become due. If any rental or other charges due under such sublease are not promptly paid to Landlord by the sublessees, or if such rentals received from such subletting during any month are less than Base Rent and Additional Rent to be paid during that month by Tenant, Tenant will be obligated to pay any such deficiency to Landlord the costs of such subletting (including, without limitation, attorneys' and accountants' fees, costs of alterations of the Premises, interest costs and brokers' fees), and any other amounts due Landlord under this Section 17.3.3. Such deficiency will be calculated and paid monthly. For all purposes set forth in this Section 17.3.3, Landlord is irrevocably appointed attorney-in-fact for Tenant, with power of substitution. No taking possession of the Premises by Landlord will be construed as an election on its part to terminate this Lease unless a written notice of such intention is given to Tenant. Landlord's subletting the Premises without termination will not constitute a waiver of Landlord's right to elect to terminate this Lease for such previous breach.

17.3.4    The right to have a receiver appointed for Tenant, upon application by Landlord, to take possession of the Premises, to apply any rental collected from the Premises and to exercise all other rights and remedies granted to Landlord pursuant to Section 17.3.

17.3.5    The right to specific performance of any or all of Tenant's obligations under, and to damages for delay in or failure of such performance.

17.4    Remedies Cumulative. The exercise of any remedy provided at law, in equity or the provisions of this Lease will not exclude any other remedies unless they are expressly excluded by this Lease. Tenant waives any right of redemption or relief from forfeiture following termination of, or exercise of any remedy by Landlord with respect to, this Lease.

17.5    Limitation of Landlord's Liability. None of Landlord's covenants, undertakings or agreements under this Lease is made or intended as personal covenants, undertakings or agreements by Landlord, or by any of Landlord's members, managers, officers, employees or agents. All liability for damage or breach or nonperformance by Landlord may be collectible only out of Landlord's interest from time to time in the Premises, and no personal liability is assumed by nor at any time may be asserted against Landlord or any of Landlord's members, managers, officers, employees or agents.

17.6    Rights of Landlord's Successors and Assigns; Transfer of Landlord's Interest. Any successor to Landlord and any assignee of Landlord's interest in this Lease will have the right to exercise all other rights and remedies of Landlord under this Lease. The foregoing will apply regardless of whether (a) Landlord's right to exercise such other rights and remedies is expressly referenced or assigned in the instrument of assignment, or (b) the assignment complies with applicable Laws relating to the manner or form in which assignments must be executed. Tenant hereby waives any right to open or strike any judgment or to object to the exercise of any other right or remedy on account of

any alleged deficiency in the instrument of assignment or noncompliance of the instrument of assignment with applicable Laws. Upon the sale or other conveyance or transfer of Landlord's interest in the Premises, the transferor will be relieved of all covenants and obligations of Landlord arising under this Lease from and after the closing of such sale, conveyance or transfer; *provided, however,* that such successor in interest shall agree to assume the obligations of Landlord in this Lease in a lease assignment document.

        17.7   <u>Waiver of Landlord and Tenant Act Notices</u>. If Landlord commences proceedings to recover possession under the Acts of Assembly and Rules of Civil Procedure, upon the expiration or earlier termination of the Term, or for non-payment of Rent or any other reason, Tenant specifically and agrees that ten days' notice will be sufficient in all cases.

      18.   <u>Fees and Expenses; Indemnity; Payment</u>.

        18.1   <u>Landlord's Right to Remedy Defaults</u>. If Tenant defaults in the performance of any of its obligations under this Lease, Landlord, at any time thereafter following an additional ten days' written notice to Tenant, may remedy such default for Tenant's account and at Tenant's expense, without waiving any other rights or remedies of Landlord with respect to such default. Notwithstanding the foregoing, Landlord will have the right to cure any failure by Tenant to perform any of its obligations under this Lease without notice to Tenant if such failure results in an immediate threat to life or safety of any person or impairs the Premises or the Parking Lot or their efficient operation. Notwithstanding anything contained in this Lease, Landlord will not be liable for, and there will be no abatement of Rent with respect to, any injury to or interference with Tenant's business arising from the exercise by Landlord of its rights under this <u>Section 18.1</u>.

        18.2   <u>Indemnity</u>.

        18.2.1   Tenant will be obligated to indemnify, defend and hold harmless Landlord, and its officers, managers, members, employees and agents (each an "**Indemnified Party**" and collectively the "**Indemnified Parties**") from and against any and all claims, actions, losses, costs, liabilities, damages and expenses including, without limitation, penalties, expenses, fines and reasonable attorneys' and experts' fees and expenses (each a "**Claim**," collectively "**Claims**"), arising from (a) Tenant's breach of any of its obligations or representations contained in this Lease, (b) any activity, work or things done, permitted or suffered by Tenant or its agents, licensees or invitees in or about the Premises or the Property contrary to the requirements of the Lease, (c) any grossly negligent or willful act or omission of Tenant or any of Tenant's agents, contractors, employees or invitees, and (d) any case commenced by or against Tenant, its agents, subtenants, licensees, concessionaires, contractors, customers or employees in which any of the Indemnified Parties is or becomes a party ("Indemnified Parties Action"). Tenant will defend all Indemnified Parties Actions at Tenant's expense with counsel reasonably satisfactory to Landlord. No settlement of an Indemnified Parties Action may be made by Tenant without the approval of the appropriate Indemnified Party or Parties.

        18.2.2   If Tenant fails to assume the defense of a Claim within 15 days of notice from the applicable Indemnified Parties, or if within such 15-day period actual prejudice may occur if action is not taken, then at Tenant's cost and expense, the applicable Indemnified Parties may undertake the defense, compromise or settlement of the Claim or consent to the entry of a judgment with respect to the Claim, on behalf of and for the account and risk of Tenant, and Tenant will thereafter have no right to challenge the defense, compromise, settlement or consent to judgment of the Claim by the applicable Indemnified Parties.

        18.3   <u>Interest on Past Due Obligations</u>. Unless otherwise specifically provided in this Lease, any amount due from Tenant to Landlord under this Lease which is not paid within thirty

days after written notice from Landlord will bear interest from the due date until paid at the Default Rate. "Default Rate" means the lesser of: (a) 5% in excess of the rate of interest per annum announced from time to time by the "Money Rates" section in *The Wall Street Journal* as the "Prime Rate;" or (b) the maximum amount or rate permitted by Law.

