Property ID: 800235346
Name: Silver Care Health Care Center
Contract/FHA#: 03522038

## LEASE of
## 1417 BRACE ROAD, CHERRY HILL, NEW JERSEY

This Lease ("Lease"), is made and entered into _June 26_, 2014 ("Effective Date"), by and between Silver Realty Associates, LLC, a limited liability company of New Jersey (called "Landlord" below), and Sunrise Detox Cherry Hill, LLC, a limited liability company of Delaware (called "Tenant" below).

### RECITALS

In consideration of their respective undertakings and agreements contained in this Lease, the parties do by this Lease agree as follows:

**(1)    Term, Leased Space and Use.**  Landlord leases to Tenant, and Tenant leases from Landlord, certain space consisting of approximately 8,650 square feet (called the "Leased Space" below) located at 1417 Brace Road, Cherry Hill, New Jersey (called the "Premises" below), as more particularly shown on the diagram attached to and made a part of this Lease as Exhibit "A".

"Rent Commencement Date" is the earlier of (i) Tenant's occupancy or (ii) 6 months after the United States Department of Housing and Urban Development ("HUD") approves Lease, as described in the section below entitled "Approvals". Rent Commencement Date is the date "Base Rent" and "Additional Rent" as defined below shall commence. The Term of the Lease is ten (10) years from Rent Commencement Date.

The Leased Space is to be occupied and used by Tenant as a sub-acute medically monitored detoxification facility for the safe and effective treatment for those struggling with the disease of addiction, and related business purposes, but for no purpose other than those described in this sentence. The facility will house a 20-bed inpatient treatment unit for adults requiring treatment for the disease of addiction (the "Permitted Use"). Tenant's permitted hours of operation will be 24 hours per day, seven days a week, subject to the limitations of applicable law. Tenant covenants that its operation at the Leased Space will not cause unreasonable noise to other tenants in the Premises and neighbors in the surrounding area particularly before and after traditional business hours. Tenant agrees to be bound by zoning ordinances and noise regulations of local governing authorities. Tenant will maintain appropriate staffing at the facility including clinical and professional staff and any staffing necessary to insure the safety of their clients as well as others on the Leased Space.

(a)    Tenant's Renewal Option.  Provided that Tenant is not then in default of any of its obligations under this Lease, Tenant may, at its option, but will not be obligated to, extend the Term of this Lease for two (2) consecutive periods of five (5) years each, provided Tenant gives Landlord written notice of renewal at least

1

one hundred twenty (120) days prior to the expiration of the term that is about to expire. The Base Rent due during any renewal option shall be the "Fair Market Rental Rate" for the Leased Space for commercial tenants with similar use in the same geographic location. Landlord shall advise Tenant in writing of its determination of such rate within sixty (60) days following timely exercise of the option to renew. If Tenant does not agree with Landlord's determination, the Fair Market Rental Rate shall be as determined by a Member of the Appraisal Institute ("M.A.I.") appraiser selected jointly by Landlord and Tenant whose decision is final and binding and unappealable. If Landlord and Tenant are unable to agree on the selection of an appraiser, then each party shall choose an appraiser both of whom together shall select a third appraiser; the third appraiser so selected shall then determine the Fair Market Rental Rate for the Leased Space. If the two appraisers fail to agree on the third appraiser within fifteen (15) days, the third appraiser shall be selected by the American Arbitration Association. The parties shall be responsible for the cost of their own appraiser and shall share equally in the cost of any third appraiser. In no event, however, shall Tenant pay as Base Rent payable for any lease year an amount less than the Base Rent payable for the preceding lease year. If Tenant exercises any renewal option, then all of the terms of this Lease shall continue in full force and effect during the renewal term, except that Base Rent shall be defined as it has been in this section.

(b)     Approvals. Tenant will be responsible for obtaining any change of use approvals required, any licenses specific to Tenant's use of the Leased Space, and any other state or federal approvals that are required for Tenant's use or occupancy, including a certificate of occupancy and building permits.

As required by HUD, Landlord and Tenant are required to obtain HUD approval for this Lease. Tenant agrees in good faith to pursue HUD approval, and Landlord agrees to diligently and in good faith assist Tenant to obtain the requisite HUD approval. If (except as described in the last sentence of this paragraph) HUD approval is not obtained for this Lease in a form which is reasonably acceptable to Landlord and Tenant within two (2) months of the Effective Date, either party may terminate Lease. If the HUD approval is not in a form which assures that the tenancy will remain undisturbed in the event of foreclosure, this lack of assurance will not be a valid reason for Tenant to find the HUD approval unacceptable.

(c)     Exclusivity of Use. Landlord shall not lease space at this Premises to another tenant, enter into any occupancy agreement with another party, consent to the change of use of any current tenant or otherwise convey any portion of the Premises to a party whose predominant use shall be as a detoxification center ("Exclusive"). In the event of a violation of this Exclusive, Tenant (i) shall have the right to terminate the Lease by delivering written notice to Landlord while the violation is ongoing. If Landlord violates this exclusivity of use provision and Tenant elects to terminate, Landlord will have sixty (60) days from the date Landlord receives Tenant's notice to cure the violation. If Landlord cures such violation within 60 days, the notice of termination will be null and void.

2

(2)     **Base Rent.** Tenant agrees to and shall pay to Landlord as rent for the Leased Space, in legal tender at time of payment, $298,000 per annum for the initial term of the Lease, in monthly payments of $24,833.33, with 3.5% annual increases for the entire term of this Lease ("Base Rent").

(3)     **Additional Rent.**

"Proportionate Share" shall be defined as the amount of Leased Space (8,650 square feet), divided by the total square footage of the Premises (139,129 square feet). Proportionate Share will therefore be 6.22%.

(a)     Tenant Utilities. Landlord shall provide or cause to be provided to Tenant water, steam, heat, gas, hot water, electricity, light, power and other utility service or services, furnished to the Leased Space. Tenant will be responsible for paying its Proportionate Share of such utility costs to Landlord. Tenant's Proportionate Share is $17,300 per annum for the first year in equal monthly installments of $1,441.66. The amount of the annual utility bill which Tenant will pay will increase by the same percentage per annum as Landlord's, every year after the first year of this Lease Term. Tenant shall have the right to inspect bills from all utility service providers in order to confirm the amount of its Proportionate Share of utility costs.

(b)     Real Estate Taxes. Tenant will pay to Landlord its Proportionate Share of the real estate taxes and assessments upon the Premises. Tenant shall pay its Proportionate Share of real estate taxes to Landlord in equal monthly installments. Tenant shall have the right to inspect bills from all taxing authorities in order to confirm the amount of its Proportionate Share of real estate taxes.

