UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

**Praesum Healthcare Services, LLC, et al.,[1]**   Case No. 25-19335-EPK
**(Jointly Administered)**

      **Debtors.**                              Chapter 11
_____/

**OBJECTION OF SECURED CREDITOR, INSTAFUNDINGUT, LLC,
TO *EXPEDITED* MOTION FOR PRIMING POST-PETITION
FINANCING FROM eCAPITAL HEALTHCARE, CORP.**

InstafundingUT, LLC ("**InstafundingUT**"), pursuant to Section 361, 363, and 364 of the Bankruptcy Code, hereby objects to the *Expedited Motion for Priming Post-Petition Financing From eCapital Healthcare, Corp.* (Dkt No. 265) filed by the Debtors in the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**"), and in support thereof states as follows:

**PRELIMINARY STATEMENT**

InstafundingUT is a creditor with a perfected lien on the Debtors' account receivable and other assets securing approximately $7.1 million of debt, yet it received no notice, opportunity to be heard, or adequate protection while the Debtors repeatedly used its collateral under a series of interim orders. The Debtors now seek approval of a $7.5 million priming DIP Facility that would further erode InstafundingUT's collateral position without providing evidence of adequate protection as required by Section 364 of the Bankruptcy Code. The Debtors' allegations of a purported "100% equity cushion," supported by non-GAAP 4-Wall metrics, unexplained EBITDA adjustments, and a gross accounts-receivable figure

---

[1] The 28 debtors in these jointly administered cases are: (1) Praesum Healthcare Services, LLC; (2) Evolve Recovery Center, LLC; (3) Evolve Recovery Center at Millbury LLC; (4) Sunrise Detox Alpharetta, LLC; (5) Sunrise Detox Brentwood, LLC; (6) Sunrise Detox Cherry Hill, LLC; (7) Sunrise Detox Duluth, LLC; (8) Sunrise Detox III, LLC; (9) Sunrise Detox Millbury, LLC; (10) Sunrise Detox Orlando, LLC; (11) Sunrise Detox Toms River, LLC; (12) The Counseling Center at Cherry Hill, LLC; (13) The Counseling Center at Clark, LLC; (14) The Counseling Center at Duluth, LLC; (15) The Counseling Center at Fair Lawn, LLC; (16) The Counseling Center at Freehold, LLC; (17) The Counseling Center at Middlesex, LLC; (18) The Counseling Center at Robbinsville, LLC; (19) The Counseling Center at Roswell, LLC; (20) The Counseling Center at Roxbury, LLC; (21) The Counseling Center at Brunswicks, LLC; (22) The Counseling Center at Toms River, LLC; (23) The Counseling Center at WestCaldwell, LLC; (24) The Counseling Center at Yorktown Heights, LLC; (25) Beacon Point Recovery Center LLC; (26) Sunrise Detoxification Center, LLC; (27) Sunrise Detox II, LLC; and (28) The Counseling Center at Millbury, LLC (collectively, the "**Debtors**").

containing substantial aging, is speculative, opaque, and legally insufficient to meet their burden. Their own assertions of imminent financial collapse only undermine the credibility of any claimed nine-figure going-concern value. The Debtors have already attempted to prime InstafundingUT by fraudulently inducing it to loan $7.1 million dollars and then using the loan proceeds to fund these Chapter 11 cases and only giving replacement liens to the Debtors' other creditors. Now the Debtors attempt to do it again only with notice this time. Because the Debtors have not demonstrated the unavailability of less intrusive financing and have not established that InstafundingUT will be adequately protected, the Debtors' request for postpetition financing should be denied.

## BACKGROUND

### I.  Procedural Background

1.  On August 13, 2025, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

### II.  The Debtors' Constant Need for "Emergency" Financing

#### A.  InstafundingUT's Financing

4.  Timothy Doran ("**Doran**"), on behalf of the Debtors, entered into that certain *Loan Agreement* (the "**Loan Agreement**") with InstafundingUT to borrow $7.1 million.

5.  The Loan Agreement provides, in relevant part, that:

[N]either Borrower nor any Secured Guarantor intends to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction within six (6) months of the Effective Date; [and] neither Borrower nor any each Secured Guarantor is presently insolvent within the meaning of the UCC as well as the United States Bankruptcy Code and neither will become insolvent upon the making of the Loan[.]

Loan Agreement at 10–11, ¶ 18.

6.  Pursuant to the Loan Agreement, InstafundingUT recorded its *State of Florida Uniform Commercial Code Financing Statement Form*, File No. 202503269522 (the "**UCC-1**") with the Florida Secured Transaction Register.