19.    <u>Access to Premises</u>. Landlord reserves for itself and its agents, employees and contractors the right to enter the Premises upon reasonable advance written notice to inspect the Premises, to supply any service to be provided by Landlord to Tenant, to show the Premises to prospective purchasers, mortgagees, beneficiaries or tenants, to determine whether Tenant is complying with its obligations under this Lease, and to alter, improve or repair the Premises or any other portion of the Premises or the Parking Lot. Landlord's right to enter the Premises will include the right to grant access to the Premises to governmental or utility employees. Landlord may erect, use and maintain scaffolding, pipes, conduits and other necessary structures in and through the Premises or the Parking Lot where reasonably required by the character of the work to be performed in making repairs or improvements. In an emergency, Landlord will have the right to enter the Premises at any time without notice. Except to the extent caused by Landlord's gross negligence or willful misconduct, Tenant waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises, any right to abatement of Rent, or any other loss occasioned by Landlord's exercise of any of its rights under this Section. Any entry to the Premises or portions of the Premises obtained by Landlord in accordance with this Section will not be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an eviction, actual or constructive, of Tenant from the Premises or any portion of the Premises. To the extent reasonably practicable, any entry will occur during normal business hours. Landlord acknowledges Tenant will be providing sensitive treatment services to individuals in the Premises. Accordingly, Landlord shall except in the event of an emergency provide reasonable prior notice to Tenant of any proposed entry or will take all reasonable steps necessary to not disrupt Tenant's business and shall require its employees and agents to comply with all Tenant patient confidentiality requirements and shall take such steps to allow Tenant personnel to accompany Landlord personnel.

20.    <u>Notices</u>. Except as otherwise expressly provided in this Lease, any payment required to be made and any bills, statements, notices, demands, requests or other communications given or required to be given under this Lease will be effective only if rendered or given in writing, sent by personal delivery or registered or certified mail, return receipt requested, or by recognized overnight courier service, addressed to Tenant at Tenant's Address; and to Landlord at Landlord's Address. Any such bill, statement, notice, demand, request or other communication will be deemed to have been rendered or given on the date of receipt or refusal to accept delivery.

21.    <u>No Waiver</u>. No term or provision of this Lease may be waived, and no breach of this Lease will be waived, except by a written instrument signed by the party against which the enforcement of the waiver is sought. No failure by Landlord to insist upon the strict performance of any obligation of Tenant under this Lease or to exercise any right, power or remedy consequent upon a breach of this Lease, no acceptance of full or partial Base Rent or Additional Rent during the continuance of any such breach, no course of conduct between Landlord and Tenant, and no acceptance of the keys or to possession of the Premises before the termination of the Term by Landlord or any employee of Landlord will constitute a waiver of any such breach or a waiver or modification of any term, covenant or condition of this Lease or operate as a surrender of this Lease. No waiver of any breach will affect or alter this Lease, but each and every term, covenant and condition of this Lease will continue in full force and effect with respect to any other then-existing or subsequent breach thereof. No payment by Tenant or receipt by Landlord of a lesser amount than the aggregate of all Base Rent and Additional Rent then due under this Lease will be deemed to be other than on account of the first items of such

28

Base Rent and Additional Rent then accruing or becoming due, unless Landlord elects otherwise. No endorsement or statement on any check and no letter accompanying any check or other payment of Base Rent or Additional Rent in any such lesser amount and no acceptance by Landlord of any such check or other payment will constitute an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Base Rent or Additional Rent or to pursue any other legal remedy.

22.    <u>Landlord's and Tenant's Certificates</u>. At any time and from time to time, within 20 days after written request, each of Landlord and Tenant will be obligated to execute, acknowledge and deliver to the other, addressed   to the requesting party and (if so requested by Landlord) any prospective purchaser, ground or underlying lessor or mortgagee or beneficiary of any part of the Premises, an estoppel certificate in form and substance reasonably designated by the requesting party. The estoppel certificate will be obligated to state (a) the Lease is in full force and effect and has not been assigned, modified, supplemented or amended, (b) all conditions under the Lease to be performed by the requesting party have been satisfied; (c) the other party has no existing claims, defenses or offsets against the enforcement of the Lease by the requesting party; (d) Rent has not been paid more than 30 days in advance of its due date and (e) there is no security deposit under the Lease. The other party will also note any exceptions to the foregoing statements. Any such certificate may be relied upon by Landlord and any prospective purchaser, ground or underlying lessor or mortgagee or beneficiary of all or any part of the Premises.

23.    <u>Rules and Regulations</u>. Tenant will faithfully observe and comply with, and will cause all occupants of the Premises to observe and comply with the Premises and Parking Lot rules and regulations (see Exhibit F), and reasonable modifications and additions to such Rules and Regulations from time to time put into effect by Landlord. Landlord will not be responsible for the nonperformance by any other tenant or occupant of the Campus or any applicable Campus rules and regulations. If there is any conflict between any such rule or regulation and this Lease, this Lease will govern.

24.    <u>Tenant's Taxes</u>. In addition to all other sums to be paid by Tenant under this Lease, Tenant will be obligated to pay, before delinquency, any and all taxes levied or assessed during the Term, whether or not now customary or within the contemplation of the parties upon, measured by or reasonably attributable to Tenant's improvements, equipment, furniture, fixtures and other personal property located in the Premises including, without limitation, Tenant Owned Property, Tenant's Work and Alterations. All state and local realty transfer taxes imposed upon any assignment or subletting will be the sole responsibility of Tenant. Notwithstanding anything to the contrary in this Section, Tenant will have the right to contest any taxes payable by Tenant under this Section provided that (i) Tenant posts bond of 150% of the tax due, and (ii) Tenant, at its sole cost and expense, diligently undertakes and pursues any such contest in appropriate proceedings, and (iii) Tenant indemnifies Landlord against and holds Landlord harmless from all loss or damages that Landlord suffers by reason of such contest, and (iv) Tenant does not permit any lien to be placed on the Property or any part of the Property or interest in the Property.

25.    <u>Signage and Parking</u>.

25.1    Tenant may not erect or place any signs on the Property, the Parking Lot or the Premises (except for signs wholly within the interior of the Premises and not visible from the exterior), without first obtaining Landlord's prior written consent which Landlord may grant or withhold in its sole discretion. Tenant will be solely responsible for the maintenance of its sign(s). All signs of Tenant must at all times comply with applicable Laws. Landlord will list in the lobby directory the name of Tenant and the names of all physicians who are constituent partners or members of or who are employed by Tenant.