(c)     Common Area Maintenance ("CAM"). Tenant will pay its Proportionate Share of CAM expenses. CAM expenses are those required to maintain the common areas of the Premises in good condition and insure the common areas and building at the Premises. CAM expenses for the base year 2012, were $415,279.00. CAM expenses for Tenant's term may be greater than 2012 CAM expenses. CAM expenses include, but are not limited to, the following: all expenses associated with the service, repairs, replacement and other maintenance of the property, building and components thereof, including wages and salaries, cost of independent contractors and materials and supplies associated with such service, repairs, replacement and maintenance, cost of insurance related to the building and property, including fire and extended coverage, boiler and machinery, sprinkler leakage and water damage, public liability and business interruption and rent loss coverage, all expenses associated with the exterior of the property including landscaping, driveway and parking lot maintenance including snow removal, trash removal, operation and maintenance of exterior lighting, and other exterior maintenance. CAM expenses shall not include: (a) expenses for any capital improvements made to the Premises which do not replace existing capital improvements (with "capital improvement" defined as Landlord's expenditure of more than $150,000 per improvement to improve the

3

Premises, which according to GAAP or IRS regulations, cannot be treated as an expense by the Landlord but must be capitalized and depreciated), except that capital expenses for improvements which result in savings of labor costs shall be included at the lesser of the cost of such improvement amortized over the useful life of the improvement or the annual savings in labor costs resulting from the improvement; (b) costs incurred or paid by the Landlord for the exclusive benefit of another tenant or other occupant of the Premises; (c) compensation to any management personnel, including fees paid to a management company, in excess of five percent of all fixed rents for the Premises; (d) expenses for repairs or other work occasioned by fire, windstorm or other insured casualty; (e) lease commissions, advertising expenses and expenses for leasing and renovating space for tenants; (f) legal expenses in enforcing the monetary terms of any lease; (g) interest and amortization payments on any mortgage or mortgages, and rental under any ground or underlying lease or leases; (h) wages, salaries or other compensation paid to any person not directly involved in the operation, maintenance or safekeeping of the Premises; (i) expenses for restoration of the Premises required as a result of a condemnation; (j) taxes; (k) electricity paid for by any tenant of the Premises; (l) depreciation and amortization charges; (m) reserves of any nature; (n) costs or expenses necessitated by or resulting from the gross negligence of Landlord, its agents or employees; and (o) costs or expenses necessitated by or resulting from any hazardous or toxic wastes, materials or substances in or from the Premises. If expenses to the common area are caused by Landlord act or omission, Landlord will pay 100% of such expenses. If expenses to the common area are caused by Tenant act or omission, Tenant will pay 100% of such expenses.

Within 90 days after the end of each calendar year, Landlord shall notify Tenant of actual CAM expenses for such the prior calendar year and of Tenant's Proportionate Share thereof. If the total of the monthly payments of CAM Expenses actually made by Tenant shall be less than Tenant's Proportionate Share of the actual CAM expenses for a particular year, Tenant shall pay to Landlord the amount of such difference within twenty (20) days after notice of the amount due. If Tenant shall have paid more than Tenant's Proportionate Share of the actual CAM expenses for a particular year, Landlord shall credit Tenant's account with the overpayment amount at such time as the next additional rental payment is due or shall pay such overpayment amount to Tenant if the Lease has terminated or expired within twenty (20) days after such termination or expiration (no overpayment shall be applicable to payments of Base Rent). Notwithstanding anything to the contrary set forth herein above, Tenant shall have the right to examine Landlord's books with respect to CAM expenses and to conduct an audit thereof to determine whether the CAM expenses comply with the requirements of the Lease. If any such audit or examination reveals that either the actual CAM expenses, or Tenant's Proportionate Share thereof, were overstated, the overstated amount shall be applied as a credit against the next installment of Base Rent due under this Lease, and Landlord will pay to Tenant on demand Tenant's reasonable costs and expenses incurred in respect of such examination. In the event Landlord disputes Tenant's findings, then an independent auditor selected by Landlord and Tenant shall resolve the dispute. The cost of such

auditor shall be paid by Landlord unless the auditor determines the dispute favorably to Landlord in which event the cost will be paid by Tenant.

Landlord shall keep, for a period of not less than twenty-four (24) months after statements are rendered as provided in this section, records in reasonable detail of the items covered by such statements and shall permit Tenant, upon the giving of reasonable prior notice, to examine and audit such records to verify such statements, at reasonable times during Landlord's normal business hours.

Each of (a), (b) and (c) above is Additional Rent. Base Rent and Additional Rent together are collectively referred to herein as "Monetary Obligations." All Monetary Obligations will be due one month in advance, on the first day of each month during the term of this Lease. Tenant shall be required to pay three (3) months Base Rent as a security deposit at the execution of this Lease. Landlord shall retain the security deposit as security for the faithful performance of all of the terms of this Lease. In no event shall Landlord be obligated to use the security deposit as payment of Monetary Obligations. The first month of Monetary Obligations and security deposit shall be due simultaneously with the execution of this Lease.

**(4)   Events of Tenant Default.**

(a) Matters Constituting a Default. The occurrence of any of the following shall constitute a Tenant default under this Lease.

(i)   If Tenant shall fail to pay any Monetary Obligation when due, or fail to pay when due any other payment required by this Lease, and the continuation of such failure for five (5) business days after written notice from the Landlord. Landlord is not required to give written notice of failure to pay a Monetary Obligation more than twice in any calendar year;

(ii)   If Tenant shall violate or fail to perform any other term, condition, covenant or agreement to be performed or observed by Tenant under this Lease for a period of thirty (30) days after written notice from Landlord. If it shall not be reasonably possible for Tenant to cure the breach or violation within said thirty (30) day period, Landlord may not take remedies as described below so long as Tenant shall commence cure within five (5) days of Landlord's written notice and proceed diligently thereafter and without material interruption to completion of cure, which shall not in any event be more than ninety (90) days. If Tenant shall violate or fail to perform any term, condition, covenant, or agreement related to its insurance obligations, Landlord will not provide notice, and Tenant will have one (1) day to cure;

5

(iii)     If Tenant shall abandon or vacate the Leased Space, for four (4) consecutive weeks without the Landlord's prior written consent;

(iv)     If Tenant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors;

(v)     If any case, proceeding, or other action against Tenant or any guarantor of Tenant's obligations hereunder shall be commenced seeking to have an order for relief entered against it as debtor, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and such case, proceeding or other action results in the entry of an order for relief against it which remains undismissed for a period of ninety (90) days;

(vi)     Any guarantor of this Lease fails to comply with any of the provisions of the guaranty agreement.

Where Landlord has agreed in this Lease to provide notice of a Lease violation and an opportunity to cure, and only in those instances, Tenant shall not be considered in default or breach of the Lease, or to have committed a Tenant default under the Lease, until the applicable notice has been provided by the Landlord and/or grace periods have expired in accordance with this Lease.