7.      The Loan Agreement and the UCC-1 gave InstafundingUT a properly perfected security interest in the Debtors' assets, including the Debtors' collateral as defined under Section 363 of the Bankruptcy Code.

8.      The Loan Agreement was executed on August 12, 2025 at 2:28 P.M. (EST).

9.      InstafundingUT disbursed $6,397,200.00 (the "**InstafundingUT's Collateral**") of loan proceeds to the Debtors account at City National Bank of Florida ("**City National**") on August 13, 2025 at or around 11:30 A.M. (EST).

10.      The UCC-1 was recorded on August 13, 2025 at 1:23 P.M. (EST).  City National Bank purports to have swept the Debtors' account thereafter at approximately 3:23 p.m. for the total amount of $5,119,108.64.

**B.      Citibank's DIP Financing**

11.      On September 22, 2025, the Debtors filed their *Expedited Motion for Post-Petition Financing from City National Bank* (Dkt. No. 111) (the "**First DIP Motion**") seeking to obtain postpetition financing from City National Bank of Florida ("**City National**") in the amount of $2,026,554.05.

12.      The First DIP Motion alleges that City National swept $5,119,908.64 from the Debtors' bank account pre-petion.  Given a dispute between the Debtors and City National on when those funds were swept, City National returned $3,093,354.59 to the Debtors.  The remaining $2,026.554.05 remained with City National, and are the funds in which the Debtors sought to borrow against for postpetition financing.[2]

13.      On October 3, 2025, the Court entered its *Interim Order Granting for Post-Petition Financing from City National Bank* (Dkt. No. 136) ("**First Interim DIP Order**") granting the First DIP Motion on an interim basis and setting a further hearing for October 15, 2025.

14.      On October 29, 2025, exactly fourteen (14) days after the running of the time for InstafundingUT to appeal the First DIP Motion, the Court entered its *Final Order Granting Motion for Post-Petition Financing from City National Bank* (Dkt. No. 196) (the "**Final CNB DIP Order**").

15.      InstafundingUT was not given notice of the First DIP Motion, the initial hearing on the First DIP Motion, the First Interim DIP Order or the second hearing on the First DIP Motion.  *See* Certificate of Service (Dkt. No. 119) (failing to serve InstafundingUT

---

[2] Of particular import, the First DIP Motion explicitly excludes any mention that the $5,119,908.64 came from InstafundingUT's Funds.

with the First DIP Motion); Certificate of Service (Dkt. No. 139) (failing to serve InstafundingUT with the First Interim DIP Order). The Final CNB Order was not served on InstafundingUT either.

      C.    **The Cash Collateral Filings**

    16.    On August 14, 2025, the Debtors filed their *Expedited Motion to Authorize Debtors' Continued Use of Cash Collateral Effective as of the Petition Date* (Dkt. No. 15) (the "**Cash Collateral Motion**").

    17.    On August 19, 2025, the Court entered its *Interim Order Granting, In Part, On Temporary Basis, Expedited Motion to Authorize Debtors' Continued Use of Cash Collateral and Setting Further Hearing* (Dkt. No. 39) (the "**First Interim Cash Collateral Order**").

    18.    On September 15, 2025, the Court entered its *Second Interim Order Granting, In Part, On Temporary Basis, Expedited Motion to Authorize Debtors' Continued Use of Cash Collateral and Setting Further Hearing* (Dkt. No. 97) (the "**Second Interim Cash Collateral Order**").

    19.    On September 29, 2025, the Court Entered its *Third Interim Order Granting, In part, On Temporary Basis, Expedited Motion to Authorize Debtors' Continued Use of Cash Collateral and Setting Further Hearing* (Dkt. No. 127) (the "**Third Interim Cash Collateral Order**").

    20.    On October 23, 2025, the Court entered the *Fourth Interim Order Granting, in Part, on Temporary Basis, Expedited Motion to Authorize Debtors' Continued Use of Cash Collateral and Setting Further Hearing* (Dkt. No. 172) (the "**Fourth Interim Cash Collateral Order**").

    21.    On November 14, 2025, the Court entered the *Fifth Interim Order Granting, In Part, On Temporary Basis, Expedited Motion to Authorize Debtors' Continued Use of Cash Collateral and Seeking Further Hearing* (Dkt No. 261) (the "**Fifth Interim Cash Collateral Order**", and together with the Cash Collateral Motion, First Interim Cash Collateral Order, Second Interim Cash Collateral Order, Third Interim Cash Collateral Order, and Fourth Interim Cash Collateral Order, the "**Cash Collateral Filings**").