25.2    Landlord grants to Tenant the right, non-exclusive and in common with others, to use the exterior paved driveways and walkways of the Parking Lot for vehicular and pedestrian access to the Premises. Tenant will also have the right, in common with Landlord, to use the unreserved parking areas of the Parking Lot for the parking of automobiles of Tenant and its employees and business visitors incident to Tenant's Permitted Use of the Premises. Tenant understands that tenants of the building on the MOB will be using the access driveway that is on the Premises to provide vehicular and pedestrian access to and from Tulip Street and the MOB. Landlord will designate 32 parking spaces on the Parking Lot perpendicular to the building on the Land for the exclusive use of Tenant. Landlord shall not be obligated to police the use of said reserved parking spaces, and Landlord shall have no liability to Tenant, nor shall Tenant's obligations under this Lease be affected, in the event of any unauthorized use of Tenant's reserved parking spaces.

25.3    Notwithstanding anything above, Tenant shall have the right to signage on any monument sign located at the Premises.

26.    Miscellaneous.

26.1    Tenant Payments. All payments by Tenant under this Agreement must be by ACH or domestic wire to an account designated by Landlord.

26.2    Financial Statements. Upon Landlord's written request from time to time (not more frequently than once per year), Tenant will promptly furnish Landlord with certified financial statements reflecting Tenant's then-current financial condition, in such form and detail as Landlord may reasonably request; provided, however, that so long as the stock of Tenant is traded on a national exchange, Tenant may furnish an annual report instead of financial statements.

26.3    References. All personal pronouns used in this Lease, whether used in the masculine, feminine or neuter gender, mean and include all other genders; the singular is intended to include the plural, and vice versa. The use in this Lease of the word "including" or "include" when following any general statement, term or matter are not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation", or "but not limited to," or words of similar import) is used with reference thereto. All references to "mortgage" and "mortgagee" mean and include deeds of trust and beneficiaries under deeds of trust, respectively. All Exhibits and Schedules referenced and attached to this Lease are incorporated in this Lease by this reference. The Section headings of this Lease have been inserted solely as a matter of convenience, and such headings in no way define or limit the scope or intent of any provision of this Lease.

26.4    Successors and Assigns. The terms, covenants and conditions contained in this Lease will bind and inure to the benefit of Landlord and Tenant and, except as otherwise provided in this Lease, their respective personal representatives and successors and assigns; provided, however, that upon the sale, assignment or transfer by Landlord (or by any subsequent landlord) of its interest in the Premises and the Parking Lot as owner or lessee including, without limitation, any transfer upon or in lieu of foreclosure or by operation of law, Landlord (or subsequent landlord) will be relieved from all subsequent obligations or liabilities under this Lease, and all obligations subsequent to such sale, assignment or transfer (but not any obligations or liabilities that have accrued prior to the date of such sale, assignment or transfer) will be binding upon the grantee, assignee or other transferee of such interest. Any such grantee, assignee or transferee, by accepting such interest, will be deemed to have assumed such subsequent obligations and liabilities.

26.5    <u>Severability</u>. If any provision of this Lease or the application of this Lease to any person or circumstance will, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, will not be affected thereby, and each provision of this Lease will remain in effect and will be enforceable to the full extent permitted by Law.

26.6    <u>Construction</u>. This Lease will be governed by and construed in accordance with the Laws of the Commonwealth of Pennsylvania, without regard for any state's choice of law requirements.

26.7    <u>Integration</u>. The terms of this Lease (including, without limitation, the Exhibits and Schedules to this Lease) are intended by the parties as a final expression of their agreement with respect to such terms as are included in this Lease and may not be contradicted by evidence of any prior or contemporaneous agreement, arrangement, understanding or negotiation (whether oral or written). The parties further intend that this Lease constitutes the complete and exclusive statement of its terms, and no extrinsic evidence whatsoever may be introduced in any judicial proceeding involving this Lease. The language in all parts of this Lease will in all cases be construed as a whole and in accordance with its fair meaning and not construed for or against any party by reason of such party having drafted such language.

26.8    <u>Surrender</u>. Upon the expiration or sooner termination of the Term, Tenant must quietly and peacefully surrender to Landlord the Premises in the condition in which the Premises are required to be kept as provided in this Lease and in the condition they were in as of the commencement of the Lease, ordinary wear and tear excepted, and Tenant must remove all Tenant Owned Property and Alterations, to the extent required or so provided in <u>Section 8.2</u>.

26.9    <u>Quiet Enjoyment</u>. Upon Tenant paying the Base Rent and Additional Rent when due and performing when required all of Tenant's obligations under this Lease, Tenant may peacefully and quietly enjoy the Premises during the Term as against all persons or entities claiming by or through Landlord; *subject, however*, to the exceptions, reservations, conditions and provisions of this Lease, and to any mortgages or deeds of trust or ground or underlying leases referred to in <u>Section 11</u>.

26.10    <u>Holding Over</u>. If Tenant holds over after the expiration of the Term, either without Landlord's consent or greater than six months, Tenant will be obligated to pay monthly Base Rent equal to 150% of the Base Rent payable during the final full month of the Lease Year (exclusive of abatements, if any), in which such termination occurs together with an amount reasonably estimated by Landlord for the monthly Additional Rent payable under this Lease, and will otherwise be on the terms and conditions specified in this Lease so far as applicable (but expressly excluding all renewal or extension rights). No holding-over by Tenant after the Term will operate to extend the Term. Upon any holding-over without Landlord's prior written consent, Tenant will be obligated to indemnify Landlord against all claims for damages by any other tenant to whom Landlord may have leased all or any part of the Premises commencing upon or after the expiration of the Term. This indemnification is in addition to, and not in limitation of, any other indemnifications required of Tenant under this Lease. Any holding-over with Landlord's written consent will be construed as a tenancy at sufferance or from month to month, at Landlord's option. Any holding-over without Landlord's written consent will entitle Landlord to reenter the Premises as provided in <u>Section 17</u>, and to enforce all other rights and remedies provided at law, in equity or this Lease.

26.11    <u>Time of Essence</u>. Time is of the essence of each and every obligation of Tenant under this Lease.