**(5)     Rights of Landlord Upon Default By Tenant.**

(a)     Landlord's Remedies.   Upon the occurrence of any default by Tenant, Landlord may, at its option, pursue any or all of the following remedies: 1) proceed against the Guarantor as described in Exhibit "B" to this Lease entitled "Guaranty Agreement"; 2) cure such default on Tenant's behalf, and at its expense in which event the same shall be due and payable immediately as Additional Rent; 3) terminate this Lease by giving written notice of such election to Tenant, which notice shall specify an effective date of such termination not earlier than the fifteen (15) days after such notice of termination shall have been given.  Landlord's cure shall not constitute a waiver of Landlord's ability to pursue other Landlord rights upon Tenant default.

In the event of a default beyond any applicable grace period, and with or without termination of the Lease, Landlord may in its own name, but as agent for Tenant, assign, sublet or relet the Leased Space for any period equal to or greater or less than the remainder of the Term hereof for any sum which Landlord may deem reasonable to any new tenant Landlord may select, and for any use or purpose which Landlord may designate.  With or without terminating this Lease, Landlord may re-enter and take possession of the Leased Space and the

6

provisions of this section shall operate as a notice to quit, any other notice to quit or of Landlord's intention to re-enter the Leased Space being hereunder expressly waived. If necessary, Landlord may proceed to recover possession of the Leased Space under and by virtue of the laws of the State of New Jersey or by such other proceedings, including re-entry and possession, as may be applicable. Notwithstanding termination of the Lease, Tenant will remain responsible for Monetary Obligations to the end of the Term payable monthly and will receive credit for rent collected from new tenant net of Landlord's expenses to obtain new tenant.

(b)    Remedies Cumulative. All rights and remedies of Landlord set forth herein are in addition to all other rights and remedies available to Landlord at law or in equity. Landlord shall not be deemed to have waived any default by Tenant hereunder unless such waiver is set forth in a written instrument signed by Landlord.

(c)    No Waiver. If Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, the same shall not constitute a waiver by Landlord of any future breach or of any other covenant, condition or agreement set forth herein, nor of any of Landlord's rights hereunder.

(6) Tenant Remedies Upon Breach by Landlord. Upon the continuation of any breach or violation by Landlord of any of the terms, conditions, covenants or agreements of this Lease to be performed by Landlord, for a period of thirty (30) days after written notice from Tenant, Tenant as its exclusive remedy may cure the breach, and, after judgment by a court of competent jurisdiction adjudicating the breach and the propriety of Tenant's expenses, offset the Tenant's costs against any Monetary Obligations due thereafter. If it shall not be reasonably possible for Landlord to cure the breach or violation within said thirty (30) day period, Tenant may not take remedies as stated above so long as Landlord shall commence cure within five (5) days of Tenant's written notice and proceed diligently thereafter and without material interruption to completion of cure, which shall not in any event be more than ninety (90) days.

(7)    Notices. All notices, statements, demands or other communications ("notice(s)") to be given under or pursuant to this Lease, or which a party hereto may wish to give, must be in writing, addressed to the other party at its address as provided below, and delivered in person, by certified or registered mail, return receipt requested and postage prepaid, or by nationally recognized delivery service such as FedEx which takes a receipt upon delivery. Such notice will be deemed to have been delivered on the date of hand delivery or on the day of delivery when mailed or delivered by delivery service as aforesaid (which would also be the day receipt is rejected or three (3) days after posting, whichever is first to occur), as the case may be. Any party may from time to time change its address for receipt of notices by sending a notice to the other parties specifying such new information.

7

| Landlord: | Silver Realty Associates, LLC |
| | c/o Alaris Health |
| | 35 Journal Square, Suite 1103 |
| | Jersey City, NJ 07306 |

| Copy to: | Gruen & Goldstein, Esqs. |
| | 1150 West Chestnut Street |
| | PO Box 1553 |
| | Union, NJ 07083 |
| | Attn: Fred R. Gruen, Esq. |

| Tenant: | Sunrise Detox Cherry Hill, LLC |
| | 3185 Boutwell Road |
| | Lake Worth, FL 33461 |
| | Attn: Sal Lauria |

| Copy to: | Nason, Yeager, Gerson, White & Lioce, P.A. |
| | 1645 Palm Beach Lakes Boulevard |
| | Suite 1200 |
| | West Palm Beach, FL 33401 |
| | Attn: John White, II |

**(8)    Holdover.** If Tenant or anyone claiming under Tenant shall remain in possession of the Leased Space or any part thereof after the expiration of the term of this Lease without any agreement in writing between Landlord and Tenant with respect thereto, the entity remaining in possession shall be deemed a Tenant at sufferance, and such entity's occupancy during such holding shall be subject to all of the applicable terms and conditions of this Lease other than Base Rent and those relating to the length of the Term, and in addition thereto Tenant shall pay to Landlord as liquidated damages (in addition to the Additional Rents reserved in this Lease) an amount equal to twice the Base Rent rate due during the last twelve (12) months of the Term and Additional Rent and other charges payable hereunder (including, without limitation, Tenant's tax payment and CAM payment) for each and every day after the expiration of the Term, up to and including the day possession of the Leased Space is surrendered. The acceptance of rents or other payments by Landlord shall not create a new or additional tenancy other than as stated in this section. Tenant's holdover tenancy may be terminated by Landlord at any time on three (3) days notice.

**(9)    No Waste, Nuisance, or Illegal Use.** Tenant agrees not to commit waste on the Leased Space nor maintain, commit, or permit the maintenance or commission of a nuisance, or use the Leased Space for an unlawful purpose. Tenant agrees to conform to all applicable laws and ordinances respecting the use and occupancy of the Leased Space. However, Tenant will not be required to make alterations, additions, or improvements to the Leased Space in order to conform with any law or ordinance.

8

**(10) Alterations, Additions, and Improvements.** Tenant will not make alterations, additions, or improvements to the Leased Space without prior approval from Landlord, which approval shall not be unreasonably withheld. Any alterations, additions, and improvements made will be at Tenant's expense (with the exception of the following section entitled "Tenant Work"), and will at the termination/expiration of the Lease, at Landlord's option (a) become Landlord's property, and remain on and be surrendered with the Leased Space as part of the Premises without disturbance or damage, or (b) be removed by Tenant at its expense and the Leased Space restored to its condition before the alteration. Nothing contained in this paragraph is to be construed to prevent Tenant from removing from the Leased Space all office machines, personal property, movable equipment, and trade fixtures customarily used in its business.