    22.    InstafundingUT was never provided with notice and an opportunity to be heard on the Cash Collateral Filings.  *See* Notice of Filing Master Service List Pursuant to Local Rule 2002-1(H)(2) (Dkt. No. 12) (failing to list InstafundingUT); Certificate of Service (Dkt. No. 20) (failing to certify service of the notice of hearing on InstafundingUT); Certificate of Service (Dkt. No. 22) (failing to certify service of the notice of hearing on InstafundingUT);

Certificate of Service (Dkt. No. 48) (failing to certify service of the First Interim Cash Collateral Order on InstafundingUT); Notice of Filing Updated Master Service List (Dkt. No. 98) (failing to list InstafundingUT); Certificate of Service (Dkt. No. 99) (failing to certify service of the Second Interim Cash Collateral Order on InstafundingUT); Notice of Filing Second Updated Master Service List (Dkt No. 131) (failing to list InstafundingUT); Certificate of Service (Dkt. No. 132) (failing to certify service of the Third Interim Cash Collateral Order on InstafundingUT); Master Service List As Of October 24, 2025 (Dkt No. 175) (failing to list InstafundingUT); Certificate of Service (Dkt. No. 176) (failing to certify service of the Fourth Interim Cash Collateral Order on InstafundingUT, which set the hearing on the Fifth Interim Cash Collateral Order).

23.    None of the Cash Collateral Filings sought or provided InstafundingUT with adequate protection for the Debtors use of its collateral.

24.    On November 14, 2025, InstafundingUT filed its *InstafundingUT, LLC's Expedited Motion for Adequate Protection* (Dkt No. 259) (the "**Motion for Adequate Protection**") seeking adequate protection in the form of a replacement lien for the Debtors unauthorized use of its collateral.

### D.    The Proposed DIP Financing from eCapital

25.    On November 14, 2025, the Debtors filed their *Expedited Motion for Priming Post-Petition Financing from eCapital Healthcare Corp.* (Dkt No. 265) (the "**Second DIP Motion**") seeking to obtain $7,500,000.00 in postpetition financing.

26.    The Second DIP Motion seeks authorization for the Debtors (the "**DIP Borrowers**") to borrow up to $7,500,000.00 from eCapital under a revolving credit facility (the "**DIP Facility**").  *See* Ex. A., Second DIP Motion (providing the term sheet for the proposed DIP financing).

27.    The obligations under the DIP Facility (the "**DIP Obligations**") are to be secured by: (i) a first-priority lien on all prepetition and postpetition assets of the Debtors including cash, accounts receivable, and inventory; (ii) a first priority lien on all previously unencumbered assets including, but not limited, to Chapter 5 causes of action; and (iii) a junior lien on all prepetition liens on such real property and related assets.  *See generally id.*

### E.    The Proposed Adequate Protection to Prepetition Secured Parties

28.    In exchange for the priming of creditors that "may have claims [totaling $26,680,643.00] secured by liens on the Debtors' receivables and other assets", the Debtors propose that those prepetition secured creditors (the "**Prepetition Secured Creditors**") are

5

adequately protected from any potential diminution of value of their interests in the collateral securing the DIP Facility due to "an equity cushion of well over 100% of their claims" (the "**Proposed Adequate Protection**").  Second DIP Motion at ¶¶ 15–16.

29.    The equity cushion providing the Proposed Adequate Protection is based on (i) a report of the Debtors' accounts receivable estimated to be roughly $31.3 million in value (the "**AR Report**"); (ii) a 4-Wall Report (the "**4-Wall Report**") prepared by Glass Ratner; and (iii) that application of conservative "multiple for valuation purposes reveals the value of the Debtors as a going concern [. . .] in the nine-figure range."  *Id.* at ¶ 16.

30.    InstafundingUT is not listed as one of the Prepetition Secured Creditors. Inclusion of the InstafundingUT as one of the Prepetition Secured Creditors puts the value of the claims secured by liens on the Debtors' receivables and other assets at $33,780,642.00. *Compare* Motion for Adequate Protection (asserting a $7.1 million dollar security interest in the debtor's assets), *with*  Second DIP Motion (asserting that the Prepetition Secured Creditors claim a secured interest in the Debtors' assets of $26,680,643.00).  If eCapital is permitted to lend to the Debtor on a secured superiority basis the total amount of claims secured by an interest in the Debtors' assets at $41,280,643.00.  *See id.* (proposing to obtain postpetition financing of $7.5 million from eCapital).