31

26.12    Broker's Commissions. Each party represents and warrants to the other that it has not entered into any agreement or incurred or created any obligation that might require the other party to pay any broker's commission, finder's fee or other commission or fee relating to the leasing of the Premises. Each party will indemnify, defend and hold harmless the other and the other's constituent partners and their respective officers, directors, shareholders, members, managers, agents and employees from and against all claims for any such commissions or fees made by anyone claiming by or through the indemnifying party.

26.13    No Merger. The voluntary or other surrender or termination of this Lease by Tenant, or a mutual cancellation of this Lease will not work a merger, but, at Landlord's sole option, will either terminate all existing subleases or subtenancies or will operate as an assignment to Landlord of all such subleases or subtenancies.

26.14    Survival. All of Tenant's and Landlord's covenants and obligations contained in this Lease that by their nature might not be fully performed or capable of performance before the expiration or earlier termination of this Lease will survive such expiration or earlier termination. No provision of this Lease providing for termination in certain events will be construed as a limitation or restriction of Landlord's or Tenant's rights and remedies at law or in equity available upon a breach by the other party of this Lease.

26.15    Amendments. No amendments or modifications of this Lease or any agreements in connection with this Lease will be valid unless in writing duly executed by both Landlord and Tenant. No amendment to this Lease will be binding on any mortgagee or beneficiary of Landlord (or purchaser at any foreclosure sale) unless such mortgagee or beneficiary has consented in writing to such amendment.

26.16    **WAIVER OF JURY TRIAL**. **LANDLORD AND TENANT KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER PARTY AGAINST THE OTHER IN ANY MATTER ARISING OUT OF THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES OR ANY CLAIM OF INJURY OR DAMAGE.**

26.17    **DELIVERY FOR EXAMINATION**. **DELIVERY OF THE LEASE TO TENANT WILL NOT BIND LANDLORD IN ANY MANNER, AND NO LEASE OR OBLIGATIONS OF LANDLORD ARISE UNTIL THIS LEASE IS SIGNED BY BOTH LANDLORD AND TENANT AND DELIVERY IS MADE TO EACH.**

26.18    Joint and Several. If Tenant consists of more than one person, all such persons will be jointly and severally liable for all of Tenant's duties, obligations, liabilities, indemnities, agreements and undertaking under or pursuant to this Lease, and the Term "**Tenant**" means each of them and all of them.

26.19    No Representations. Tenant acknowledges that neither Landlord nor any broker, agent or employee of Landlord has made any representation, warranty or promise with respect to the Premises, the Parking Lot, the Property or this Lease except as expressly set forth in this Lease, and no right, privilege, easement or license is being acquired by Tenant except as expressly set forth in this Lease.

26.20    No Partnership. Nothing contained in this Lease will be construed as creating any relationship between Landlord and Tenant other than that of landlord and tenant. Tenant may not use the name of (a) the Premises, the Campus or any structure on the Campus for any purpose other than as the address of the business to be conducted by Tenant in the Premises, (b) the Premises

as Tenant's business address after Tenant vacates the Premises or (c) Landlord or do or permit to be done anything in connection with Tenant's business or advertising which in the reasonable judgment of Landlord may reflect unfavorably on Landlord, the Campus or the Premises or confuse or mislead the public as to any apparent connection or relationship between Landlord, the Campus or the Premises and Tenant.

26.21    <u>Landlord's Reservation</u>. Landlord reserves the right to make changes and modifications to the Premises, the Parking Lots and the Campus, without Tenant's consent, provided that such changes do not materially adversely affect the use of the Premises and Parking Lots by Tenant and its invitees.

26.22    <u>Consents</u>. Landlord's review, approval and consent powers (including the right to review plans and specifications) are for its benefit only. Such review, approval or consent (or conditions imposed in connection therewith) will not constitute a representation concerning legality, safety or any other matter.

26.23    <u>Tenant's Authority</u>. Tenant and the person executing and delivering this Lease on Tenant's behalf represent and warrant that such person is duly authorized to so act; that Tenant is duly organized, is qualified to do business in the Commonwealth of Pennsylvania, is in good standing under the Laws of the state of its organization and the Laws of the Commonwealth of Pennsylvania, and has the power and authority to enter into this Lease; and that all action required to authorize Tenant and such person to enter into this Lease has been duly taken.

27.    <u>Other Provisions</u>.

27.1    <u>Reasonable Rent</u>. Landlord and Tenant acknowledge and agree that the rental payments required pursuant to this Lease are the product of *bona fide*, arms-length negotiations and represent the commercially reasonable, fair market value of the Premises for general commercial purposes, without taking into account the intended use of the Premises or the volume or value of any actual or expected federal health care program or other referrals to, or business otherwise generated for, directly or indirectly, either Landlord or Tenant. The rental payments do not reflect any additional value Landlord or Tenant may attribute to the proximity or convenience of the Premises to sources of referrals or business otherwise generated for which payment may be made in whole or in part under any federal health care program.

27.2    <u>Exclusion, Debarment or Suspension</u>. Each party represents and warrants to the other that neither it nor any of its employees or agents have been excluded from participation in any federal health care program, as defined under 42 U.S.C. Section 1320a-7b(f), for the provision of items or services for which payment may be made under such federal health care programs, nor been debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded by any federal department or agency. If a party or any employee or agent of a party is excluded from participation in, or is otherwise unable to participate in, a federal health care program, or is debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded by any federal department or agency, such party must promptly notify the other party. If Tenant is so excluded, debarred, suspended or can no longer participate in any federal health care program, Landlord will have the right to terminate this Lease immediately.

27.3    <u>Termination for Compliance Purposes</u>. The parties will modify this Lease from time to time to the extent necessary to comply with existing changes in applicable Laws and official interpretations and guidance thereof. Furthermore, upon the written advice of legal counsel, either party may terminate this Lease without liability to the other party if such termination is legally necessary for legal compliance purposes.

33

27.4    <u>Patriot Act; Executive Order 13224; Anti-Money Laundering Act.</u>

27.4.1  For purposes of this <u>Section 27.4</u>, the following definitions apply: "**Anti-Money Laundering Act**" means The International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001. "**Benefited Party**" means (a) Tenant; (b) any officer, director, shareholder, partner or member of Tenant; (c) any direct or indirect holder of any equity interest in Tenant and (d) any affiliate of Tenant. "**Executive Order**" means Executive Order 13224 signed on September 24, 2001 and titled "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism." "**Patriot Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001. "**Prohibited Person**" means any person or entity with whom US persons or entities are prohibited or restricted from doing business pursuant to (a) the Executive Order and the Annex thereto, (b) the regulations of the Office of Foreign Asset Control of the Department of the Treasury (including the Specially Designated Nationals and Blocked Persons List, as updated from time to time or (c) any Law.