(a) Tenant Work. Tenant will build out the Leased Space ("Tenant Work") subject to Landlord's approval as set forth in this Section. In any circumstance described herein requiring the approval of the Landlord, such approval will not be unreasonably withheld (with the exception of approval for changes to "Final Plans", as described below). Annexed hereto as Exhibit "C" are outline plans and specifications ("Outline Plans") for Tenant Work. Within 30 days of the Effective Date, Tenant will submit to Landlord plans and specifications which are a complete version of Outline Plans and in a form which a contractor could use to begin Tenant Work immediately ("Complete Plans"). When Landlord approves Complete Plans, or Tenant makes changes to Complete Plans necessary for Landlord approval, these "Final Plans" will become Exhibit "D". Any changes to Final Plans will require Landlord approval, which Landlord may withhold in its absolute discretion. Tenant will begin Tenant Work as described in Final Plans when both (a) Landlord has approved plans for Tenant Work, and (b) HUD has approved Lease in a form as described in the section above entitled "Approvals", and Tenant will prosecute the same to conclusion with full manpower and materials and diligence. Tenant will select all professionals who will complete Tenant Work including contractors, architects, and engineers. Tenant will be responsible for obtaining all permits and approvals required to complete Tenant's Work. Tenant will manage the process of Tenant Work and will manage all professionals Tenant hires to complete Tenant Work. Landlord will pay for a maximum of $600,000 of Tenant Work (Tenant will pay one hundred (100%) percent of all soft costs including architect, engineer, permits, attorney, etc.) by paying for a portion of each payment ("draw") to general contractor for Tenant Work in accordance with a fraction of which $600,000 is the numerator and total cost of the Tenant Work is the denominator. For example, if the total price indicated for Tenant Work is $1,000,000, Landlord will pay for 6/10 of each draw. Estimates for cost breakdown and total cost are to be provided by Tenant's architect and are to be included with Complete Plans. Tenant will pay all costs for Tenant Work that exceed $600,000. Landlord and Tenant will receive duplicate copies of all bills for draws pertaining to Tenant Work, and Landlord and Tenant will make their respective payments directly to the professional(s) performing Tenant Work, or the designated

9

representative of such professional(s) in accordance with the procedures generally applied by institutional construction mortgage lenders.

Tenant and the professionals Tenant hires for Tenant Work will not place any lien at any time on Leased Space or Premises. However, to the extent any lien is imposed resulting from Landlord's failure to pay as required herein, Landlord shall indemnify and hold Tenant harmless for such lien and Landlord shall retain sole responsibility for the discharging and other curative acts with respect to such lien.

**(11)   Liens.** Tenant agrees to keep Leased Space free and clear of liens, including construction liens, arising out of any work performed, materials furnished, or obligations incurred by Tenant, not including those agreed to in the section below entitled "Disposition of Fixtures and Personal Property at Termination of Lease". Landlord does not agree to submit the Tenant's leasehold estate to liening under the Construction Lien Law.

**(12)   Signs.** Tenant agrees that no signs or symbols will be placed in the windows or doors of the Leased Space or on any exterior part of the building, without Landlord's prior written approval which it may withhold at its absolute discretion. Tenant shall have the right, subject to Landlord's reasonable approval, to install a monument sign in front of the Leased Space and a façade sign above the main entrance to Tenant's location. Any Tenant signs must be consistent with the character of other signs at the Premises, and are subject to local zoning and permit requirements. Tenant will remove, immediately on demand by Landlord, any sign or symbol placed on the building exterior or in the windows or doors of the building, and visible from the street, that Landlord finds unsatisfactory in exercise of its absolute discretion. Failure to remove such a sign or symbol within 24 hours will constitute a Default of this Lease. Any signs placed on the Premises must be placed subject to local zoning ordinances, and subject to the agreement that Tenant will remove them at the termination of its tenancy and will repair any damage to the Premises caused by the signs. If the Tenant fails to remove the signs, Landlord may have them removed at Tenant's expense.

**(13)   Parking.** Tenant shall have access to the parking spaces located at Premises. If Tenant leases at least fifteen (15) off-site parking spaces at Fashion Square Shopping Center owned by Kimco Realty located on Brace Road, Cherry Hill, NJ, or at a location which is the same or less distance from Premises as Fashion Square Shopping Center, Landlord shall designate 2 parking spaces in close proximity to the entrance to Leased Space.

**(14)   Access for Inspection and Repairs.** Tenant will allow Landlord and its agents, upon reasonable notice, in no event less than one (1) hour, to the designated agent of the Tenant (as set forth in Section 7 hereof entitled "Notices"), free access at all reasonable times to the Leased Space for the purpose of inspecting or making repairs, additions, or alterations to the Leased Space.

10

Landlord will ensure that any such people entering the Leased Space do not interfere with the conduct of Tenant's business operations in the Leased Space.

**(15)    Repairs and Maintenance.**  Landlord shall be responsible for the exterior and structural portions of Leased Space, including the roof, gutter, downspouts, masonry walls, foundation and structural members, and shall maintain such portions in good condition and repair.  Landlord shall be responsible for the electrical, mechanical, plumbing, and fire protection located outside or under the Leased Space servicing the building in which the Leased Space is located, up to the point of connection to the Leased Space. Landlord shall not be responsible for repairs which were caused by the negligence of the Tenant or a party for whose actions the Tenant is responsible and Tenant shall be responsible for those repairs.  Tenant will maintain the Leased Space in good repair and tenantable condition during the continuance of this Lease.

**(16)    Public Liability Insurance.**    *Tenant agrees to carry public liability insurance insuring Tenant, Landlord, and Landlord's mortgagee against all claims for personal injury or property damage caused by conditions or activities on the Leased Space, in amounts to be reasonably approved by the Landlord and not to exceed $3,000,000 combined single limit.*  Tenant will be responsible for paying any and all Landlord losses and expenses due to claims for personal injury or property damage caused by conditions or activities on the Leased Space which are not covered by public liability insurance.  Tenant will defend and indemnify Landlord for all losses, damages, claims, and expenses arising out of or in connection with Tenant's occupancy or breach of any covenant in this Lease.

Except as otherwise set forth herein, except to the extent caused by the acts or omissions of Tenant or its agents, employees, contractors, servants, licensees, invitees or customers, Landlord agrees to indemnify and save harmless Tenant from any claim or loss by reason of an accident or damage to any person or property happening on any common area (including parking areas, sidewalks, ramps and service areas) of the building  or from any violation of applicable law including any law, regulation, or ordinance concerning trash, hazardous materials, or other pollutant in or about the building (excepting the Leased Space), where such accident, damage or injury results or is claimed to have resulted from an act or omission on the part of Landlord or Landlord's contractors, licensees, agents, servants or employees, and further agrees to carry public liability insurance coverage on all common areas with a company qualified to transact business in the state of New Jersey, stipulating limits of liability of not less than $1,000,000 each occurrence/$3,000,000 general aggregate combined single limit coverage. Landlord's obligations under this paragraph shall survive the expiration or earlier termination of this Lease.