## OBJECTION

## I.    The Legal Standard for Approval of Postpetition Financing

31.    The law is well-settled that a bankruptcy court should only approve proposed debtor-in-possession financing if such financing is fair, reasonable, and adequate. *See In re Ames Dep't Stores*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) (collecting cases where a bankruptcy court declined to approve postpetition financing because the terms were not fair, reasonable, or adequate under the circumstances). In determining the fairness, reasonableness, and adequacy of the terms of a postpetition financing facility, bankruptcy courts must consider whether: (i) the debtor is unable to obtain unsecured credit under Section 364(b) of the Bankruptcy Code; and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. § 364(d)(1)(A)–(B).

32.    With respect to the issue of adequate protection, the debtor has the burden of proof.  11 U.S.C. § 364(d)(2); *see also RTC v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (mortgagee's must be adequately protected to approve post-petition financing on a super-priority basis); *In re Westport Holdings Tampa,*

*Ltd. P'ship*, 607 B.R. 715, 729 (Bankr. M.D. Fla. 2019) (holding that "the [debtor] has the burden of proof on the issue of adequate protection") (citing 11 U.S.C. § 364(d)(2)).

33.    Courts recognize that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564 (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)). "The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11." *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). "In other words, the proposal should provide the prepetition secured creditor with the same level [of] protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564.

34.    Granting postpetition financing on a priming basis is extraordinary and is allowed only as a last resort. *See, e.g.*, *In re Seth*, 281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("The ability to prime is extraordinary[.]"); *In re Beker Indus.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (holding that the application of what is adequate protection for secured creditors is left to the vagaries of each case, "but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process"). Priming is impermissible unless there is adequate protection to existing lienholders. *See generally In re First South Sav. Ass'n*, 820 F.2d 700, 701–11 (5th Cir. 1987).

35.    "A proposal depending upon a pre-petition lender having adequate protection, no matter its form, should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564 (citing *In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985); *In re American Mariner Indus., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)).

36.    As discussed in more detail below, the standards that must be satisfied for this Court to approve the DIP Facility have not been met.

**I.    The Debtors Have Not Satisfied Their Burden That All Prepetition Secured Creditors Will Be Adequately Protected**

37.    "The important question" this Court must ask in determining the adequacy of protection afforded to secured creditors under Section 364 of the Bankruptcy Code is whether the interest of the secured creditor whose lien is to be primed "is being unjustifiably jeopardized." *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 899 (Bankr. N.D. Ohio 1992) (quoting *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991)).

38.    The Debtors contend that the Prepetition Secured Creditors are adequately protected by an equity cushion, without recognizing the impact of InstafundingUT's secured

7

claim and, if approved, eCapital's superpriority priming lien on the total dollar value of secured claims. *See* Second DIP Motion ¶ 16 (asserting that "[c]reditors currently and will continue to enjoy an equity cushion well over 100% of their claims.").

39.     Unsupported claims of an equity cushion supported by the 4-Wall Report and AR Report are insufficient to satisfy the Debtors' burden of proof in establishing that prepetition secured creditors are adequately protected. *See, e.g.*, *Desert Fire Prot. v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC)*, 434 B.R. 716, 754 (S.D. Fla. 2010) ("When formulating adequate protection in connection with post-petition financing on a priming basis, preserving or enhancing the value of collateral must be viewed side-by-side with the decrease in value of the creditor's interest in property caused by the priming lien.").

40.     First, the AR Report only shows $31 million of accounts receivable, but the Debtors have secured creditors with liens on the Debtors' assets in excess of $33 million. And now the Debtors are seeking to take on an additional $7.5 million of debt.

41.     Second, the 4-Wall Report is an internal, non-GAAP metric that fundamentally misrepresents the value of the Debtors' business as a going concern. To properly determine the going-concern value of the Debtors' business, any valuation must account for all necessary costs to keep the corporate structure running. The 4-Wall Report strips out corporate overhead and other enterprise-level costs. The 4-Wall Report does not reflect the actual cash flows available to service debt or the value of the collateral on a going-concern basis. Furthermore, the 4-Wall Report contains a line item for unexplained "Other Adjustments." By including this line item without any explanation or insight as to what it represents, the 4-Wall Report artificially increases EBITDA by over $6.5 million. In sum, the 4-Wall Report is unreliable and does not accurately represent the value of the Debtors' business.

42.     Third, the AR Report is also problematic for determining the value of the business. The AR Report shows substantial receivables in older aging accounts—91–120 days, 121–150 days, and 151–180 days—totaling many millions of dollars. Collectability risk increases with age, meaning that the $31+ million headline A/R number does not necessarily translate into actual value that can provide an equity cushion for secured lenders.