27.4.2  Tenant represents and warrants that (a) no Benefited Party is a Prohibited Person, and (b) no Benefited Party is in violation of the Executive Order, the Patriot Act, the Anti-Money Laundering Act, or any order, rule, regulation or recommendation promulgated under or in connection with the Executive Order, the Patriot Act or the Anti-Money Laundering Act.

27.4.3  Tenant covenants and agrees to ensure that throughout the Term (a) no Benefited party will be a Prohibited Person, and (b) no Benefited Party will be in violation of the Executive Order, the Patriot Act, the Anti-Money Laundering Act, or any order, rule, regulation or recommendation promulgated under or in connection with the Executive Order, the Patriot Act or the Anti-Money Laundering Act.

27.4.4  On request by Landlord from time to time, Tenant must promptly deliver to Landlord such certification or other evidence as Landlord may request, confirming that all Benefited Parties are in compliance with the requirements of this <u>Section 27.4</u>.

27.5    <u>Intentionally Omitted.</u>

27.6    <u>Landlord Services.</u>  Landlord will provide the following services all hours of all days throughout the Term:

27.6.1  Central air-conditioning, heating, and ventilating ;

27.6.2  Electrical, water, and sewer service all hours of every day all year;

27.6.3  Security services in the Building and Parking Lots, provided that Landlord shall have no liability to Tenant in the event that any security services provided are ineffective;

27.6.4  Cleaning, maintenance, and repair of the exterior portions of the Premises and Parking Lots so that they are consistently in reasonably good condition; and

27.6.5  Exterior window repairs and cleaning periodically to ensure the windows are watertight and reasonably clean.

34

28.    <u>Regulatory Matters</u>.

28.1    Landlord and Tenant enter into this Lease with the intent of conducting their relationship and implementing the agreements contained in this Lease in full compliance with applicable federal, state and local law, including without limitation, the Medicare/Medicaid Anti-Kickback statute (the "**Anti-Kickback law**") and Section 1877 of the Social Security Act (the "**Stark law**"), as amended. Notwithstanding any unanticipated effect of any of the provisions of this Lease, neither party will intentionally conduct itself under the terms of this Lease in a manner that would constitute a violation of the Anti-Kickback law or the Stark law. Without limiting the generality of the foregoing, Landlord and Tenant expressly agree that nothing contained in this Lease will require either party to refer any patients to the other, or to any affiliate or subsidiary of the other.

28.2    If any legislation, regulation or government policy is passed or adopted, the effect of which would cause either party to be in violation of such Laws due to the existence of any provision of this Lease, then Landlord and Tenant agree to negotiate in good faith for a period of 90 days to modify the terms of this Lease to comply with applicable Law. The determination of whether either party will be in violation of such Laws will be made by qualified independent legal counsel selected by Landlord and as to whom Tenant has no reasonable objection. Should the parties fail to agree upon modified terms to this Lease within this time, then either Landlord or Tenant may immediately terminate this Lease by giving written notice to the other party.

29.    <u>Lien Waivers</u>.  Landlord hereby explicitly waives any lien rights, at law or in equity, Landlord may have in all Tenant Owned Property at the time of execution of this Lease but does not waive any claim against any assets of Tenant by reason of a breach of this Lease in the future.

**IN WITNESS WHEREOF**, Landlord and Tenant, intending to be legally bound, have each caused their duly authorized representatives to execute this Lease on their behalf as of the date first above written.

**LANDLORD**

AC HSS OFFICE VENTURES I, LLC

By: _____

Name: _____

Title: _____

**TENANT**

BEACON POINT RECOVERY CENTER, LLC

By: _____

Name: _____

Title: _____

36

DocuSign Envelope ID: 15EEC06E-744B-4FC2-976C-99174FECF234

**IN WITNESS WHEREOF**, Landlord and Tenant, intending to be legally bound, have each caused their duly authorized representatives to execute this Lease on their behalf as of the date first above written.

**LANDLORD**

AC HSS OFFICE VENTURES I, LLC

By: _Louis Lagios_

Name: _____

Title: _____


**TENANT**

BEACON POINT RECOVERY CENTER, LLC

By: _____

Name: _____

Title: _____

**EXHIBIT A**

<u>Intentionally Omitted</u>

# EXHIBIT B

## Intentionally Omitted

**EXHIBIT C**

<u>**Intentionally Omitted**</u>

## EXHIBIT D

## TENANT'S WORK AGREEMENT

This Exhibit is attached to and made a part of that certain Lease Agreement dated _____, 20___ (the "**Lease**"), by and between AC HSS Office Ventures I, LLC ("**Landlord**") and **Beacon Point Recovery Center, LLC.** ("**Tenant**"). Terms used but not defined in this Exhibit have the meaning ascribed to them in the Lease.

1.    <u>Tenant's Authorized Representative</u>. Tenant designates _____ ("**Tenant's Authorized Representative**") as the person authorized to represent Tenant in connection with Tenant's Work pursuant to this Exhibit. Landlord will not be obligated to respond to or act upon any such item until such item has been initialed by Tenant's Authorized Representative.

2.    <u>Schedule</u>.

(a)    Tenant must submit to Landlord a final space plan and all specifications, details, finishes, elevations and sections for Tenant's Work ("**Tenant's Space Plan**"), at least 30 days prior to commencement of Tenant's Work. Tenant's Space Plan must indicate partition layout, door location, special equipment types, floor load requirements exceeding 50 pounds per square foot live load and telephone and electrical and computer outlet locations.

(b)    If required by Landlord, Tenant must submit to Landlord final architectural, mechanical and engineering working drawings approved by Tenant and Landlord at least 30 days prior to commencement of Tenant's Work. Such architectural working drawings must include: master legend, construction plan, reflected ceiling plan, telephone and electrical outlet layout, finish plan and all architectural details, elevations and specifications necessary to construct Tenant's Work. The documentation for Tenant's Space Plan required to be produced under <u>Section 2(a)</u> above and the other documentation required to be produced under this <u>Section 2(b)</u> must be in the form of a blue-line print set, one complete reproducible set and CAD versions (or plans in such other form and detail as Landlord may require). Upon completion of Tenant's Work, Tenant must furnish Landlord with "as-built" drawings in CAD format.