**(17)    Damage or Destruction By Fire, War, or Acts of God.**    In the event the Leased Space becomes untenantable in whole or in substantial part as a result of destruction or damage by fire, acts of war, or Act of God, this Lease will cease,

11

provided, however, that the Landlord will have the option of rebuilding or repairing the Leased Space. If Landlord elects to rebuild or repair the Leased Space, during the period of repair or rebuilding, Tenant's Monetary Obligations under this Lease will be abated in the same proportion that the portion of the Leased Space rendered unfit for occupancy by Tenant bears to the whole of the Leased Space.

Notwithstanding anything contained in this Lease to the contrary, Tenant shall have the right to terminate this Lease upon giving written notice to Landlord of the exercise thereof within ten (10) days of the following events: if the Leased Space is untenantable or damaged as a result of a casualty or other act of God and (a) Landlord's construction estimates reveals it may not be able to restore the Leased Space within one hundred eighty (180) days, or Landlord fails to restore the Leased Space within one hundred eighty (180) days, after the date of the casualty or other act of God, or (b) more than twenty-five percent (25%) of the Leased Space is rendered untenantable for one hundred twenty (120) days.

**(18)    Eminent Domain Proceedings (Condemnation).** If the Leased Space or any part which Tenant determines is necessary for its operations is condemned for public or semi-public use by eminent domain proceedings, or if by reason of law, ordinance, regulation or court judgment, Tenant's use of the Leased Space for any of the specific purposes referred to in this agreement becomes prohibited, Tenant will have the right to terminate this Lease on written notice to Landlord within ten (10) days after the event, and rental will be paid only to the time when Tenant surrenders possession of the premises. If only part of the Leased Space is condemned, Tenant may elect to continue in possession of that part of the Leased Space not appropriated or condemned under the same terms and conditions of this Lease, except that in these cases Tenant will be entitled to an equitable reduction of the rental payment under this Lease. Any Monetary Obligation paid in advance beyond the time of condemnation will be returned by Landlord to Tenant on demand. Tenant does not waive any right it may have to recover from the condemnation authority for any damage it may suffer by reason of a condemnation. Tenant may pursue any condemnation award to which it is entitled by applicable law. Tenant may recover from the condemning authority or from Landlord (if Tenant can show that such amount was included in Landlord's award) that portion of any net award or payment (as defined in the following sentence) attributable to Tenant's work or installations in the Leased Space, including without limitation, the unamortized value of improvements installed in the Leased Space by Tenant at Tenant's expense based on straight-line depreciation over the remainder of the term but not including an award for the value of the Leasehold. A net award or payment shall mean the entire award or payment for such taking, less the actual and reasonable expenses incurred in collecting such award or payment.

**(20)    Litigation Costs.** If any legal action is filed to enforce this Lease, or any part of this Lease, the substantially prevailing party will be entitled to recover reasonable attorney fees, to be fixed by the court, and costs of the action.

12

**(21)    Applicable Law/TRIAL BY JURY WAIVER.** New Jersey law will be used in interpreting this Lease and in determining the rights of the parties under it and disputes will be resolved in the Superior Court of New Jersey. THE PARTIES WAIVE TRIAL BY JURY AND TENANT WAIVES RIGHT TO TRANSFER DISPOSSESS ACTION FROM SPECIAL CIVIL PART TO LAW DIVISION OR CHANCERY DIVISION OF SUPERIOR COURT.

**(22)    Surrender of Leased Space and Keys at Termination.** Tenant agrees that at the expiration of this Lease, it will surrender the Leased Space in good order, repair, and condition without notice, and will deliver to Landlord all keys belonging to the Leased Space.

**(23)    Disposition of Fixtures and Personal Property at Termination of Lease.** All alterations, additions, and improvements affixed to the Leased Space and made by Tenant in accordance with this Lease will become Landlord's property as provided in the section of this Lease entitled "Alterations, Additions, and Improvements", and will be surrendered with the Leased Space as part of the Leased Space, as provided in that section or shall be removed by Tenant at its expense and the Leased Space restored to its condition before the alteration, at Landlord option. Tenant may remove all personal property, trade fixtures, and office equipment, whether or not attached to the Leased Space, provided that they can be removed without damage resulting to the building or Leased Space. All holes or other damage to the Premises or Leased Space caused by removal of those items must be repaired and restored by Tenant promptly after the property is removed. Any such personalty not removed from the Leased Space shall become the property of Landlord and may be disposed of in such manner as Landlord may see fit and at Tenant expense. This Lease, and this provision will survive termination of the Lease.

Landlord acknowledges that Tenant's furniture, trade fixtures, equipment, signs, contents and other removable personal property, whether presently existing or hereinafter acquired (collectively, "Tenant's Property") is encumbered or may in the future be encumbered by security interests held by third party financers, and Landlord agrees such security interests are superior to any lien of Landlord and/or Landlord pursuant to this Lease or at law. Landlord also acknowledges that certain equipment is encumbered by a first lien to equipment vendors and financers. As a result of the foregoing, Landlord acknowledges and agrees that (a) Landlord shall have no lien on Tenant's Property, (b) Landlord waives any common law, Uniform Commercial Code and/or statutory right, lien, security interest or similar claim against any of Tenant's Property, and (c) Landlord waives all rights of levy, and/or distraint, that Landlord may now or hereinafter have, whether by statute or by common law in Tenant's Property, whether for payment of Monetary Obligations or otherwise. Landlord agrees to reasonably cooperate with respect to any of Tenant's financing efforts with respect to Tenant's Property and to execute any documents Tenant may reasonably require to accomplish such financing, provided such are commercially reasonable to Landlord. Additionally, Landlord agrees to execute and deliver any instrument which may be deemed reasonably necessary

regarding a record of Tenant's performance under this Lease to any third party financers of Tenant requesting such instrument. Tenant shall have the right to remove any or all of Tenant's Property at any time during this Lease.

(24)    **No Assignment or Lease Without Consent.** Tenant may not sell or assign this Lease or any part of this Lease, or any interest, or sublet the Leased Space in whole or in part without first having received the written consent of Landlord, which may not be unreasonably withheld or delayed. This Lease will not be assigned by operation of law. If Landlord once gives consent to assignment of this Lease or of any interest, or for sublease, that consent will not bar Landlord from subsequently refusing to consent to any further assignment or subleasing. Any attempt to sell, assign, or sublease without written consent of Landlord will be deemed sufficient grounds for dispossession and will entitle Landlord to proceed pursuant to the above section of this Lease entitled "Rights of Landlord Upon Default By Tenant" if it so elects. Notwithstanding assignment of the Lease, Tenant will remain jointly and severally liable upon the Lease with assignees.