43.     As a result, the Court cannot rely on either the 4-Wall Report or the AR Report as a basis for value when determining whether the prepetition secured creditors are adequately protected, if primed. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 287–88 (S.D.N.Y. 1996) (debtor could not provide adequate protection necessary to secured creditor necessary to

obtain superpriority financing where there was only speculative benefit to secured creditor that the property's value would increase more than the amount of the financing, as it was not clear that the financing would increase the value of the property); *In re St. Petersburg Hotel Assocs. Ltd.*, 44 B.R. 944, 946 (Bankr. M.D. Fla. 1984) ("An examination of the assumptions relied on by the Debtor which forms the basis for the proposition that the Mortgagee is adequately protected reveals that the assumptions are mere expectations, many of which are highly speculative and unrealistic.").

44.     The Debtors also offer no analysis quantifying InstafundingUT's protection with the purported equity cushion, no evidence that InstafundingUT will be oversecured after the priming lien, and no evidence of the impact of the DIP Facility on InstafundingUT's recovery.   Adequate protection must be creditor-specific; it cannot rest on generalized assertions about aggregate value.  *See, e.g.*, *In re Beker Indus.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (holding that the application of what is adequate protection for secured creditors is left to the vagaries of each case, "but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

45.     The Debtors have yet to propose a reorganization strategy or to advise how they intend to satisfy the claims of its numerous creditors.  The Debtors have not presented any marketing or sale process by which to sell the Debtors' business as a going concern and have not proposed a plan of reorganization or liquidation.  Any allegation that obtaining postpetition financing under the DIP Facility will somehow result in the prepetition secured creditors realizing the value of their collateral is speculative at best.

46.     In light of the foregoing, the Debtors' have not met their burden to show that InstafundingUT is adequately protected.

## II.    The Debtors Have Not Satisfied Their Burden That They Cannot Obtain Postpetition Financing On More Favorable Terms

47.     A debtor may obtain credit secured by priming liens under Section 364(d) of the Bankruptcy Code only if (i) the debtor cannot obtain credit otherwise, and (ii) existing lienholders are adequately protected.

48.     The Debtors leap directly to the most intrusive remedy—a priming lien on "all of the Debtors' assets" for the benefit of eCapital—without satisfying either the unavailability requirement or the adequate protection requirement.

49.     Under Section 364 of the Bankruptcy Code, the Debtors must show they cannot obtain credit on less burdensome terms (e.g., unsecured, secured only by unencumbered property, or on a junior-lien basis) without granting a priming lien.  11 U.S.C. § 364(c), (d).

Courts routinely require a factual record showing that potential lenders refused to lend on lesser protections and that the proposed DIP is the best available in the market. *See, e.g.*, *In re Saybrook Mfg. Co., Inc.*, 127 B.R. 494, 497–99 (M.D. Ga. 1991), *aff'd*, 963 F.2d 1490 (11th Cir. 1992) (holding that cross-collateralization is a disfavored form of DIP financing that may be approved only upon a detailed evidentiary showing that the debtor cannot obtain alternative financing on acceptable terms and that the proposed facility is fair, reasonable, and in the best interests of the estate).

50.    The Second DIP Motion contains only the allegation that "no potential lender has offered to extend necessary post-petition credit" except on a priming, superpriority basis. There is no evidence of: (i) the number or identity of lenders contacted; (ii) the terms those lenders offered or rejected; (iii) whether unsecured or non-priming secured credit was actually unavailable; or (iv) any attempt to negotiate less intrusive structures (e.g., limited collateral packages, junior liens, smaller facilities).  The record is insufficient for the Court to find that the Debtors have met the requirements of Section 364(d) of the Bankruptcy Code.

## CONCLUSION

For the foregoing reasons, InstafundingUT hereby seeks the entry of an order of the Court: (i) sustaining this Objection; (ii) denying the Second DIP Motion; and (iii) for such other and further relief that is just and proper.

**Dated: November 19, 2025**

**EDELBOIM LIEBERMAN PLLC**
*Counsel for InstafundingUT, LLC*
2875 NE 191st St., Penthouse One
Miami, FL 33180
Telephone: (305) 768-9909
Facsimile: (305) 928-1114
Email: morgan@elrolaw.com
Email: alex@elbizlaw.com

By:    */s/ Morgan B. Edelboim*
       Morgan B. Edelboim, Esq. (FBN 40955)
       Alexander Lewitt, Esq. (FBN 1048121)

## CERTIFICATE OF SERVICE

I HEREBY certify that a true and correct copy of the foregoing was served on November 19, 2025 by Notice of Electronic Filing to all parties registered to receive electronic notification via CM/DKT notification and upon the Twenty (20) largest unsecured creditors.

By:    */s/ Morgan B. Edelboim*
       Morgan B. Edelboim, Esq.

10