(c)    Tenant's Space Plan and all other plans, specifications and drawings (and changes thereto) will be subject to Landlord's written approval which it will not unreasonably withhold, condition or delay. Such approval will not constitute Landlord's representation that such approved plans, drawings or changes comply with applicable Laws. Any deficiency in design or construction, although same had prior approval of Landlord, will be solely the responsibility of Tenant.

(d)    The approval by Landlord of the Tenant's plans, specifications and drawings will be subject to the following procedural requirements:

(i)    Landlord must, within 10 business days after the later of its receipt of the applicable documents or any additional requested information, review and approve the same, or return the same to Tenant with requested modifications.

(ii)    Tenant must, within 5 business days after its receipt of the applicable documents as returned by Landlord for modification, modify the applicable documents so as to

Ex. D-1

comply with Landlord's requests and resubmit the same, as modified in accordance with Landlord's requests, to Landlord for its review and approval.

         (iii)     Landlord must, within ten business days after the date of its receipt of the applicable modified documents, review and approve the same, provided Tenant has complied with Landlord's reasonable request(s) regarding such required modifications.

         (iv)     If Landlord returns the modified documents to Tenant with additional requested modifications, Landlord and Tenant must mutually and agree to a period of time within which such modifications must be made and within which such modified plans must be re-submitted to Landlord by Tenant, until the modified documents are finally approved by Landlord.

         (v)     With respect to Landlord's review and approval set forth in this Tenant's Work Agreement and to the extent the Tenant's Work involves any modifications to the structural, mechanical, electrical or plumbing systems or components of the Premises or the Parking Lot, then such approval may be withheld by Landlord in its absolute and sole discretion and if and to the extent that such plans, in Landlord's sole judgment, do not involve modification to such systems or components, such approval will not be unreasonably withheld or delayed by Landlord.

      3.    <u>Substantial Completion</u>. Tenant must commence Tenant's Work within ten business days after (a) the receipt of the City of Philadelphia and other regulatory approvals, if any, required for the construction of all or any part of Tenant's Work or, if no such approvals are required, then (b) Landlord's Approval of Tenant's Work. Tenant must thereafter diligently and continuously perform the Tenant's Work and must substantially complete Tenant's Work. All of Tenant's Work must be performed in accordance with the Lease and this Tenant's Work Agreement. For purposes of this Lease, "**substantially complete**" means that Tenant's Work has been completed subject only to punch list items that do not unreasonably interfere with the use of the Premises.

      4.    <u>Contractors</u>. All contractors and subcontractors and other persons or entities performing labor or supplying materials for Tenant's Work will be subject to Landlord's approval which will not unreasonably withhold, condition or delay. Notwithstanding the foregoing, Landlord may disapprove any proposed contractors, subcontractors, laborers or suppliers, in Landlord's sole discretion, if in Landlord's opinion the employment or engagement of any such person or party may cause labor disharmony at the Property, or its environs, or if any proposed contractors provide wages, hours and working conditions that are not in conformity with "area standards."

**EXHIBIT E**

**Intentionally Omitted**

## EXHIBIT F

## PREMISES AND PARKING LOT RULES AND REGULATIONS

Landlord reserves the right to make additional rules and regulations. Landlord will provide Tenant with any change, in writing, to the Premises and Parking Lot Rules and Regulations. All changes become binding upon Tenant upon such receipt. Capitalized terms which are not defined in these Rules and Regulations have the meaning given to the term in the Lease. Whenever Landlord's consent is required under these Rules and Regulations, such consent will be in Landlord's sole discretion unless otherwise specified.

1.      Sidewalks, entrances, passages, elevators, vestibules, stairways, corridors, halls, lobby and any other part of the Premises, the Parking Lot or the Property may not be obstructed or encumbered by Tenant or used for any purpose other than ingress or egress to and from each tenant's premises. Landlord will have the right to control and operate the Campus in such a manner as Landlord deems appropriate.

2.      No awnings or other projections will be attached to the outside walls of the Premises without the prior written consent of Landlord; in its sole discretion. All window treatments and window blinds used by Tenant must comply with Landlord's Premises standard and must be attached in a manner approved by Landlord. Tenant is responsible for cleaning, repairing and replacing its window treatments and window blinds.

3.      No showcases or other articles may be put in front of or affixed to any part of the exterior of the Premises or the Parking Lot, or placed in hallways or vestibules without prior written consent of Landlord.

4.      Rest rooms and other plumbing fixtures may not be used for any purposes other than those for which they were constructed. No debris, rubbish, rags, plaster, hazardous chemicals or substances, or other substances may be thrown in toilets or sinks. Only Premises standard toilet tissue and seat covers may be flushed in toilets. All damage resulting from any misuse of these fixtures will be the responsibility of the tenant who, or whose employees, agents, visitors, clients, or licensees, caused same.

5.      Without the prior consent of Landlord, Tenant may not mark, paint, drill, bore, cut or string wires or in any way deface any part of the Premises or the Parking Lot except for the reasonable hanging of decorative or instructional materials on the walls of the Premises. Tenant will be responsible for any damage to the Premises caused by such hanging.

6.      Tenants may not construct, maintain, use or operate in any part of the Premises any electrical device, wiring or other apparatus in connection with a loudspeaker system or other sound/communication systems that can be heard outside the Premises. Tenant must obtain Landlord's prior written consent to the installation of any such communication systems within the Premises.

7.      Dirt bikes, mopeds, skateboards, roller blades, Segway's, hover boards and other unlicensed vehicles or means of transportation are not permitted on any portion of the Property, and licensed motorcycles and licensed vehicles will be permitted only on the exterior driveways of the Property and the Parking Lot.

8.  No tenant may cause or permit any unusual or objectionable odors to be produced upon or permeate from its premises.

9.  No space in the Premises or the Parking Lot may be used for the manufacture of goods for sale in the ordinary course of business, or for sale at auction of merchandise, goods or property of any kind.

10. Nothing may be thrown out of the doors, windows, or down corridors or stairs of the Premises and no trash of any kind may be or dumped or deposited anywhere at or around the Premises, the Parking Lot or the Campus except in containers for the Premises.