(25)    **Quiet Enjoyment.** Notwithstanding anything contained herein to the contrary, Tenant shall be entitled to quiet enjoyment of the Leased Space for so long as it complies with its material obligations under this Lease. This section is not intended to create any implied covenants.

(26)    **Estoppel Certificate.** At any time and from time to time upon not less than ten (10) days prior notice by Tenant to Landlord or vice versa, the requested party will execute, acknowledge and deliver to the requesting party a statement in form reasonably acceptable to the requesting party certifying that the Lease is in full force and effect, Tenant is in possession, Tenant has commenced the payment of its Monetary Obligations, and any other information reasonably requested by the requesting party.

(27)    **Force Majeure.** In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock outs, labor troubles, inability to procure materials, failure of power, governmental moratorium or other governmental action or inaction (including failure, refusal or delay in issuing permits, approvals and/or authorizations), injunction or court order, riots, insurrection, war, fire, earthquake, flood or other natural disaster or other reason of a like nature not the fault of the party delaying in performing work or doing acts required under the terms of this Lease (but excluding delays due to financial inability) (herein collectively, "Force Majeure Delays"), then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this section shall not apply to nor operate to excuse Tenant from the payment of Monetary Obligations in accordance with the terms of this Lease. The party claiming a force majeure delay must give notice of the delay within ten (10) days after inception of the delay.

14

[SIGNATURES ON FOLLOWING PAGE]

15

IN WITNESS WHEREOF, the Landlord and Tenant have hereunto caused these presents to be signed and sealed the day and year first above written.

WITNESS:

_____

ATTEST:

_____

SILVER REALTY ASSOCIATES, LLC
a New Jersey Limited Liability Company

BY: _____

SUNRISE DETOX CHERRY HILL, LLC
a Delaware Limited Liability Company

BY: _____

EXHIBIT A

LEASED SPACE



FINAL LOCATION
OF VISUAL BARRIER
TO BE DETERMINED
BY THE LANDLORD

EXHIBIT B

GUARANTY

## GUARANTY AGREEMENT FOR LEASE OF
## 1417 BRACE ROAD, CHERRY HILL, NEW JERSEY

For and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by Silver Realty Associates, LLC (hereinafter called "Landlord") to Sunrise Detox II, LLC, 1272 Long Hill Road, Stirling, New Jersey 07980 (hereinafter called "Guarantor"), receipt of which is hereby acknowledged, and in consideration of the Landlord's execution and delivery of a certain lease dated _____, 2013, between Silver Realty Associates, LLC, a New Jersey limited liability company, as Landlord, and Sunrise Detox Cherry Hill, LLC, a Delaware limited liability company, as Tenant, covering premises known as 1417 Brace Road, Cherry Hill, New Jersey (``Lease''), more particularly described in the aforesaid Lease.

IT IS HEREBY AGREED AS FOLLOWS:

1.  Duplicates of all notices required to be given by the Landlord under the said Lease to the Tenant thereunder shall likewise be given, in the same manner as provided in the said Lease or Lease Amendment, to the Guarantors.

2.  The Guarantors, for themselves and their heirs, executors, distributees, administrators, and assigns, do hereby jointly and severally guaranty the Lease and all of Tenant's covenants for a period which is the greater of five (5) years from this date or one (1) year after the date Tenant vacates and surrenders the Leased Space (as referred to in the Lease). This is a guaranty of payment and not performance, and constitutes a primary obligation of Guarantors.

3.  This is a direct guaranty of payment, and Landlord need not exhaust remedies against Tenant before Guarantor is liable hereon.

4.  Landlord shall have the full right, in its sole discretion upon written notice to Guarantor, from time to time and at any time and without affecting, impairing or discharging, in whole or in part, the liability of the Guarantor hereunder, (a) to extend in whole or in part, by renewal or otherwise and on one or any number of occasions, the time for the performance of any term or condition of the Lease or Lease Amendment; (b) to settle,

1

compromise, release, substitute, surrender, modify or impair and to enforce and exercise, or to waive, fail or refuse to enforce or exercise any claims, rights or remedies, of any kind or nature, which Landlord may at any time have against the Tenant.

5.    This Guaranty is and shall be construed to be an absolute, continuing, unconditional guaranty. Landlord shall have the right to proceed against the Guarantor immediately upon any default hereunder and shall not be required to take any action or proceeding of any kind against the Tenant.  The liability of the Guarantor hereunder shall continue in full force and effect until all covenants covered hereby are fully satisfied and discharged and shall not be reduced, affected, impaired or discharged, in whole or in part, by reason of (a) the death of the Guarantor, or (b) the fact that any covenanted performance may be, or may arise out of the Lease or Lease Amendment which may be illegal, ultra vires, unauthorized, invalid, irregular, or unenforceable, for any reason; or (c)  the release of or substitution of the Guarantor; or (d) any irregularity in the execution of the Lease or Lease Amendment; (e) the fact that the Tenant may not have been properly formed; or (f) any other circumstance which might otherwise constitute an equitable or legal discharge or defense of the Guarantor; or (g) any other circumstance which might otherwise constitute an equitable or legal discharge or defense of the Guarantor or Tenant.  The liability of the Guarantor hereunder shall not be reduced, affected, impaired or discharged, in whole or in part, by any payment to Landlord from any source which Landlord thereafter returns or refunds, in whole or in part, by reason of the assertion of any claim of any kind relating thereto, including, without limitation, any claim of breach of contract, breach of warranty, preference, illegality, invalidity, or fraud. Landlord may defend, compromise or pay any such claim, as Landlord in its sole discretion may elect.  The term of this guaranty shall commence on the date hereof.

6.    As non-exclusive security for the payment of the Guarantor's liabilities hereunder and of any other debts, obligations and liabilities which may be owed to Landlord by the Guarantor at any time, Landlord is hereby granted and at all times shall have a general and continuing lien upon and a right of set-off against funds, rights and interests of the Guarantor and any evidences thereof which may now or at any time hereafter be in the possession, custody or control of Landlord or of any other party for Landlord's account.  Any funds paid or property delivered by Tenant to Guarantor at any time during the term of this Guaranty shall be received and held by Guarantor in trust for Landlord, and upon any default by Tenant under the Lease or Lease Amendment, Guarantor shall forthwith pay over to Landlord such funds and property on account of the obligations of Tenant under the Lease or Lease Amendment, subject to the limitation of Paragraph 3 above.