11. Tenant may not place, install or operate on the Premises or in any part of the Property, any engine, stove, barbeque grill or machinery or conduct mechanical operations or cook thereon or therein (except for coffee machine, microwave oven, and/or vending machine), or place or use in or about the Premises or Property any explosives including fireworks, gasoline, kerosene oil, acids, caustics or any other flammable, explosive, or hazardous material without prior written consent of Landlord. Use of portable heaters, candles, scented warmers, sterno and other portable food warming devices, and other objects having an open flame are prohibited. Holiday and other decorations must comply with fire safety standards. Live Christmas trees are prohibited. Tenant may not block fire extinguishers or exits

12. Tenant may not install any additional locks or bolts of any kind upon any door or window of the Premises without prior written consent of Landlord. Upon Landlord's consent, Tenant must use a lockset that is standard to or compatible with the Premises master key system as determined by Landlord. All such additional locks and bolts will be installed at Tenant's sole cost and expense. When Tenant's Lease expires without renewal or is terminated, Tenant must return to Landlord all keys for the Premises and all security access cards. Tenant will not be issued more than one key or security access card per employee. Tenant must provide to Landlord a list of all Tenant employees by name and must immediately notify Landlord whenever such a person is no longer employed by Tenant or if a key and/or access card are lost. Tenant must obtain all keys and security access cards from its former employees and must return keys and security access cards to Landlord within three business days of such employee leaving the employ of Tenant. Tenant is fully responsible for all loss and damage to property and all bodily injury, including death, between the times that an employee of Tenant leaves or is otherwise separated from employment with Tenant and the date and time on which Tenant returns such person's keys and security card to Landlord. Tenant must pay to Landlord Landlord's standard charge for lost cards and lost keys. Landlord may increase this charge from time to time. No person or entity other than Tenant and/or their employees may have keys or security access cards unless Landlord grants its prior written approval.

13. All doors to hallways and corridors must be kept closed during business hours. Doors may not be propped open, nor may door frame latch holes be covered by any material preventing the door from properly latching, at any time.

14. Tenant may not use the name of the Premises, the Campus or the Landlord in any way in connection with Tenant's business except as the address of Tenant's business. Landlord will also have the right to prohibit any advertising by Tenant, which, in Landlord's sole opinion, tends to impair the reputation of the Premises or the Campus or its desirability as a site for

offices or which implies or states any kind of sponsorship or endorsement of Tenant by Landlord or that otherwise, in Landlord's sole opinion, is likely to create confusion in the public or liability for the Landlord. Immediately upon written notice from Landlord, Tenant must refrain from or discontinue such advertising.

15. All deliveries by vendors, couriers, clients, employees or visitors to the Premises that involve the use of a hand cart, hand truck, or other heavy equipment or device must be made via the freight elevator if the Premises has a freight elevator or, if there is no freight elevator or if Landlord has otherwise so approved in writing, such other delivery route as so approved by Landlord. Tenant will be responsible to Landlord for any loss or damage resulting from any deliveries made by or for Tenant to the Premises.

16. Prior to moving in or out of the Premises, Tenant must first obtain Landlord's Property Manager's consent to (a) identity of Tenant's movers and their insurance coverages as evidenced by a certificate of insurance naming Landlord and tenant as additional insured in amounts reasonably determined by Landlord, (b) the date and time of the move and (c) Tenant's plan for protection of elevators, floors and walls of the Premises during the move. Tenant must strictly comply with the moving plan as approved by the Landlord's Property Manager. Tenant must deliver an appropriate certificate of insurance to Landlord prior to moving any equipment or furniture.

17. Landlord has the right but not the obligation to inspect all freight to be brought into the Premises or the Parking Lot and to exclude from the Premises, the Campus or the Parking Lot all freight or other material which violates any of these rules and regulations.

18. The requirements and process for approval of Tenant's contractors is set forth in the Lease. Furthermore, without limiting the Lease provisions, Tenant must obtain Landlord's prior consent to the identity of all contractors or vendors for any work and such contractors and vendors must comply with Landlord's policies and procedures, including contractor/vendor registration and clearance.

19. Landlord reserves the right to exclude from the Premises, the Campus or the Parking at all times any person who is not known or does not properly identify himself or herself to Landlord's management or security personnel or who in Landlord's sole judgment poses a threat to the peaceful occupation or security of the Premises, the Campus or the Parking .

20. No space within the Premises, the Campus or the Parking may be used at any time for the purpose of lodging, immoral or illegal purposes, or behavior which is not appropriate for the purposes of the Premises, the Campus or the Parking.

21. No employees or invitees of Tenant may use the Parking Lot as lounging areas during "breaks" or during lunch periods or for eating or drinking activities.

22. No canvassing, soliciting or peddling is permitted in the Premises, the Campus or the Parking by tenants, their employees or other persons.

23. No mats, trash or other objects may be placed in the Parking Lot.

24. If Landlord provides Tenant with recycling containers, then Tenant must place all recyclable items of cans, bottles, plastic and office recyclable paper in such containers.

25. Tenant may not place any pictures, signage, advertising, decals, banners and other similar items in or on windows or doors that are visible from the exterior, without the prior written consent of Landlord in its sole discretion.

26. Landlord is not responsible for lost or stolen equipment, personal property or money from Premises regardless of when, how, where and under what conditions the loss occurs.

27. Tenant and its agents, employees and invitees must observe and comply with the driving and parking signs and markers on the Property.

28. Tenant may not store or permit storage of any of its items outside of the Premises.

29. Tenant may not enter the Premises or the Parking Lot if Landlord has temporarily closed the Premises or the Parking Lot due to power loss or other emergency or repair.

30. Tenant must comply with all emergency directives of Landlord.

31. Alcoholic beverages and smoking (including e-cigarettes) are prohibited in the Premises, the Campus or the Parking Lot.

32. Tenant must supply its backup power for any refrigeration, procedural equipment and other electronic devices, all of which must be approved by Landlord subject to the Lease.

33. No animals, birds or other pets (other than service animals) of any kind may be brought into or kept in or about the Premises, the Property, the Campus or the Parking Lot.

34. No weapons may be permitted on the Property, except that licensed law enforcement officers employed by a police agency will be allowed to carry their weapons on the Property. A weapon is any instrument or device that could cause serious bodily injury or death. This includes firearms, explosives, tasers, knives, impact weapons (e.g., batons) and any other instrument that can be used as a weapon.