The Guarantor hereby waives (a) notice of the acceptance of this Guaranty by Landlord, (b) all defenses,

2

off-sets and counterclaims which the Guarantor or the Tenant may now or hereafter have with respect to the Lease or Lease Amendment. The Guarantor hereby waives trial by jury and the right thereto in any action or proceeding in any Court, arising on, out of, under, or by reason of, or relating in any way to, this Guaranty, or its validity, interpretation, or enforcement, or to any other controversy, claim or dispute, however arising, between the Guarantor and Landlord or their respective distributees, executors, administrators, successors, assigns or assignors. Guarantor agrees to indemnify and hold Landlord harmless from and against any and all liabilities, damages, costs and expenses, including but not limited to reasonable attorneys' fees, incurred by Landlord in the enforcement of Landlord's rights under this Guaranty.

7.    Any notice given hereunder must be served by Certified Mail, Return Receipt Requested, addressed to the party for whom it is intended at its then principal office or residence address, or if the same be unknown, to its last known principal business or residence address; and shall be deemed served when duly deposited in any post office or branch post office. Any notice hereunder not served as provided in this paragraph shall have no force or effect whatever.

8.    This Guaranty is made in the State of New Jersey and shall be governed, construed and interpreted, as to validity, enforcement and in all other respects, in accordance with the law of the State of New Jersey.    This Guaranty shall be binding upon the distributees, heirs, executors, administrators, successors and assigns of the Guarantor and shall inure to the benefit of the distributees, heirs, executors, administrators and assigns of Landlord.    Landlord shall have the right to assign and transfer this Guaranty, in whole or in part, to any assignee of the Lease or Lease Amendment or  any portion thereof.    Landlord's heirs, distributees, executors, administrators, successors and assigns shall have all of the rights, elections, remedies, privileges, discretions and powers granted hereunder to Landlord, and shall have the right to rely upon this Guaranty.    This Guaranty cannot be changed or terminated orally.

9. No waiver of any of the Landlord's rights hereunder and no modification of this Guaranty shall be deemed to be made for any reason whatsoever, including, but not limited to, any act or failure or delay in acting of Landlord unless the same shall be in writing and duly signed by Landlord, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights of Landlord or obligations of Guarantor in any other respect or

at any other time.

      10.  Guarantor hereby submits to the jurisdiction of the Superior Court of New Jersey, all controversies, claims or disputes, however arising on, out of, under, or by reason of, or relating in any way to, this Guaranty, or its validity, interpretation, or enforcement. Said forum shall apply the law of the State of New Jersey to such resolution. Service of process upon the Guarantor shall be effected in accordance with Rules of Court or by certified mail upon Guarantor.

      11.  If any provision of this Guaranty shall be unenforceable in whole or in part for any reason whatsoever, then such provision, to the extent it is unenforceable, shall be ineffective and the balance of this Guaranty shall be deemed valid and enforceable and construed as if the offending provision had been deleted therefrom.

      IN WITNESS WHEREOF, this Guaranty has been duly sealed and executed by the Guarantor this 23rd day of July, 2013.

WITNESS

GUARANTOR

Sunrise Detox II, LLC,
a New Jersey limited liability
company

4

EXHIBIT C

TENANT WORK – OUTLINE PLANS

19





**SUNRISE: CHERRY HILL**
CONCEPT PLAN

N

**LO-1C**

Scale 3/32"=1'-0"
MAY 9, 2013

EXHIBIT D

TENANT WORK – FINAL PLANS

## FIRST AMENDMENT TO LEASE

This FIRST AMENDMENT TO LEASE (this "First Amendment") is made and entered into as of March ___, 2015 (the "Effective Date") by and between **SILVER REALTY ASSOCIATES, LLC**, a New Jersey limited liability company ("Landlord"), and **SUNRISE DETOX CHERRY HILL, LLC** ("Tenant").

## RECITALS

WHEREAS, Landlord and Tenant are parties to that certain Lease dated as of June 26, 2014 (the "Lease") pursuant to which Tenant leases from Landlord certain premises comprised of approximately 8,560 rentable square feet (the "Demised Premises") within the building located at 1417 Brace Road, Cherry Hill, New Jersey (the "Building"); and

WHEREAS, the tenant, Bio-Medical Applications of New Jersey, Inc. ("Fresenius"), of the space adjacent to the Demised Premises (the "Fresenius Premises") and Alaris Health at Cherry Hill ("Silver Care Center"), located in the rear of the Building, currently utilize a portion of the Demised Premises for the transport of persons between the Fresenius Premises and the Silver Care Center; and

WHEREAS, Landlord has agreed to amend the Rent Commencement Date of the Lease; and

WHEREAS, Landlord and Tenant wish to amend certain provisions of the Lease, as set forth below.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties agree as follows:

1.    Recitals. The above Recitals are specifically incorporated herein by reference.

2.    Tenant's Additional Work.  (a) Provided that Silver Care and SCO, Silver Care Operations, LLC ("SCO") enter into the access agreement attached hereto as Exhibit A and Fresenius enters into the lease amendment attached hereto as Exhibit B (collectively, the "Access Agreements"), Tenant agrees, at Tenant's cost and expense, to complete the work required to re-locate the corridor between the Fresenius Premises and Silver Care Center, in accordance with and as set forth on the plans attached hereto as Exhibits C and D ("Tenant's Additional Work"), and Landlord consents to Tenant's performance of Tenant's Additional Work subject to the terms of this First Amendment.  Tenant shall be required to get Landlord approval for all details

1

of Tenant's Additional Work not reflected in Exhibits C and D, including all finishes, which approval shall not be unreasonably withheld. Tenant may obtain such approval via written or email correspondence from Landlord. Landlord shall cooperate with Tenant in seeking to obtain the Access Agreements. Landlord acknowledges and agrees that Tenant's Additional Work shall become Landlord's property and Tenant shall not be required to remove any of Tenant's Additional Work or restore the common areas of the Building or the premises in the Building where that work was performed, the Demised Premises, the Fresenius Premises or Silver Care Center upon the expiration or sooner termination of the Lease.

(b)  Provided that Silver Care and SCO and Fresenius enter into their respective Access Agreements, Tenant shall commence Tenant's Additional Work upon (i) Tenant's receipt of both of said Access Agreements, and (ii) Tenant's receipt of all permits and approvals, if any, required to complete Tenant's Additional Work.

(c)  Tenant or its contractors shall have the following insurances in place before commencing the Tenant's Additional Work: workers compensation insurance and general commercial liability insurance. Fresenius, Landlord and SCO shall be named as additional insureds. Tenant agrees to indemnify and hold Landlord and SCO harmless from and against any and all loss, damage or liability arising directly from injury or property damage caused by the Tenant's Additional Work, except to the extent attributable to the negligent or intentional act or omission of Landlord, its employees, agents or independent contractors.