## Exhibit G

## Description of Parking Lot

ALL THAT CERTAIN Lot or piece of ground situated in the 45th Ward of the City of Philadelphia and described in accordance with a Subdivision Plan of Property made June 16th, 2019 by Juron Surveying and Mapping LLC, as follows to wit:

BEGINNING AT A POINT formed by the intersection of the Northeasterly side of Allegheny Avenue (120 feet wide) legally open, on City Plan and Northwesterly side of Tulip Street (50 feet wide) legally open, on City Plan;

THENCE extending N 32 degrees 24 minutes 26 seconds W, along the said Northeasterly side of Allegheny Avenue, the distance of 210.861 feet to a point;

THENCE extending N 57 degrees 35 minutes 34 seconds E, the distance of 556.573 feet to a point;

THENCE extending S 32 degrees 24 minutes 26 seconds E, the distance of 210.861 feet to a point on the said Northwesterly side of Tulip Street;

THENCE extending S 57 degrees 35 minutes 34 seconds W, along the said Northwesterly side of Tulip Street, the distance of 556.573 feet to a point, being the FIRST MENTIONED POINT AND PLACE OF BEGINNING.

BEING known as 2235 E. Allegheny Avenue.

PREMISES C

ALL THAT CERTAIN lot or piece of ground, situate in the 25th and 45th Wards of the City of Philadelphia, Commonwealth of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a point on the Northeasterly right-of-way line of E. Allegheny Avenue (120 foot wide right-of-way, legally open, on city plan), at its intersection with the Southeasterly right-of-way line of Tulip Street (50 foot wide right-of-way, legally open, on city plan), and from said point of beginning running, thence;

1. Along the Southeasterly right-of-way line of Tulip Street, North 57 degrees - 35 minutes - 34 seconds East, a distance of 461.116 feet to a point, thence;

The following four (4) courses and distances along the dividing line between proposed Lot A and proposed Lot B:

2. South 32 degrees - 24 minutes - 26 seconds East, a distance of 100.867 feet to a point, thence;

3. North 57 degrees - 35 minutes - 34 seconds East, a distance of 113.884 feet to a point, thence;

4. South 32 degrees - 24 minutes - 26 seconds East, a distance of 9.000 feet to a point, thence;

5. North 57 degrees - 35 minutes - 34 seconds East, a distance of 160.573 feet to a point on the Southwesterly right-of-way line of E. Westmoreland Street (60 foot wide right-of-way, legally open, on city plan), thence;

6. Along the Southwesterly right-of-way line of E. Westmoreland Street, South 32 degrees - 24 minutes - 26 seconds East, a distance of 31.00 feet to a point, thence;

7. Along the dividing line between proposed Lot A and Lot 134, South 57 degrees - 35 minutes - 34 seconds West, a distance of 55.000 feet to a point, thence;

8. Along the common dividing line between Lot 134, 135, 148, 136, 137, 138, 139 and Lot 116 & 130, South 32 degrees - 24 minutes - 26 seconds East, a distance of 101.00 feet to a point on the Northwesterly right-of-way line of Memphis Street (50 foot wide right-of-way, legally open, on city plan), thence;

9. Along the Northwesterly right-of-way line of Memphis Street, South 57 degrees -35 minutes - 34 seconds West, a distance of 680.673 feet to a point on Northeasterly right-of-way line of E. Allegheny Avenue, thence;

10. Along the Northeasterly right-of-way line of E. Allegheny Avenue, North 32 degrees - 24 minutes - 26 seconds West, a distance of 241.667 feet to the point and place of beginning.

This description was written based upon a map entitled "Proposed Subdivision Plan, Fortune Real Estate Partners, LP, Tulip Street & Allegheny Avenue, Lots 209, 116-133, 141-147 & 191, Map 24N8, City & County of Philadelphia, Commonwealth of Pennsylvania", prepared by Control Point Associates, Inc., Dated 11/9/2016, Sheet 1 of 1.

BEING known as 2301 East Allegheny Avenue

## SCHEDULE 1.25

## Description of the Property

ALL THAT CERTAIN lot or parcel of ground, together with the buildings and improvements erected thereon, located in the City of Philadelphia and Commonwealth of Pennsylvania, described as follows, to wit:

BEGINNING at a point on the Southwesterly (erroneously shown as Southeasterly in prior deed) right of way line of East Westmoreland Street (60 feet wide right of way, legally open, on City Plan) at its intersection with the Southeasterly right of way line of Tulip Street (50 feet wide right of way, legally open, on City Plan), and from said point of beginning running, thence;

1. along the Southwesterly right of way line of East Westmoreland Street, South 32 degrees 24 minutes 26 seconds East, a distance of 109.667 feet to a point, thence;

The following four (4) courses and distances along the dividing line between proposed lot B and proposed lot A:

2. South 57 degrees 35 minutes 34 seconds West, a distance of 160.573 feet to a point; thence;

3. North 32 degrees 24 minutes 26 seconds West, a distance of 9.000 feet to a point; thence;

4. South 57 degrees 35 minutes 34 seconds West, a distance of 113.884 feet to a point, thence;

5. North 32 degrees 24 minutes 26 seconds West, a distance of 100.667 feet to a point on the Southeasterly right of way line of Tulip Street; thence;

6. along the Southeasterly right of way line of Tulip Street, North 57 degrees 35 minutes 34 seconds East, a distance of 274.457 feet to the point and place of beginning.

This description was written based upon a map entitled "Proposed Subdivision Plan, Fortune Real Estate Partners, LP, Tulip Street & Allegheny Avenue, Lots 209, 116-133, 141-147 & 191, Map 24N8, City & County of Philadelphia, Commonwealth of Pennsylvania", prepared by Control Point Associates, Inc., dated 11/9/2016, Sheet 1 of 1.

BEING Nos. 3261-3285 Tulip Street.

## SCHEDULE 7.2.4

Without the express prior written approval of Landlord, which approval will be at the sole discretion of Landlord and may be withheld for any reason, reasonable or unreasonable, or no reason at all, and notwithstanding anything to the contrary in this Lease, the provision or operation of any of the following services or facilities will not be permitted on the Premises or any portion thereof:

- The sale or distribution of alcoholic beverages or tobacco products;

- An adult bookstore or establishment selling, exhibiting or distributing pornographic or obscene materials; or

- A massage parlor, topless bar or other similar sexually oriented business.