3.    Rent Commencement.  The "Rent Commencement Date" as defined in Section 1 of the Lease is hereby amended to be the earlier of (i) Tenant's occupancy or (ii) March 6, 2015.

4.    Miscellaneous.

(a)    In the event of any conflict between the terms of this First Amendment and the terms of the Lease, the terms of this First Amendment shall supersede, govern and control.

(b)    This First Amendment shall bind and inure to the benefit of and may be enforced by the parties hereto and their respective heirs, legal representatives, successors and assigns.

(c)    Any capitalized term or phrase used in this First Amendment shall have the same meaning as the meaning ascribed to such term or phrase in the Lease unless expressly otherwise defined in this First Amendment.

(d)    Except as expressly modified hereby, all other terms, conditions, provisions, rights and obligations of the Lease shall continue in full force and effect and are hereby ratified and affirmed.

(e)    This First Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and together shall constitute one and the same agreement.

2

(f)    This First Amendment may be executed in original counterparts or by facsimile or PDF and any facsimile or PDF shall have the same effect and be as fully binding and enforceable as if such facsimile or PDF was an original counterpart.

### [SIGNATURES FOLLOW]

IN WITNESS WHEREOF and intending to be legally bound hereby, the parties hereto have caused this First Amendment to be executed as of the Effective Date.

WITNESS:                                        LANDLORD

                                                **SILVER REALTY ASSOCIATES, LLC,**
                                                a New Jersey limited liability company

Name: _____          By: _____
                                                Name:
                                                Title:

WITNESS:                                        TENANT

                                                **SUNRISE DETOX CHERRY HILL,**
                                                **LLC**
                                                By: _____
Name: _SAL LAURIA_____                Name: _____
                                                Title: _V.P DEVELOPMENT._

4590538.v1

3

## FIRST AMENDMENT TO LEASE

This FIRST AMENDMENT TO LEASE (this "First Amendment") is made and entered into as of March ___, 2015 (the "Effective Date") by and between **SILVER REALTY ASSOCIATES, LLC,** a New Jersey limited liability company ("Landlord"), and **SUNRISE DETOX CHERRY HILL, LLC** ("Tenant").

## RECITALS

WHEREAS, Landlord and Tenant are parties to that certain Lease dated as of June 26, 2014 (the "Lease") pursuant to which Tenant leases from Landlord certain premises comprised of approximately 8,560 rentable square feet (the "Demised Premises") within the building located at 1417 Brace Road, Cherry Hill, New Jersey (the "Building"); and

WHEREAS, the tenant, Bio-Medical Applications of New Jersey, Inc. ("Fresenius"), of the space adjacent to the Demised Premises (the "Fresenius Premises") and Alaris Health at Cherry Hill ("Silver Care Center"), located in the rear of the Building, currently utilize a portion of the Demised Premises for the transport of persons between the Fresenius Premises and the Silver Care Center; and

WHEREAS, Landlord has agreed to amend the Rent Commencement Date of the Lease; and

WHEREAS, Landlord and Tenant wish to amend certain provisions of the Lease, as set forth below.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties agree as follows:

1.    Recitals. The above Recitals are specifically incorporated herein by reference.

2.    Tenant's Additional Work. (a) Provided that Silver Care and SCO, Silver Care Operations, LLC ("SCO") enter into the access agreement attached hereto as Exhibit A and Fresenius enters into the lease amendment attached hereto as Exhibit B (collectively, the "Access Agreements"), Tenant agrees, at Tenant's cost and expense, to complete the work required to re-locate the corridor between the Fresenius Premises and Silver Care Center, in accordance with and as set forth on the plans attached hereto as Exhibits C and D ("Tenant's Additional Work"), and Landlord consents to Tenant's performance of Tenant's Additional Work subject to the terms of this First Amendment.  Tenant shall be required to get Landlord approval for all details

1

of Tenant's Additional Work not reflected in Exhibits C and D, including all finishes, which approval shall not be unreasonably withheld. Tenant may obtain such approval via written or email correspondence from Landlord. Landlord shall cooperate with Tenant in seeking to obtain the Access Agreements. Landlord acknowledges and agrees that Tenant's Additional Work shall become Landlord's property and Tenant shall not be required to remove any of Tenant's Additional Work or restore the common areas of the Building or the premises in the Building where that work was performed, the Demised Premises, the Fresenius Premises or Silver Care Center upon the expiration or sooner termination of the Lease.

(b)    Provided that Silver Care and SCO and Fresenius enter into their respective Access Agreements, Tenant shall commence Tenant's Additional Work upon (i) Tenant's receipt of both of said Access Agreements, and (ii) Tenant's receipt of all permits and approvals, if any, required to complete Tenant's Additional Work.

(c)    Tenant or its contractors shall have the following insurances in place before commencing the Tenant's Additional Work: workers compensation insurance and general commercial liability insurance. Fresenius, Landlord and SCO shall be named as additional insureds. Tenant agrees to indemnify and hold Landlord and SCO harmless from and against any and all loss, damage or liability arising directly from injury or property damage caused by the Tenant's Additional Work, except to the extent attributable to the negligent or intentional act or omission of Landlord, its employees, agents or independent contractors.

3.    Rent Commencement. The "Rent Commencement Date" as defined in Section 1 of the Lease is hereby amended to be the earlier of (i) Tenant's occupancy or (ii) March 6, 2015.

4.    Miscellaneous.

(a)    In the event of any conflict between the terms of this First Amendment and the terms of the Lease, the terms of this First Amendment shall supersede, govern and control.

(b)    This First Amendment shall bind and inure to the benefit of and may be enforced by the parties hereto and their respective heirs, legal representatives, successors and assigns.

(c)    Any capitalized term or phrase used in this First Amendment shall have the same meaning as the meaning ascribed to such term or phrase in the Lease unless expressly otherwise defined in this First Amendment.

(d)    Except as expressly modified hereby, all other terms, conditions, provisions, rights and obligations of the Lease shall continue in full force and effect and are hereby ratified and affirmed.

(e)    This First Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and together shall constitute one and the same agreement.

2

(f)    This First Amendment may be executed in original counterparts or by facsimile or PDF and any facsimile or PDF shall have the same effect and be as fully binding and enforceable as if such facsimile or PDF was an original counterpart.

## [SIGNATURES FOLLOW]

IN WITNESS WHEREOF and intending to be legally bound hereby, the parties hereto have caused this First Amendment to be executed as of the Effective Date.

WITNESS:

Name: _____

WITNESS: David Sussman

Name: _____

LANDLORD

**SILVER REALTY ASSOCIATES, LLC,**
a New Jersey limited liability company

By: _____
Name: _____
Title:

TENANT

**SUNRISE DETOX CHERRY HILL, LLC**

By: _____
Name:
Title:

4590538.v1

3