**ASSET PURCHASE AGREEMENT**

by and among

**Mandi Mayfair Group LLC**

as Purchaser,

and

**Each of the Entities Set Forth on Schedule 1 as a "Seller"**

collectively, as Sellers

DATED AS OF FEBRUARY 18, 2026

## TABLE OF CONTENTS

**Page**

**ARTICLE I. ASSET TRANSFER; CLOSING DELIVERABLES** .......... 4
Section 1.01 Closing and Effective Time .......... 4
Section 1.02 Transfer of Acquired Assets .......... 4
Section 1.03 Excluded Assets .......... 7
Section 1.04 Assumed Liabilities .......... 8
Section 1.05 Excluded Liabilities .......... 9
Section 1.06 Assumption/Rejection of Contracts and Leases .......... 9
Section 1.07 Purchase Price .......... 10
Section 1.08 Sellers' Deliverables .......... 11
Section 1.09 Purchaser's Deliverables .......... 1
Section 1.10 Sellers' Deliverables at the Closing of the Transfer of the Post-Closing Acquired Assets .......... 1
Section 1.11 Purchaser's Deliverables at the Closing of the Transfer of the Post-Closing Acquired Assets .......... 1
Section 1.12 Interim Management Agreement .......... 1
Section 1.13 Post-Closing Adjustments .......... 2

**ARTICLE II. TRANSFER OF OPERATIONS** .......... 2
Section 2.01 Cooperation and Licensure .......... 2
Section 2.02 Patient Funds; Advance Payments .......... 2
Section 2.03 Recapture Claims .......... 3
Section 2.04 Employees .......... 3
Section 2.05 Accounts Receivable .......... 4
Section 2.06 Prorations .......... 5
Section 2.07 Treatment of Prorations .......... 6
Section 2.08 Reserved .......... 6
Section 2.09 Medicare/Medicaid; Provider Agreements .......... 6
Section 2.10 Transfer of Records; Access to Records .......... 8
Section 2.11 Utilities; Deposits .......... 9
Section 2.12 Information Systems. .......... 9
Section 2.13 Use of Telephone Numbers; Emails .......... 9
Section 2.14 Operating Procedures Manuals .......... 10

Section 2.15 INTERIM MANAGEMENT AGREEMENT CONTROLS ....................................10

**ARTICLE III. REPRESENTATIONS AND WARRANTIES OF SELLERS..........................................10**

Section 3.01 Power and Authority; Organization ........................................................10

Section 3.02 Authorization; Enforceability................................................................10

Section 3.03 No Defaults ..........................................................................................10

Section 3.04 Real Property and Assets.......................................................................11

Section 3.05 Health Care Representations .................................................................12

Section 3.06 Compliance with Laws..........................................................................12

Section 3.07 ERISA and Benefit Plans .......................................................................13

Section 3.08 Patriot Act Representations....................................................................13

Section 3.09 Material Contracts ................................................................................13

Section 3.10 Intellectual Property Assets ...................................................................13

Section 3.11 No Consent or Approval........................................................................14

Section 3.12 Insurance .............................................................................................14

Section 3.13 WARN Act ...........................................................................................14

Section 3.14 Brokerage and Transaction Bonuses.......................................................14

Section 3.15 Nature of Transaction............................................................................15

Section 3.16 Disclosure.............................................................................................15

**ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................................15**

Section 4.01 Authority, Validity and Binding Effect ...................................................15

Section 4.02 No Defaults ..........................................................................................15

Section 4.03 "As Is, Where Is" Transaction ...............................................................16

**ARTICLE V. COVENANTS ...........................................................................................16**

Section 5.01 Compliance with Laws ..........................................................................16

Section 5.02 Efforts ..................................................................................................16

Section 5.03 Adequate Assurances regarding the Purchaser Assumed Agreements.......16

Section 5.04 Consents; Notices .................................................................................17

Section 5.05 Case Disposition....................................................................................17

Section 5.06 Trade Name Transfer.............................................................................18

Section 5.07 Bank Accounts and Cash Management...................................................18

Section 5.08 Vehicles ................................................................................................19

Section 5.09 Books and Records................................................................................19

Section 5.10 Cooperation in Legal Proceedings ........ 19

**ARTICLE VI. MISCELLANEOUS ........ 20**

Section 6.01 Further Assurances ........ 20

Section 6.02 Notices ........ 20

Section 6.03 Entire Agreement; Amendment; Waiver ........ 21

Section 6.04 Assignment ........ 21

Section 6.05 Joint Venture; Third Party Beneficiaries ........ 21

Section 6.06 Representation by Counsel ........ 21

Section 6.07 Captions ........ 22

Section 6.08 Counterparts ........ 22

Section 6.09 Governing Law ........ 22

Section 6.10 JURISDICTION; VENUE ........ 22

Section 6.11 Performance ........ 22

Section 6.12 Attorney's Fees ........ 22

Section 6.13 Waiver of Jury Trial ........ 22

Section 6.14 Severability ........ 23

Section 6.15 Usage ........ 23

Section 6.16 Confidentiality ........ 23

Section 6.17 Sale Order Provisions ........ 23

**Exhibits**

Exhibit 1 Defined Terms

Exhibit 2 Interim Management Agreement

Exhibit A Form of Bill of Sale

Exhibit B Form of Assignment and Assumption Agreement

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of February 18, 2026 (the "Effective Date"), by and among Mandi Mayfair Group LLC, a New Jersey limited liability company ("Purchaser"), and each of the entities set forth on Schedule 1 attached hereto as a "Seller" (each, a "Seller", and collectively, the "Sellers"). Purchaser and Sellers may be referred to herein as a "Party" and collectively as, the "Parties."

## RECITALS:

**A.** WHEREAS, each Seller is the licensed operator of that certain detox, residential and/or outpatient drug and alcohol treatment facility set forth opposite its name on Schedule 1 attached hereto (each, a "Facility", and collectively, the "Facilities").

**B.** WHEREAS, each Seller owns or leases the Acquired Assets (as defined herein), including those used in connection with the operation by such Seller of the applicable Facility.

**C.** WHEREAS, each Seller desires to sell to Purchaser all of the Acquired Assets owned by such Seller, subject to the assumption by Purchaser of the Assumed Liabilities (which Acquired Assets and Assumed Liabilities generally comprise the Business), and Purchaser desires to purchase from such Seller the Acquired Assets and assume the Assumed Liabilities, in each case, upon the terms and conditions hereinafter set forth.

**D.** WHEREAS, in connection with that certain voluntary bankruptcy cases by Praesum Healthcare Services, LLC and its Affiliates in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), lead case number 25-19335, Praesum Healthcare Services, LLC, et al. (the "Bankruptcy Cases"), the Bankruptcy Court entered its Order (I) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (II) Granting Related Relief on January 19, 2026 [Dkt. No. 516] (the "Sale Order"), approving the sale of the Acquired Assets to Purchaser pursuant to this Agreement.

**E.** WHEREAS, Purchaser and Sellers have entered into that certain Interim Management Agreement, dated January 23, 2026 (the "Interim Management Agreement"), which, consistent with the Sale Order, provides that, as of 12:01 a.m. Eastern Time on January 24, 2026, Purchaser is entitled to all revenues and responsible for all operational costs of the Facilities, and shall assume such costs of any facility closures elected by Purchaser from and after such time as specified in Article V of the Interim Management Agreement (capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Interim Management Agreement).

**F.** WHEREAS, the Parties desire to consummate the transactions contemplated hereby simultaneously with the execution of this Agreement.

**G.** WHEREAS, all capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them on Exhibit 1 hereto, which is incorporated into this Agreement as if set forth herein in full.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto do hereby agree as follows:

## ARTICLE I.
## ASSET TRANSFER; CLOSING DELIVERABLES

Section 1.01 Closing and Effective Time.

(A) Closing. The closing of the transactions contemplated under this Agreement (the "Closing") shall take place simultaneously with the execution of this Agreement on February 18, 2026 (the "Closing Date"), by conference call and exchange of signature pages by email.

(B) Effective Time. The "Effective Time" shall mean 12:01 a.m. Eastern Time on January 24, 2026, consistent with the Sale Order and Interim Management Agreement. Any provision in this Agreement referring to actions "prior to Closing" that have already occurred as of the Effective Time are deemed satisfied.

Section 1.02 Transfer of Acquired Assets.

(A) On the terms and subject to the conditions set forth in this Agreement and the Sale Order, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept free and clear of all Liabilities and Liens (other than Permitted Liens), the right, title and interest of Sellers in, to and under all of the properties and assets of Sellers that are necessary to run and operate the Sellers' Business (including all Facilities currently operated by the Sellers), along with all other properties and assets of the Sellers, in each case to the extent that such properties and assets may be transferred to Purchaser prior to completion of the Change of Control/Facility Transfer Process (as defined herein), other than the Excluded Assets, including, without limitation and for the avoidance of doubt, the following assets (herein collectively called the "Closing Date Acquired Assets"):

(1) all Accounts Receivable;

(2) all of the books, records, policies and procedures manuals, files, logs, ledgers and journals pertaining to or used in the operation of the Facilities, including, but not limited to, employee records (including, without limitation, all employee background checks, disciplinary records, employment applications, W-4's, I-9's) and patient records, stored in any form or medium, including any electronic data stored on storage devices or in

the cloud, and originals of any of the foregoing that relate to the Facilities (collectively, the "Facility Records");

(3) all information technology systems, clocks, telephone systems and telephone and facsimile numbers, domain names, and websites relating to the Facilities and all post office box addresses, associated with the Facilities;

(4) all third party guaranties or warranties then in effect, if any, with respect to the Facilities and the Personal Property (as hereinafter defined);

(5) all rights, claims, credits, refunds, causes of action, choses in action, rights of recovery and rights of setoff of each Seller against third parties arising out of, or related to, the Acquired Assets, including any rights in connection with product returns, rebates, credits and related claims and any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to each Seller related to the Acquired Assets, except for such matters that are expressly excluded as an Excluded Asset;

(6) all rights under insurance policies of each Seller to the extent relating to any Acquired Asset or Assumed Liability (excluding all directors' and officers' insurance policies);

(7) all Intellectual Property Rights used in or associated with the Business or any Facility, including without limitation: (i) all trade names under which each Facility operates as listed on Schedule 1.02(A)(7), (ii) all trademarks, service marks, logos, and other branding associated with such trade names, (iii) all domain names, social media accounts, and online presence associated with the Facilities, (iv) all goodwill associated with the foregoing, and (v) all registrations and applications for any of the foregoing (collectively, "Intellectual Property Assets"), together with the right to sue for past, present and future infringements thereof;

(8) all of the Sellers' goodwill in respect of the Business and the operation of the Facilities; and

(9) all flexible spending account balances with respect to the Transferred Employees to the extent assignable;

(10) all utility deposits held by utility companies for the Facilities; and

(11) all prepaid expenses and deposits (other than Security Deposits under Assumed Real Property Leases which are addressed in Section 1.02(B)(2)), including without limitation prepaid insurance premiums, prepaid maintenance contracts, prepaid software licenses, prepaid rent, and other prepaid items relating to the operation of the Facilities.

(B) Within three (3) Business Days of the completion of the Change of Control/Facility Transfer Process with respect to any Facility (the date of such transfer of assets with respect to such Facility, the "Facility Transfer Effective Date"), the applicable Seller shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept free and clear of all Liabilities and Liens (other than Permitted Liens), the right, title and interest of such Seller in, to and under all of the properties and assets of such Seller that are necessary to run and operate the Sellers' Business with respect to such Facility, along with all other properties and assets of the Sellers, in each case to the extent that such properties and assets may not be transferred to Purchaser until the completion of the Change of Control/Facility Transfer Process with respect to such Facility (other than the Excluded Assets), including, without limitation and for the avoidance of doubt, the following assets (herein collectively called the "Post-Closing Date Acquired Assets", and together with the Closing Date Acquired Assets, collectively, the "Acquired Assets"):

(1) Subject to the terms and conditions of this Agreement, and to the extent (x) assignable pursuant to Sections 363 and 365 of the Bankruptcy Code, and (y) designated by Purchaser on or before the Facility Transfer Effective Date and such assumption and assignment is approved by the Bankruptcy Court, all rights of the such Seller in, to and under the Contracts listed or described on Schedule 1.02(B)(1) as of the Assumption/Rejection Deadline (as defined in Section 1.06 (A)), as may be amended by Purchaser from time to time as provided herein (the "Assumed Contracts");

(2) Subject to the terms and conditions of this Agreement, and to the extent (x) assignable pursuant to Sections 363 and 365 of the Bankruptcy Code and applicable Law, and (y) designated by Purchaser on or before the Facility Transfer Effective Date and such assumption and assignment is approved by the Bankruptcy Court, all rights of such Seller in, to and under the real property leases of Sellers listed or described on Schedule 1.02(B)(2), as may be amended by Purchaser from time to time as provided herein (the "Assumed Real Property Leases"), which rights shall include the rights to receive any security deposits (the "Security Deposits") held by the landlords under the Assumed Real Property Leases;

(3) Subject to the terms and conditions of this Agreement, and to the extent (x) assignable pursuant to Sections 363 and 365 of the Bankruptcy Code and applicable Law, and (y) designated by Purchaser on or before the Facility Transfer Effective Date and such assignment and assumption is approved by the Bankruptcy Court, all rights of the such Seller in, to and under the Provider Agreements listed or described on Schedule 1.02(B)(3), as may be amended by Purchaser from time to time as provided herein (the "Assumed Payor Agreements");

(4) Subject to the terms and conditions of this Agreement, and to the extent (x) assignable pursuant to Sections 363 and 365 of the Bankruptcy Code and applicable Law, and (y) designated by Purchaser on or before the Facility Transfer Effective Date and such assignment and assumption is approved by the Bankruptcy Court, all rights of

such Seller in, to and under the equipment leases of Sellers listed or described on Schedule 1.02(B)(4), as may be amended by Purchaser from time to time as provided herein (the "Assumed Equipment Leases");

(5) Subject to the terms and conditions of this Agreement, and to the extent (x) assignable pursuant to Sections 363 and 365 of the Bankruptcy Code and applicable Law, and (y) designated by Purchaser on or before the Facility Transfer Effective Date and such assignment and assumption is approved by the Bankruptcy Court, all rights of the such Seller in, to and under all admissions, occupancy, treatment, and similar written agreements entered into in the Ordinary Course of Business with patients and customers of the applicable Facility, and any amendments or modifications thereof, as described on Schedule 1.02(B)(5), as may be amended by Purchaser from time to time as provided herein (collectively, the "Patient Agreements" and together with the Assumed Contracts, the Assumed Real Property Leases, the Assumed Payor Agreements and the Assumed Equipment Leases, collectively, the "Purchaser Assumed Agreements");

(6) Subject to the terms and conditions of this Agreement, and to the extent (x) assignable pursuant to Sections 363 and 365 of the Bankruptcy Code and applicable Law, and (y) designated by Purchaser on or before the Facility Transfer Effective Date and such assignment and assumption is approved by the Bankruptcy Court, any and all other items of tangible and intangible personal property owned by Sellers (collectively, the "Personal Property"), including any and all inventory, medications, supplies and petty cash located at the Facilities, except for those assets listed as Excluded Assets; and

(7) All certificates of need (if any), certifications, licenses, permits and approvals related to or used in connection with the applicable Facility, to the extent such Seller's interests are legally assignable and/or transferrable.

Section 1.03 Excluded Assets. Notwithstanding anything to the contrary contained herein, the Acquired Assets shall not include the following items (collectively, the "Excluded Assets"):

(A) Sellers' rights under this Agreement;

(B) all cash and cash equivalents received on hand as of the Effective Time, all bank and deposit accounts (provided that Purchaser shall maintain control over Facility Bank Accounts as provided in the Interim Management Agreement with pre-Effective Time cash to be credited to Sellers), real estate and insurance escrows, and inter-company accounts;

(C) any Contracts other than Assumed Contracts;

(D) any leases for Leased Real Property, and rights thereunder, that are not Assumed Real Property Leases (the "Excluded Real Property Leases");

(E) any equipment leases or amendments other than Assumed Equipment Leases;

(F) all refunds for Taxes, fees, assessments and charges relating to the period prior to the Effective Time;

(G) Sellers' corporate minute books and seals;

(H) all licenses, permits, approvals and certifications that are not legally assignable or transferable;

(I) all claims and causes of action brought pursuant to Sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and similar actions under applicable state law (the "Avoidance Actions"), except for proceeds of causes of action to recover any unauthorized transfers of New DIP Collateral after the date of entry into the Original Term Sheet (as such terms are defined in the Letter of Intent);

(J) all litigation claims against the Debtors' directors and officers (including any recovery on account of such claims from the Debtors' directors' and officers' insurance policies) and the proceeds thereof; and

(K) all directors' and officers' insurance policies.

Section 1.04 Assumed Liabilities. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume only the following Liabilities (without duplication) (collectively the "Assumed Liabilities") and no other Liabilities:

(A) any and all Liabilities of each Seller arising under the Purchaser Assumed Agreements in each case solely to the extent arising from performance that first comes due after the applicable Facility Transfer Effective Date (provided, however, notwithstanding anything to the contrary herein or otherwise, the Assumed Liabilities shall not include any Liability arising out of or relating to a breach (including the occurrence of any event that with the passing of time or the giving of notice would constitute a breach) that occurred or arises from or relates to an event prior to such Facility Transfer Effective Date);

(B) all costs to cure all defaults under the Purchaser Assumed Agreements as determined by the Bankruptcy Court pursuant to Section 365(b) of the Bankruptcy Code (the "Cure Costs");

(C) any amounts that become due and payable by Purchaser or its Affiliates under the terms and conditions under the Interim Management Agreement (as defined herein), including costs associated with winding down any Rejected Facility (as defined herein); and

(D) any Transfer Taxes arising in connection with the transactions contemplated by this Agreement.

Section 1.05 Excluded Liabilities. Notwithstanding anything to the contrary set forth in this Agreement, and except with respect to the Assumed Liabilities that Purchaser has expressly and unambiguously agreed to assume pursuant to the terms of this Agreement, Purchaser shall not assume any indebtedness, obligations or Liabilities of the Sellers whatsoever, whether fixed or contingent, known or unknown, matured or unmatured, accrued or unaccrued (collectively, "Excluded Liabilities"). Excluded Liabilities shall include, without limitation, any indebtedness, obligations or Liabilities relating to (a) any malpractice or other tort claims, statutory or regulatory claims, claims of state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Sellers or the operation of the Facilities before the Effective Time, (b) any accounts payable, Taxes (other than Transfer Taxes), or other obligation or Liability of Sellers to pay money incurred by Sellers with respect to the operation of the Facilities prior to the Effective Time, other than Cure Costs, (c) any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind entered into prior to the Effective Time, (d) the Assumed Payor Agreements and the other Assumed Contracts to the extent attributable to the period prior to the Effective Time (except for Cure Costs to be paid by Purchaser pursuant to Section 1.04(B)), (e) violations or deficiencies related to operation of the Facilities with respect to the period prior to the Effective Time, (f) any Liabilities relating to the Facilities' employees accrued prior to the Effective Time (or with respect to service prior to the Effective Time) including, but not limited to, any Liabilities under ERISA, any Tax law, or any Benefit Plan (except the flexible spending accounts set forth in Section 1.02(A)(9)), (g) the operations of the Facilities prior to the Effective Time and (h) any and all Liabilities arising under or relating to the WARN Act or any similar state or local law with respect to any employment actions taken by Sellers prior to the Effective Time. For the avoidance of doubt, in accordance with the Sale Order, Purchaser shall have no successor, transferee or vicarious liability of any kind.

Section 1.06 Assumption/Rejection of Contracts and Leases.

(A) Purchaser shall have the right to direct Sellers to assume and assign and/or reject any executory contracts or unexpired leases associated with the Business. Specifically, Purchaser shall have the right to direct Sellers to assume and assign all relevant contracts and leases relevant to the Business, and such determinations (including the ability to add or remove designated contracts or leases to be assumed and assigned) may be made by Purchaser in its sole discretion on a Facility-by-Facility basis at any time prior to the Facility Transfer Effective Date and all other conditions precedent to the transfer of such Facility having been satisfied (the "Assumption/Rejection Deadline"). Purchaser acknowledges and understands that the ability of Sellers to assume and assign and/or reject any executory contracts or unexpired leases associated with the Business is limited by the constraints set forth in the Order Granting Debtors' Motion to Extend Time to Assume Commercial Real Property Leases [Dkt. No. 370], entered in the Bankruptcy Cases on December 17, 2025, and as otherwise imposed by Section 365(d) of the Bankruptcy Code.

(B) In the event the Purchaser elects not to assume any executory contract or unexpired lease associated with any Facility prior to the Assumption/Rejection Deadline (a "Rejected Facility"), Sellers shall reject such contract or lease, and any Acquired Assets associated with the Rejected Facility shall, as applicable, not be transferred to Purchaser or shall be abandoned by Purchaser back to the Sellers. The treatment of Rejected Facilities shall be governed by Section V of the Interim Management Agreement, including Purchaser's obligation to wind down operations and surrender licenses. Any damages or claims associated with any Rejected Facility shall be borne exclusively by Sellers' estates.

Section 1.07 Purchase Price.

(A) The aggregate purchase price for the Acquired Assets shall be Eighteen Million Five Hundred Thousand Dollars ($18,500,000) (the "Purchase Price").

(B) The Purchase Price shall be payable as follows:

(1) Six Million Dollars ($6,000,000) previously delivered as a non-refundable deposit (the "Deposit"), which was released from escrow on January 23, 2026, and applied by the Chapter 11 Trustee to payment of the DIP Obligations to the DIP Lender, as directed by the Sale Order; and

(2) Twelve Million Five Hundred Thousand Dollars ($12,500,000) to be paid by Purchaser at Closing by wire transfer of immediately available funds.

(C) The parties acknowledge that pursuant to Paragraph 12 of the Sale Order, the Chapter 11 Trustee has used proceeds from the Deposit and/or Purchase Price to pay in full all DIP Obligations to the DIP Lender.

(D) The Purchase Price shall be allocated among the Acquired Assets in accordance with the allocation set forth on Schedule 1.07(D) (the "Purchase Price Allocation"). Sellers and Purchaser hereby covenant and agree that they will not take a position on any Tax return, before any Governmental Authority charged with the collection of any Tax or in any judicial proceeding that is any way inconsistent with the Purchase Price Allocation set forth on Schedule 1.07(D), unless and to the extent required to do so pursuant to any Legal Requirement. Sellers and Purchaser shall report, act and file Tax returns in all respects and for all purposes consistent with the Purchase Price Allocation set forth on Schedule 1.07(D) and cooperate in the filing of any forms with respect to such allocation. In the event that the Purchase Price Allocation is disputed by any Tax authority, the Party (or the Party's Affiliate) receiving notice of the dispute shall promptly notify the other Party hereto, and if the parties previously agreed on the Purchase Price Allocation, the parties agree to use commercially reasonable efforts to defend, and to cause their respective Affiliates to defend, such purchase price allocation in any audit or similar Tax proceeding.

(E) Bulk Sales Laws. Pursuant to Section 363(f) of the Bankruptcy Code and the Sale Order, the transfer of the Acquired Assets shall be free and clear of any and all Liens

and Liabilities in the Acquired Assets (other than Permitted Liens), including any Liens or claims arising out of any bulk- transfer Laws.

Section 1.08 Sellers' Deliverables. At Closing, Sellers shall deliver the following to Purchaser (collectively, the "Sellers' Deliverables"):

a bill of sale and general assignment for the Acquired Assets, in the form attached hereto as

Exhibit 2

Interim Management Agreement

See attached.

(A) Exhibit A (the "Bill of Sale");

(B) an Assignment and Assumption of Assumed Contracts, in the form attached hereto as Exhibit B (the "Assignment and Assumption Agreement");

(C) a certificate from Sellers, in a form reasonably acceptable to Purchaser, executed by a duly authorized officer of Sellers, certifying the corporate or limited liability company documents of Sellers, including the articles of organization and resolutions authorizing the transactions contemplated hereby, and appearing on said certificate shall be true and correct signatures of all authorized persons who have executed this Agreement and all documents to be executed and delivered by Sellers pursuant hereto; and

(D) such other instruments of conveyance as are reasonably requested by Purchaser to give effect to the transactions contemplated hereby, in form and substance reasonably satisfactory to Sellers and Purchaser.

Section 1.09 Purchaser's Deliverables. At Closing, Purchaser shall deliver the following to Sellers (collectively, the "Purchaser Deliverables"):

(A) an executed counterpart of the Bill of Sale and Assignment and Assumption Agreement; and

(B) such other instruments of conveyance as are reasonably necessary to give effect to the transactions contemplated hereby, in form and substance reasonably satisfactory to the Purchaser and Sellers.

Section 1.10 Sellers' Deliverables at the Closing of the Transfer of the Post-Closing Acquired Assets. At the closing of the transfer of the Post-Closing Acquired Assets in accordance with Section 1.02(B), Sellers shall deliver to Purchaser (i) a Bill of Sale, and (ii) an Assignment and Assumption Agreement.

Section 1.11 Purchaser's Deliverables at the Closing of the Transfer of the Post-Closing Acquired Assets. At the closing of the transfer of the Post-Closing Acquired Assets in accordance with Section 1.02(B), Purchaser shall deliver to Seller countersigned copies of (i) a Bill of Sale, and (ii) an Assignment and Assumption Agreement.

Section 1.12 Interim Management Agreement. The Parties acknowledge and agree that the Required Approvals will not be obtained prior to the Closing Date. The Parties further acknowledge that the Interim Management Agreement, pursuant to which the operations of each Facility shall be managed by Purchaser of its Affiliate ("Manager") on behalf of each Seller and under the permits and approvals for the Facilities that are currently in place, from the Closing Date until the transfer of all of the Post-Closing Acquired Assets in accordance with Section 1.02(B) above, remains in effect. In accordance with the terms of the Interim Management Agreement, as of 12:01 a.m. Eastern Time on January 24, 2026, Purchaser is entitled to all revenues and responsible for all operational costs of the Facilities.

Section 1.13 Post-Closing Adjustments. If either Party discovers any errors in any of the prorations or adjustments calculated pursuant to Section 2.06 or Section 2.07, then the Party discovering such error shall promptly notify the other Party thereof and the Parties shall promptly make such appropriate payments to one another as shall be necessary to rectify such error. The provisions of this Section 1.13 shall survive the Closing for one (1) year.

## ARTICLE II.
## TRANSFER OF OPERATIONS

Section 2.01 Cooperation and Licensure. Subject to and consistent with the Interim Management Agreement, the Parties, on behalf of themselves and their employees and agents, agree to cooperate with each other to effect an orderly transfer of the operation of the Facilities prior to and after the Effective Time. Sellers shall cooperate with Purchaser to take all actions necessary for Purchaser to file the applications that are necessary to transfer or obtain the requisite licenses to operate the Facilities (collectively, the "Facility Licenses") by Purchaser prior to or after the Effective Time, and, in that regard, Sellers agree, promptly upon request by Purchaser, to execute any reasonably necessary documents or notifications, or take any action required in connection with such efforts, or otherwise requested by the applicable Governmental Authority in connection with the transactions contemplated herein, or otherwise as may be requested by Purchaser in furtherance of the Change of Control/Facility Transfer Process. Sellers agree to promptly provide or make available to Purchaser, upon request, to the extent such documentation is within Sellers' possession or control, any and all existing documentation requested by Purchaser necessary for the issuance of the Facility Licenses and to support the Change of Control/Facility Transfer Process. Sellers agree to use commercially reasonable efforts to cooperate with Purchaser in obtaining the Facility License and any other Required Approval from any relevant Governmental Authority that is required as a result of the transactions contemplated hereby or otherwise in connection with the Change of Control/Facility Transfer Process.

Section 2.02 Patient Funds; Advance Payments.

(A) On the Closing Date, and subject to adjustment on the applicable Facility Transfer Effective Date, Sellers shall provide Purchaser with an accounting of all funds belonging to patients at the Facilities which are held by Sellers in a custodial capacity, if any, and an accounting of all advance payments received by each of them pertaining to patients at the Facilities (collectively, the "Resident Trust Funds/Payments"). Such accounting shall set forth the names of the patients for whom such Resident Trust Funds/Payments are held and the amounts held on behalf of each patient.

(B) If applicable, on the applicable Facility Transfer Effective Date, Sellers shall transfer the Resident Trust Funds/Payments to a bank account designated by Purchaser and Purchaser shall acknowledge receipt of and does hereby expressly assume all of Sellers' financial and custodial obligations arising from and after such date with respect to the Resident Trust Funds/Payments transferred to Purchaser, it being the intent and purpose of this provision that, as of the date Required Approvals are obtained for such Facility, Sellers

shall be, and are hereby, relieved of all fiduciary and custodial obligation with respect to such Resident Trust Funds/Payments transferred to Purchaser and that Purchaser shall, and does hereby, assume all obligations from and after such transfer date with respect to the Resident Trust Funds/Payments transferred to Purchaser and shall be directly accountable to the patients with respect thereto. Such transfer shall not relieve Sellers of their custodial and fiduciary responsibilities for the Resident Trust Funds/Payments and property to the beneficiaries thereof for the period prior to the Effective Time and to the extent there are any inaccuracies or mistakes in Sellers' accounting related thereto.

(C) On the date that the Post-Closing Acquired Assets are transferred in accordance with Section 1.02(B), Purchaser shall, and does hereby, assume custody of all Resident Trust Funds/Payments and any other trust accounts for patients transferred by Sellers to Purchaser and agrees to treat such accounts in the fiduciary capacity required by law. Purchaser agrees to indemnify and hold the Sellers harmless from all Liabilities, claims, and demands that may be asserted and/or incurred against the Sellers in connection with Purchaser's treatment of such Resident Trust Funds/Payments received by Purchaser on and after the Facility Transfer Effective Date. Likewise, Sellers agree to indemnify and hold the Purchaser harmless from all Liabilities, claims, and demands that may be asserted and/or incurred against the Purchaser in connection with Sellers' treatment of such accounts prior to the Facility Transfer Effective Date.

Section 2.03 Recapture Claims. Each Party hereto agrees to notify the other promptly after receipt of any notice of any claim by any Governmental Authority with respect to any of the following, relating to periods prior to the Effective Time: (i) an alleged Medicare, Medicaid or other Third Party Payor overpayment, (ii) an imposition of civil monetary penalties or other immediate sanctions, or (iii) any other recoupments, recaptures, rate adjustments, set offs, audit liabilities, fines, penalties or assessments sought or claimed by any Third Party Payor or Governmental Authority, in each case, whether arising as a result of cost report or rate audits, utilization reviews, program integrity activities or otherwise (collectively "Recapture Claim"). To the extent ascertainable on or prior to the Closing Date, Sellers shall pay or cause to be paid any Recapture Claim which is for the periods prior to the Effective Time.

Section 2.04 Employees. Subject to Manager's authority under the Interim Management Agreement:

(A) Sellers shall terminate their employment relationships with Facilities' employees ("Employees") in accordance with Purchaser's directions and consistent with the Interim Management Agreement.

(B) Purchaser shall not be bound by or assume any collective bargaining agreements, Employee Plans, or employment contracts to which any Seller may be a party. Other than in the Ordinary Course of Business, or required by law or the terms of any contract existing as of the date hereof, Sellers shall not make any material changes in the

compensation or benefits of the Employees at the Facilities prior to the Facility Transfer Effective Date.

(C) Purchaser shall offer to hire and use commercially reasonable efforts to employ the minimum number of Employees necessary to avoid WARN Act (defined in Subsection (D) below) notice or similar notice requirements contained in any applicable law. Such Employees who accept such employment offers from Purchaser shall be referred to as the "Transferred Employees."

(D) Purchaser and Sellers acknowledge and agree that the provisions of Section 2.06(C), are designed, in part, to ensure that Sellers are not required to give notice to Employees under the Worker Adjustment and Retraining Notification Act or any other comparable state or local law (collectively, the "WARN Act"). Seller shall provide Purchaser with accurate termination data for the ninety (90) day period preceding the Effective Time to enable Purchaser to evaluate WARN Act implications for any post-Closing employment decisions. Nothing in this Section 2.04 shall, however, create any third-party beneficiary or other rights in favor of any person not a party hereto, including Employees, or constitute an employment agreement or condition of employment for Transferred Employees.

(E) Sellers acknowledge that the UMR-administered self-funded health plan was terminated effective as of December 31, 2025, with significant unfunded claims. All such claims are Excluded Liabilities. Purchaser has no obligation for any pre-Effective Time health plan claims.

(F) Purchaser may communicate directly with Employees regarding benefits and employment matters, including regarding the status of historical health insurance claims and go-forward benefit plans.

Section 2.05 Accounts Receivable.

(A) In accordance with the Sale Order and Interim Management Agreement, all revenues received on or after the Effective Time belong to Purchaser ("Purchaser's Accounts Receivable"), regardless of when the underlying services were rendered. In accordance with the Interim Management Agreement, Purchaser has the right to direct regular sweeps of cash from any Reimbursement Account to accounts under Purchaser's control.

(B) Sellers acknowledge and agree that Sellers have retained Coronis Health RCM I, LLC ("Coronis") for purposes of collecting Accounts Receivables prior to the Effective Time. Sellers agree that any payment, whether received by Sellers or Coronis from private pay or Third Party Payors or as repayment or reimbursement arising out of cost reports, received after the Effective Time shall be remitted by Sellers or Coronis to Purchaser less any fees owed to Coronis solely for periods after the Effective Time within three (3) Business Days of Sellers' receipt thereof (but no more frequently than once per week), together with a copy of the remittance advice or statements appliable to such payments.

(C) To the extent Sellers receive any proceeds from the Purchaser's Accounts Receivable, the parties acknowledge that the Sellers shall hold the payment in trust and shall remit the same to Purchaser in accordance with this Section 2.05.

(D) "Accounts Receivable" means all accounts receivable, including but not limited to all accounts receivable arising out of, resulting from or in connection with services and/or goods and materials provided to clients and residents, including but not limited to all accounts receivable and rights to reimbursement from private pay clients and residents, the Medicaid and Medicare programs, the Veteran's Administration, Blue Cross/Blue Shield and other insurance carriers and Third Party Payors, including whether billed or unbilled or accrued or unaccrued; all third party cost report settlements; and all rights to payment however evidenced or incurred, including but not limited to, all rights to payment and/or reimbursement from and claims against (i) insurers of persons to whom the Facilities provide services or goods, and (ii) any Governmental Authority; and all cash and non-cash proceeds and products of the foregoing, including but not limited to all proceeds of the sale or collection of the foregoing, cash and deposit accounts whether now existing or hereafter arising, including any unearned premiums, refunds or returns on premiums, or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing accounts.

Section 2.06 Prorations.

(A) Except as otherwise provided herein and consistent with the Interim Management Agreement, Sellers shall be responsible for claims or charges which are owed to third parties arising from the use, operation or control of the Facilities prior to the Effective Time, including payroll, real and personal property Taxes, insurance premiums, utilities, amounts due under executory contracts that constitute Excluded Assets and similar obligations for all periods prior to the Effective Time. Consistent with Paragraph 28 of the Sale Order and the Interim Management Agreement, Purchaser is responsible for all rent incurred under any unexpired lease for any period on or after the Effective Time during which the Sellers and/or Purchaser occupy, use, or manage such leased property, whether or not such lease is ultimately assumed or rejected. Purchaser, to the extent it utilizes the services provided by third parties, shall be responsible for, and shall pay on a timely basis, any claims or charges which are due to third parties used by Purchaser arising from the use, operation or control of the Facilities from and after the Effective Time.

(B) Revenues and expenses pertaining to Assumed Contracts, utility charges for the billing period in which the Closing Date occurs, real and personal property Taxes, and other items of revenue or expense that will burden or benefit the Facilities after the Closing shall be prorated between Sellers and Purchaser as of the Effective Time. Sellers shall provide Purchaser with bills and other documentation related to all items subject to proration hereunder including copies of all real estate and personal property Tax bills applicable to the Facilities.

(C) All such prorations shall be made on the basis of actual days elapsed in the relevant accounting, billing or revenue period and shall be based on the most recent information available to Sellers or Purchaser. Utility charges that are not metered and read on the Closing Date shall be estimated based on prior charges and shall be re-prorated upon receipt of statements therefor. Personal property Taxes, and water, vault and sewer charges, as well as any other governmental charges or Taxes assessed shall be apportioned at the Closing between periods prior to the Effective Time and periods on or following the Effective Time based on the rates and assessed valuation applicable to the fiscal year immediately preceding the Closing Date. After the actual Tax bills for the tax period in which the Closing occurs are received by either Purchaser or Sellers, the Parties shall recalculate such proration based on actual amounts. Any adjustment amount owed by either Party shall be paid within twenty (20) Business Days of demand by the Party entitled thereto, together with a copy of the applicable Tax bill and calculation of the adjustment amount.

Section 2.07 Treatment of Prorations. The accounts of Sellers and Purchaser created pursuant to the prorations provided for in the preceding Section 2.08 shall be netted against each other; as follows:

(A) If the result is a net positive balance for Purchaser, Sellers shall pay to Purchaser the amount of such balance in immediately available funds in accordance with the terms of Section 1.07 of this Agreement; and

(B) If the result is a net positive balance for Sellers, Purchaser shall pay to Sellers the amount of such balance in immediately available funds in accordance with the terms of Section 1.07 of this Agreement.

Section 2.08 Reserved.

Section 2.09 Medicare/Medicaid; Provider Agreements.

(A) Upon the applicable Facility Transfer Effective Date and subject to completion of required regulatory processes, Purchaser shall assume any and all of Seller's rights and interests in and to Sellers' Medicare provider numbers and Medicare provider reimbursement agreements with respect to the Facilities ("Sellers' Medicare Provider Agreements") and shall bill Medicare under such provider numbers for services rendered by Purchaser on and after the Effective Time, until Purchaser's receipt of an approval letter acknowledging assignment of Sellers' Medicare Provider numbers. From the Effective Time until the applicable Facility Transfer Effective Date, Purchaser shall bill under Sellers' Medicare Provider Agreements pursuant to the Interim Management Agreement. Sellers agree to cooperate with Purchaser in the assignment of Sellers' Medicare Provider Agreements to Purchaser, including completing those portions of Form 855A which confirm the change of ownership of the Facilities and the assignment by Sellers of Sellers' Medicare Provider Agreements to Purchaser and providing to Purchaser or any government entity any information requested to effect the transfer of Sellers' Medicare provider numbers. Except as otherwise provided by applicable law, Purchaser expressly does not assume, and the

assumption by Purchaser of the Sellers' Medicare Provider Agreement shall not be construed to impose upon Purchaser, any obligations under Sellers' Medicare Provider Agreements arising with respect to occurrences during the Sellers' operation of the Facilities. Likewise, except as otherwise provided by applicable law, Sellers expressly do not assume, and the assumption by Purchaser of the Sellers' Medicare Provider Agreements shall not be construed to impose upon Sellers, any obligations under Sellers' Medicare Provider Agreements arising with respect to occurrences during the Purchaser's operation of the Facilities.

(B) To the extent permitted by applicable law, and to the extent Purchaser desires to assume the same, upon the applicable Facility Transfer Effective Date and subject to completion of required regulatory processes, Purchaser shall assume any and all of Sellers' rights and interests in and to Sellers' Medicaid provider numbers and Medicaid provider reimbursement agreements with respect to the Facilities ("Sellers' Medicaid Provider Agreements") and shall bill Medicaid under such provider number for services rendered by Purchaser on and after the Effective Time, until Purchaser's receipt of if its own Medicaid provider agreements. From the Effective Time until the Facility Transfer Effective Date, Purchaser shall bill under Sellers' Medicaid Provider Agreements pursuant to the Interim Management Agreement. Sellers agree to cooperate with Purchaser in the assignment of Sellers' Medicaid Provider Agreements to Purchaser or the issuance of its own Medicaid provider agreement, including providing to Purchaser or any government authority any information requested to effect the transfer of Sellers' Medicaid Provider Agreements to Purchaser or Purchaser's enrollment in the Medicaid program. Except as otherwise provided by applicable law, Purchaser expressly does not assume, and the assumption by Purchaser of the Sellers' Medicaid Provider Agreements shall not be construed to impose upon Purchaser, any obligations under Sellers' Medicaid Provider Agreements arising with respect to occurrences during the Sellers' operation of the Facilities. Likewise, except as otherwise provided by applicable law, Sellers expressly do not assume, and the assumption by Purchaser of the Sellers' Medicaid Provider Agreements shall not be construed to impose upon Sellers, any obligations under Sellers' Medicaid Provider Agreements arising with respect to occurrences during the Purchaser's operation of the Facilities.

(C) Sellers shall also assign to Purchaser as of the applicable Facility Transfer Date any managed care and other commercial Provider Agreements with respect to the Facilities, to the extent such agreements are assignable and designated as Assumed Payor Agreements pursuant to Section 1.02(B)(3). If such managed care agreements and other commercial Provider Agreements are not assignable, Purchaser may bill under Sellers' commercial managed care Provider Agreements pursuant to the Interim Management Agreement until Purchaser is able to secure its own commercial managed care Provider Agreements. Sellers shall not terminate any of their managed care Provider Agreements or any other Provider Agreements with respect to the Facilities during the term of this Agreement or during any period thereafter if Purchaser is billing under such agreements.

(D) If the Facilities benefit from any contracts (a "VA Contract") between Sellers and the Department of Veterans Affairs (the "VA"), Sellers shall use their commercially

reasonable efforts to cooperate with Purchaser in seeking a novation (a "Novation") of the VA Contract including, but not limited, to signing any novation agreement and other forms reasonably requested by Purchaser or the VA. Purchaser shall be entitled to bill under the VA Contract pursuant to a Subcontract Pending Novation in the form and substance reasonably acceptable to the parties. Purchaser shall pay any reasonable out-of-pocket expenses incurred by Sellers in securing the Novation including any legal opinion required in connection with such Novation.

(E) Sellers and Purchaser understand that reimbursements from Medicare or Medicaid for items/services provided/rendered after the Effective Time may continue to be issued to Sellers for a period of time. If and to the extent they include payment for periods after the Effective Time and Purchaser is entitled to such payments in accordance with the priority for such remittances as set forth in this Agreement, Sellers shall forward all such Medicare or Medicaid reimbursements in accordance with this Agreement to the accounts designated in writing by Purchaser to Sellers until such time as reimbursements are remitted directly to Purchaser by Medicare and Medicaid.

Section 2.10 Transfer of Records; Access to Records. On or before the Closing Date, to the extent permitted by law and not already transferred, Sellers shall deliver to Purchaser the originals or copies of all of the Facility Records, including patient medical and financial records, by leaving all such records maintained in paper forms at the Facilities and transferring all such records maintained electronically to Purchaser's systems as, when, and how requested by Purchaser; provided, however, that nothing herein shall be construed as precluding Sellers from removing from the Facilities on the Closing Date its corporate or financial records which relate to its operations at the Facilities or to its overall corporate operations. Sellers shall use commercially reasonable efforts to remove from Facility Records transferred to Purchaser in paper forms any records relating to former patients of the Facilities. Nothing herein shall prohibit Sellers from maintaining a copy of any records to the extent allowed under applicable law as necessary for its efficient and lawful operation; provided, however, that Sellers agree that all information, records and data collected or maintained regarding patients of the Facilities shall be confidential, and Sellers shall preserve the existence and maintain the confidentiality of the patient records pursuant to this Agreement in accordance with federal and state law. At all times on and after the Closing Date, each Party shall allow the other Party, upon request and at sole cost and expense of the other Party, to have reasonable access during regular business hours upon reasonable prior written notice, to make copies of, or otherwise make available to the other Party such records relating to the operation of the Business in such Party's custody (including the Facility Records transferred hereby), to the extent reasonably necessary to enable the requesting Party to investigate and defend malpractice, employee or other claims, to file or defend cost reports and Tax returns, to verify accounts receivable collections, and to perform similar matters. To the extent that the Facility Records are maintained in an electronic format, the parties shall cooperate in good faith to coordinate the electronic transfer to Purchaser all right, title and interest of Sellers in and to all such Facility Records, in a manner required under this Agreement or as otherwise mutually acceptable to the parties; provided however, that:

Purchaser shall be responsible for any third party costs (such as Point Click Care charges) related to the transfer of patient records included within the Facility Records. Purchaser agrees to maintain such books, records, and other material comprising records of the Facilities' operations prior to the Effective Time that have been received by Purchaser from Sellers or otherwise, including patient records and records of patient funds, for all timeframes required under applicable law.

Section 2.11 Utilities; Deposits. As set forth in the Interim Management Agreement, Sellers are responsible for utility costs incurred prior to the Effective Time and Purchaser is responsible for utility costs incurred from and after the Effective Time. Purchaser shall arrange for all such utilities to be billed in its or Purchaser's name on and after the Effective Time and shall pay all fees due therefor on and after the Effective Time. All utilities costs which "straddle" the Effective Time shall be prorated at Closing between Sellers and Purchaser, as provided herein.

Section 2.12 Information Systems.

(A) Sellers shall use commercially reasonable efforts to permit transfer of data in fully operational form for use in Purchaser's computer applications, at Purchaser's sole cost and expense.

(B) Sellers shall cooperate with Purchaser and provide Purchaser with such assistance as Purchaser may reasonably request in order to provide for an orderly, efficient and safe transition of the operations of the Facilities from Sellers to Purchaser and the continued operation of the Facilities after the Closing Date in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the patients of the Facilities, all at Purchaser's sole cost and expense. During such time as Sellers provide Purchaser with access to the Facilities under this Section 2.15, Purchaser shall not connect with or hook into Sellers' computer lines or computers. Such access shall be prescheduled with Sellers and shall not interrupt normal business operation.

(C) To the extent any patient records remain in Sellers' possession or control (which Sellers make no representation about), Sellers shall, upon reasonable request and at Purchaser's expense, use reasonable efforts to provide copies of any such records they can locate.

Section 2.13 Use of Telephone Numbers; Emails. Consistent with the Interim Management Agreement, Purchaser has been using the present telephone and facsimile numbers of the Facilities and all post office box addresses associated with the Facilities. At Closing, to the extent not already completed, upon Purchaser's Request, Sellers shall transfer or cause to be transferred the telephone and facsimile numbers used by the Facilities to Purchaser. Sellers and Purchaser agree to cooperate to arrange for current e-mail addresses of the Facilities and its on-site staff to be forwarded to Purchaser's new e-mail addresses for a period of ninety (90) days following Closing, and to cooperate to arrange for an email auto-response with Purchaser's correct email address for the ninety (90) day period thereafter.

Section 2.14 Operating Procedures Manuals. Sellers agree to provide Purchaser with a copy of its operating manual and policies and procedures on the Closing Date (by leaving a physical copy of the same at the Facilities or delivering an electronic copy to Purchaser) and allow Purchaser to use such manuals after the Closing Date.

Section 2.15 INTERIM MANAGEMENT AGREEMENT CONTROLS. For all matters relating to Facility operations between the Effective Time and the applicable Facility Transfer Effective Date, the Interim Management Agreement controls. In the event of any conflict between this Agreement and the Interim Management Agreement regarding operational matters, the Interim Management Agreement shall govern.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

To Sellers' Knowledge, Sellers hereby make the representations and warranties indicated below to Purchaser on the on the Closing Date and on each Facility Transfer Effective Date:

Section 3.01 Power and Authority; Organization. Each Seller has all necessary limited liability company or corporate power and authority, as applicable, to carry on its business as it is now being conducted. Each Seller is duly organized and in good standing under the laws of the state of its domestic jurisdiction. Each Seller has all necessary corporate power and authority, as applicable, to enter into this Agreement and the other Transaction Documents to which such Seller is a party to execute all documents and instruments referred to herein or contemplated hereby.

Section 3.02 Authorization; Enforceability. The execution, delivery and performance of this Agreement and the other Transaction Documents to which each Seller is a party has been duly authorized by all necessary action on the part of the Sellers. This Agreement has been, and each other Transaction Document will have been prior to Closing, duly executed and delivered by the Sellers. This Agreement and the other Transaction Documents to which each Seller is a party constitute valid and legally binding agreements of such Seller, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws relating to or affecting creditors' rights generally or general principles of equity (regardless of whether enforcement is sought in an action at law or in equity).

Section 3.03 No Defaults. The execution and delivery of this Agreement and each other Transaction Document, and the performance of its obligations hereunder, do not and will not:

(A) conflict with or result in any material breach of the provisions of, or constitute a default under the certificate of formation, certificate of limited partnership, limited liability company agreement or limited partnership agreement, as applicable, of Sellers;

(B) violate any material restriction to which each Seller is subject or, without the giving of notice, passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any material license, authorization or permit or other material agreement or instrument to which each Seller is a party, which will not be satisfied or terminated with respect to the Facility prior to the Closing Date as a result of the transactions contemplated by this Agreement or result in the termination of any such instrument or termination of any provisions in such instruments that will result in the impairment of any Seller's rights under such instruments;

(C) constitute a violation of any applicable material resolution, rule, regulation, law, statute or ordinance of any administrative agency or Governmental Authority, or any judgment, decree, writ, injunction or order of any court to which each Seller is subject or by which its assets are bound, or any credit agreement or other financing arrangement to which each Seller is a party; or

(D) violate the Sale Order or any other order of the Bankruptcy Court applicable to the Sellers.

Section 3.04 Real Property and Assets.

(A) Sellers do not own any real property.

(B) Schedule 3.04(B) sets forth, as of the date hereof, the address of each Leased Real Property and a complete list of all Leases for such Leased Real Property, together with the Security Deposits and all amounts owed under each such Lease prior to the Effective Time. Except as set forth on Schedule 3.04(B), with respect to each of the Leases: (i) the Sellers have not subleased, licensed or otherwise granted any right to use or occupy the Leased Real Property or any portion thereof; (ii) such Lease is legal, valid, binding, enforceable and in full force and effect, subject to proper authorization and execution of such Lease by the other party thereto and except as may be limited by bankruptcy, insolvency, reorganization or other Laws affecting creditors' rights generally and by general equitable principles; (iii) Sellers are in sole and exclusive possession of all Leased Real Property there are no contractual or legal restrictions that preclude or restrict in any material way the ability to use the Leased Real Property for the purposes for which it is currently being used; and (iv) the Sellers are not, nor any other party to such Lease is in breach or default under such Lease;

(C) The Leased Real Property identified on Schedule 3.04(B) comprises the real property used in the Business;

(D) As of the Effective Time, Sellers had title to or valid leasehold interests in the Acquired Assets, subject to (i) liens disclosed in the Bankruptcy Court docket and (ii) liens extinguished by the Sale Order. Purchaser acknowledges that it has had possession and control of the Acquired Assets since the Effective Time and has had full opportunity to assess their condition.

Section 3.05 Health Care Representations.

(A) Each Facility is and shall be, as of the Effective Time, licensed by the applicable Governmental Authority as a detox, residential or outpatient drug and alcohol treatment facility. Such licenses are, and shall on the Closing Date, be unrestricted, unconditional, in good standing and in full force and effect and subject to no material waivers or limitations. Except as otherwise set forth on Schedule **Error! Reference source not found.**, no Seller has received any written notice from the applicable state licensure agency or any other governmental agency requiring the correction of any condition with respect to such license which has not been the subject of a plan of correction for which compliance has been implemented or has not otherwise been closed or abated, and the good standing of any such license is not in jeopardy.

(B) Sellers have complied with all restrictions regarding the confidentiality, maintenance, use and disposal of any and all protected health information as defined in the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA") and patient charts under all applicable Legal Requirements in connection with the operation of the Facilities, including, without limitation, the requirements of HIPAA, the Health Information Technology for Economic and Clinical Health Act, and any business associate agreements entered into by Sellers in connection therewith (each, a "Business Associate Agreement"). No "security incidents" or "breaches" (as such terms are defined in HIPAA) with respect to the Facilities have occurred within the past six (6) years. Sellers have no knowledge of any breach by any Person who has acted as a business associate, as defined by HIPAA, of Sellers ("Business Associate") of any Business Associate Agreement or any violation by a Business Associate of HIPAA.

Section 3.06 Compliance with Laws.

(A) Except as set forth on Schedule 3.06(A), Sellers are currently, and for the past three (3) years have been, in compliance in all material respects with all applicable Laws. No written or oral notices have been received by Sellers alleging a violation of any Law;

(B) Neither the Sellers nor any of their members, managers, officers, employees or independent contractors has (i) offered, paid, solicited or received any unlawful bribes, kickback payments, rebates or other similar unlawful payments of cash or other consideration, including complimentary services, housing or transportation for purposes including for the purpose of doing business with any Persons and/or to receive any third-party reimbursement for any services, or (ii) made any unlawful payments to referral sources, customers or clients or employees of customers or clients for purposes of doing business with any Persons and/or to receive any third-party reimbursement for any services. The Sellers and their respective directors, officers, and employees have complied in all material respects with the Foreign Corrupt Practices Act of 1977, as amended;

(C) In the past year the Sellers and their respective directors, officers, employees, agents and other Persons acting on their behalf have complied in all material

respects with all applicable economic sanctions Laws administered by the United States Department of Treasury, Office of Foreign Assets Control ("OFAC"). Neither the Sellers nor any of their respective officers, directors, employees, agents or representatives is designated on, or owned by any Person that is designated on OFAC's List of Specially Designated Nationals and Blocked Persons List;

Section 3.07 ERISA and Benefit Plans. Under no circumstances will Purchaser have any Liability with respect to any Employee Plan, including but not limited to any unfunded claims or obligations thereunder, regardless of whether such Employee Plan relates to the Transferred Employees.

Section 3.08 Patriot Act Representations. Sellers are not, and are not acting, directly or indirectly, for or on behalf of any Person named as a "specially designated national and blocked person" (as defined in Presidential Executive Order 13224) on the most current list published by the U.S. Treasury Department of Foreign Assets Control, and Sellers are not engaged in this transaction, directly or indirectly, on behalf of, and is not facilitating this transaction, directly or indirectly, on behalf of, any such Person. Neither Sellers nor their constituents or Affiliates are in violation of any laws relating to terrorism or money laundering, including the aforesaid Executive Order and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as amended.

Section 3.09 Material Contracts.

(A) Set forth on Schedule 3.09 is a true, correct and complete list of each Contract required to operate the Business and the Facilities, including any Contracts which involve (1) future payments, performance of services or delivery of goods or materials, to or by any Seller in an amount exceeding $10,000 on an annual basis or (2) are not terminable by the applicable Seller upon ninety (90) days or less notice without payment of any termination fee (collectively, the "Material Contracts"), together with all amounts due under such Material Contracts through the Effective Time.

(B) Sellers have provided Purchaser true and complete copies of all Material Contracts, including all amendments thereto. Neither Seller nor any counterparty thereto, is in breach or default under any Material Contract and there has not occurred any event which with the passage of time or the giving of notice (or both) would constitute such a default or breach. Except as set forth on Schedule 3.09, each of the Material Contracts is (i) valid and binding on the applicable Seller a party thereto and, to the Knowledge of Seller, the other party or parties thereto, and is in full force and effect and (ii) enforceable against the applicable Seller a party thereto and the other party or parties thereto, in accordance with its terms.

Section 3.10 Intellectual Property Assets. Set forth on Schedule 3.10 is a true and correct schedule of all Intellectual Property Assets of Sellers including, without limitation, all domain names and internet addresses owned by Sellers or used in connection with the

Business. Sellers own, are licensed or otherwise possess legally enforceable rights to use in the manner and to the extent currently being used by Sellers all the Intellectual Property Assets, without (i) infringing or violating the valid and enforceable rights of others, (ii) constituting a breach of any agreement, obligation, promise or commitment by which Sellers and their Affiliates may be bound or (iii) violating any laws in any applicable jurisdiction. There is no unauthorized use, infringement, misappropriation or other violation of any of the Intellectual Property Assets by any Person. The Intellectual Property Assets include all Intellectual Property Rights and interests necessary to conduct the Business as it is currently conducted, and assuming any contractually required consents are obtained, such rights will not be adversely affected by Sellers or any other person claiming under or through Sellers or otherwise in connection with or arising from the execution and delivery of this Agreement or the consummation of any of the transactions contemplated hereby.

Section 3.11 No Consent or Approval. Except as disclosed on Schedule 3.11 and except for the matters pending before the Bankruptcy Court, Sellers are not a party to, subject to, or bound by any understanding or agreement, or any judgment, order, writ, injunction, or decree of any court or Governmental Authority that prevents or impairs (i) the carrying out of this Agreement, or (ii) the assignment, transfer or use of any Acquired Assets to be transferred hereunder. Other than the Facility License and other Required Approvals, no authorization, consent, approval or other order of, declaration to or filing with any Governmental Authority is required for the consummation by the Sellers of the transactions contemplated by this Agreement.

Section 3.12 Insurance. Schedule 3.12 attached hereto sets forth a list of: (i) all policies of insurance held or owned by Sellers or otherwise in force and providing coverage for the Facilities, their operations or the Acquired Assets (including but not limited to medical malpractice insurance, and any state sponsored plan or program for worker's compensation); and (ii) all bonds, indemnity agreements and other agreements of suretyship made for or held by Sellers or otherwise in force and relating to the Facilities, its operations or the Acquired Assets.

Section 3.13 WARN Act. Sellers have not, within the ninety (90) days preceding the Effective Time, terminated sufficient employees at any Facility to trigger any obligation under the WARN Act or similar state or local law. Schedule 3.20 sets forth the number of employees terminated at each Facility in the ninety (90) days prior the Effective Time.

Section 3.14 Brokerage and Transaction Bonuses.

(A) Except for Bailey & Co. Securities, LLC, no broker, finder or financial advisor or other Person is entitled to any brokerage fees, commissions, finders' fees, financial advisory fees or similar fees in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Sellers. Except for Bailey & Co. Securities, LLC, no broker, finder or financial advisor or other Person is entitled to any brokerage fees, commissions, finders' fees, financial advisory fees or similar fees in

connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Purchaser.

(B) There are no special bonuses, "stay-put" bonuses, transaction bonuses, change in control or similar payments, sale bonuses, severance, employment agreement "golden parachutes" or other similar compensation in connection with the transactions contemplated by this Agreement which will not be satisfied at or before the Closing Date.

Section 3.15 Nature of Transaction. Purchaser acknowledges that this is a sale pursuant to Section 363 of the Bankruptcy Code and that, except for the specific representations and warranties expressly set forth in this Article III (which are based on Sellers' Knowledge as defined herein), the Acquired Assets are being transferred in their condition as of the Closing Date without any additional representations or warranties of any kind, whether express or implied.

Section 3.16 Disclosure. Except as set forth on Schedule 3.16, no representation or warranty or other statement made by Sellers in this Agreement, the Disclosure Schedules attached hereto, or any of the Transaction Documents, certificates or agreements entered into or delivered by Sellers in connection with the transactions contemplated in this Agreement, contains any untrue or misleading statement of material fact.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the representations and warranties indicated below to Sellers on the Closing Date:

Section 4.01 Authority, Validity and Binding Effect. Purchaser has all necessary limited liability company power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individuals executing this Agreement on each of its behalf to do so. This Agreement has been duly validly executed and delivered by Purchaser and is enforceable against Purchaser in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent conveyance, moratorium, liquidation, reorganization or other similar laws affecting the enforcement of creditors' rights in general.

Section 4.02 No Defaults. The execution and delivery of this Agreement and any documents contemplated hereby by Purchaser, and the performance of its obligations hereunder and thereunder, do not and will not:

(A) conflict with or result in any material breach of the provisions of, or constitute a default under, the articles of formation and operating agreement of Purchaser.

(B) violate any material license, authorization or permit or other material agreement or instrument to which Purchaser are a party, unless (i) such violation will be cured

prior to the Closing Date, (ii) such license, authorization, permit, agreement or instrument will be terminated prior to the Closing Date as a result of the transactions contemplated by this Agreement or (iii) such violation will not materially and adversely affect Purchaser's ability to satisfy its obligations hereunder and consummate the transactions contemplated hereby.

(C) constitute a violation of any applicable material resolution, rule, regulation, law, statute or ordinance of any administrative agency or Governmental Authority, or of any judgment, decree, writ, injunction or order of any court to which Purchaser is subject or by which its assets are bound, or any credit agreement or other financing arrangement to which Purchaser, or any of its Affiliates is a party, unless (i) such violation will be cured prior to the Closing Date, or (ii) such violation will not materially and adversely affect Purchaser's ability to satisfy its obligations hereunder and consummate the transactions contemplated hereby.

Section 4.03 "As Is, Where Is" Transaction. Pursuant to the letter of intent provided in the Notice of Filing of Letter of Intent (With Addendum) and Deposit Verification Letter [Dkt. No. 510] filed in the Bankruptcy Cases, the transaction contemplated by this Agreement is an "as is, where is" sale conducted pursuant to § 363 of the Bankruptcy Code.

## ARTICLE V.
## COVENANTS

Section 5.01 Compliance with Laws. The parties shall comply in all material respects with all applicable laws, and with all applicable rules and regulations of all Governmental Authorities, in conjunction with the execution, delivery and performance of this Agreement and the transactions contemplated hereby.

Section 5.02 Efforts.

(A) Following the Closing, the parties shall use commercially reasonable efforts to complete the Change of Control/Facility Transfer Process and obtain all Required Approvals.

(B) The obligations of the Sellers pursuant to this Agreement, including this Section 5.02(B), shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases) and each Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Sale Order).

Section 5.03 Adequate Assurances regarding the Purchaser Assumed Agreements. The Parties acknowledge that the Sale Order constitutes adequate assurance of future performance under all Purchaser Assumed Agreements designated for assumption as of the Sale Order date. For any contracts designated for assumption after the Sale Order date, Purchaser will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code.

Section 5.04 Consents; Notices. At or prior to the Closing, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in Section 5.04, Sellers shall use commercially reasonable efforts to obtain all Consents and give all notices required for Sellers to assign the Purchaser Assumed Agreements to which they are a party to Purchaser to the extent not assignable without any such approval, consent, or notice pursuant to Section 363 or Section 365 of the Bankruptcy Code; provided that, for the avoidance of doubt, to the extent deemed necessary by Purchaser, Purchaser shall also be authorized (but not required) to obtain Consents for the Sellers to assign the Purchaser Assumed Agreements to Purchaser but only to the extent such Purchaser Assumed Agreements are not assignable without any such Consent pursuant to Section 363 and Section 365 of the Bankruptcy Code. If any Consent is not obtained prior to the Closing, then, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in Section 5.04 and to the extent permitted by applicable Law, Sellers shall continue to be required to use commercially reasonable efforts after the Closing to obtain the Consents and will use commercially reasonable efforts to establish an agency type or other similar arrangement reasonably satisfactory to Sellers and Purchaser under which Purchaser would obtain, to the extent practicable, all rights under the Purchaser Assumed Agreements.

Section 5.05 Case Disposition. The Chapter 11 Trustee shall not pursue a conversion of the Debtors' cases under Chapter 11 of the Bankruptcy Code to cases under Chapter 7 of the Bankruptcy Code (the "Conversion") unless each of the following conditions has been satisfied:

(1) The Buyer shall have delivered written notice to the Chapter 11 Trustee confirming that the Buyer has received assurances, in form and substance satisfactory to the Buyer in its sole discretion, from each applicable Governmental Authority with jurisdiction over the licensure, certification, or regulatory approval of the Acquired Assets or the operation of the Business (each, an "Applicable Regulatory Authority") that the Conversion will not (i) adversely affect, delay, impair, or otherwise jeopardize the regulatory approval process for the transfer of any Permits, licenses, certifications, or other regulatory authorizations included in the Acquired Assets to the Buyer, (ii) result in the revocation, suspension, termination, or material modification of any such Permits, licenses, certifications, or regulatory authorizations, or (iii) otherwise adversely affect the Buyer's ability to operate the Business following the Effective Time; and

(2) The Bankruptcy Court shall have entered an order, in form and substance acceptable to the Buyer in its reasonable discretion, authorizing the Chapter 7 trustee appointed in each converted case (each, a "Chapter 7 Trustee") to operate the applicable Debtor's business and affairs solely for the limited purposes of (i) complying with the Chapter 11 Trustee's and Debtors' obligations under the Interim Management Agreement; (ii) preserving, maintaining, and protecting all licenses, Permits, certifications, and other regulatory authorizations necessary to operate the Business (including employing employees to the extent necessary to preserve, maintain, and protect the foregoing), (iii) preserving, maintaining, and assuming or assigning (as applicable) all Assumed Contracts, (iv) preserving,

maintaining, and assuming or assigning (as applicable) all Assumed Leases, in each case pending the consummation of the transactions contemplated by this Agreement; and (v) preserving, maintaining, and protecting Buyer's right to the Acquired Assets.

(B) Sellers agree to maintain their corporate existence and Sellers shall not seek (and shall oppose any effort by any other party in interest) to dismiss, convert to Chapter 7, or dissolve any of the Sellers until the completion of the Change of Control/Facility Transfer Process for all Facilities operated by such Seller.

(C) Sellers acknowledge their obligation under the Sale Order to continue to exist through the completion of the Change of Control/Facility Transfer Process and shall cooperate in good faith with all regulatory filings, license transfers, and change of ownership applications necessary to transfer the Facilities to Purchaser or its designees.

(D) If the Change of Control/Facility Transfer Process cannot be completed by Purchaser for any Facility due to the conversion or dismissal of Sellers' cases or the dissolution or other wind-down of any Seller, other than as a result of any breach of this Agreement by Purchaser, then Purchaser may, in its sole discretion, (i) terminate the Interim Management Agreement as to the applicable Facility operated by such Seller, (ii) deem any leases or executory contracts associated with such Facility as rejected, and (iii) elect not acquire title to, or elect to abandon to the applicable Seller, any Acquired Assets associated with such Facility.

(E) Notwithstanding the foregoing, in the event any of the Bankruptcy Cases must remain open or in a Chapter 11 proceeding solely to complete the Change of Control/Facility Transfer Process, Purchaser shall pay the reasonable costs associated therewith, including US Trustee quarterly fees and the professional fees of the Chapter 11 Trustee, the Chief Restructuring Officer, and their retained professionals, subject in each case (other than in the case of the US Trustee) to a reasonable budget acceptable to Purchaser.

Section 5.06 Trade Name Transfer. Sellers shall execute and deliver any and all documents necessary to transfer all trade names, trademarks, and related intellectual property rights associated with the Facilities to Purchaser, including without limitation trademark assignments, domain name transfers, and amendments to any state or local business name registrations. To the extent any trade name cannot be immediately transferred, Sellers grant Purchaser an exclusive, irrevocable, royalty-free license to use such trade names until transfer is completed.

Section 5.07 Bank Accounts and Cash Management. Consistent with Section II(C) of the Interim Management Agreement, which grants Manager sole dominion and control over Reimbursement Accounts, Sellers acknowledge and agree that Purchaser may establish new bank accounts for the Facilities and implement cash sweeps from existing Facility Bank Accounts to such new accounts. Sellers shall cooperate with Purchaser in establishing such accounts and sweep arrangements, including executing any documents reasonably required by financial institutions to effectuate such arrangements.

Section 5.08 Vehicles. Within thirty (30) days following Closing, Sellers shall execute and deliver all documents necessary to transfer title to all vehicles included in the Acquired Assets to Purchaser or its designees, including but not limited to certificates of title, odometer statements, powers of attorney for title transfers, and any lien releases. Sellers shall cooperate with Purchaser to complete all state motor vehicle department requirements for such transfers. Until title transfers are complete, Sellers authorize Purchaser to operate such vehicles for Facility purposes and shall maintain such vehicles on Sellers' insurance policies with Purchaser as additional insured, with Purchaser reimbursing the incremental insurance costs.

Section 5.09 Books and Records. The books and records acquired by the Buyer hereunder will, following the Closing, be in the custody of the Buyer. However, the Buyer hereby agrees, for a period of two (2) years from and after the Closing Date, to permit the Seller and counsel to the Seller and any professionals employed in the Bankruptcy Case (the "Estate Representatives"), or any other party by order of the Bankruptcy Court, to have reasonable access to such books and records relating or pertaining to the business and operations of the Seller (including for the purpose of making copies thereof), at mutually convenient times upon at least five (5) business days' prior written notice, solely to the extent Seller or such Estate Representative has need therefor in order to prosecute claims and causes of action included in the Excluded Assets, defend any claims of causes of action, prepare and file Tax returns and to complete the administration of the Bankruptcy Case. Any such access shall be subject to applicable law, including without limitation patient privacy laws (including HIPAA), confidentiality obligations, and attorney-client privilege. If at any time after the two-year period the Buyer desires to dispose of or destroy any such records, the Buyer shall provide Seller or the applicable Estate Representative with thirty (30) days prior written notice thereof. If Seller or such Estate Representative desires to retain any such records or books, Seller or such Estate Representative shall arrange to collect such books and records from the Buyer, at Seller or the Estate Representative's expense, within such thirty-day period. Buyer's obligations under this Section are subject to applicable records retention requirements under state and federal law. The provisions of this Section 5.09 shall survive the Closing.

Section 5.10 Cooperation in Legal Proceedings. From and after the Closing Date, each Party shall reasonably cooperate with each other Party in the defense or prosecution of any Legal Proceeding already instituted or that may be instituted hereafter against or by such other Party relating to or arising out of the conduct of the Acquired Assets or Assumed Liabilities prior to the Closing Date (other than (i) any Legal Proceeding among the Parties and/or their Affiliates arising out of the transactions contemplated by this Agreement or any Ancillary Agreement, or (ii) any Legal Proceeding against Purchaser or its Affiliates) and specifically includes the prosecution of claims and causes of action included in the Excluded Assets. Purchaser's cooperation obligations shall be limited to (a) providing reasonable access to documents and records in accordance with Section 5.07, and (b) making employees available for up to thirty (30) hours per year in the aggregate without charge, and thereafter at the rate of $350 per hour. The Party requesting such cooperation shall pay (net of any

reimbursement that may be received under existing insurance policies) the reasonable out-of-pocket expenses incurred in providing such cooperation (including legal fees and disbursements) by the Party providing such cooperation. For clarity, no Party shall be required to provide cooperation that would waive attorney-client privilege or violate applicable law. The provisions of this Section 5.10 shall survive the Closing.

## ARTICLE VI.
## MISCELLANEOUS

Section 6.01 Further Assurances. Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein, contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

Section 6.02 Notices. All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and shall be either (i) delivered by hand, or (ii) sent by recognized overnight courier, or (iii) by electronic mail.

*If to Purchaser:*
The Mandi Group, L.L.C.
10 Teaberry Court
Lakewood, NJ 08701
Attention: Yitzy Weinfeld, Isidore Bleier
Email: yweinfeld@gmail.com; izzytov@gmail.com

*With a copy to:*
Holland & Knight LLP
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Attention: Ibrahim Barakat, Tyler Lane
Email: Ibrahim.Barakat@hklaw.com; Tyler.Lane@hklaw.com

*If to Sellers:*
Robert C. Furr
Chapter 11 Trustee
FurrCohen, PA
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Email: rfurr@furrcohen.com

*With a copy to:*
Carol Fox
Senior Managing Director
Glass Ratner Advisory & Capital Group, LLC
1675 N. Military Trail, Suite 650

Boca Raton, FL 33486
Email: cfox@glassratner.com

All notices, requests, consents and other communications hereunder shall be deemed to have been given: (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above; (ii) if sent by overnight courier, on the next Business Day following the day such notice is delivered to the courier service; or (iii) if made by electronic mail, at the time that delivery thereof has been acknowledged by electronic confirmation or otherwise. The address of any party herein may be changed at any time by written notice to the parties.

Section 6.03 Entire Agreement; Amendment; Waiver. This Agreement together with the Sale Order, the Interim Management Agreement and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Agreement may not be modified or amended except in writing signed by the parties hereto. No waiver of any term, provision or condition of this Agreement, in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

Section 6.04 Assignment. Except as set forth herein, neither this Agreement nor the rights, duties or obligations arising hereunder shall be assignable or delegable by either party hereto without the express prior written consent of the other party hereto. Notwithstanding the foregoing, Purchaser is permitted to assign and transfer this Agreement to one or more Affiliates of Purchaser for purposes of taking ownership of the Acquired Assets, and Sellers consent to the transfer of this Agreement to such any such Affiliate, provided that any such Affiliate shall be bound by all of the terms and conditions hereof. Nothing contained in this Section 6.04 shall relieve Purchaser from its liability for such obligations under this Agreement.

Section 6.05 Joint Venture; Third Party Beneficiaries. Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Agreement.

Section 6.06 Representation by Counsel. The parties hereto acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the negotiations which preceded the execution of this Agreement, and that each party has executed this Agreement with the consent and on the advice of such independent legal counsel. This Agreement is a negotiated document. As a result, any rule of construction providing for any ambiguity in the terms of this Agreement to be construed against the draftsperson of this Agreement shall be inapplicable to the interpretation of this Agreement.

Section 6.07 Captions. The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

Section 6.08 Counterparts. This Agreement may be executed and delivered (including by facsimile transmittal, which for purposes of this Agreement shall be deemed to be an original signature) in one or more counterparts and all such counterparts taken together shall constitute a single original Agreement. This Agreement may be executed by facsimile or .pdf signature and a facsimile or .pdf signature shall constitute an original for all purposes.

Section 6.09 Governing Law. This Agreement shall be governed by the laws of the State of Florida as to, including, but not limited to, matters of validity, construction, effect and performance but exclusive of its conflicts of laws provisions.

Section 6.10 JURISDICTION; VENUE. THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY JUDICIAL PROCEEDING RELATING TO ANY DISPUTE ARISING OUT OF THE INTERPRETATION, PERFORMANCE OR BREACH OF THIS AGREEMENT. IN THE EVENT THAT THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA DECLINES TO EXERCISE SUCH JURISDICTION, THEN THE STATE COURT AND THE FEDERAL DISTRICT COURT FOR THE COUNTY OF PALM BEACH, STATE OF FLORIDA, SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY JUDICIAL PROCEEDING RELATING TO ANY DISPUTE ARISING OUT OF THE INTERPRETATION, PERFORMANCE OR BREACH OF THIS AGREEMENT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY CONSENT, AND WAIVE ANY OBJECTION, TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURTS THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURTS HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. THE PARTIES ALSO CONSENT TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ACTIONS ARISING OUT OF THIS AGREEMENT.

Section 6.11 Performance. In the event of a default by either party under this Agreement, the other party shall have the right, in addition to any other remedies which may be available, to obtain specific performance of the terms of this Agreement, and the defaulting party hereby waives the defense that there may be an adequate remedy at law.

Section 6.12 Attorney's Fees. In the event of any dispute between the parties hereto that results in arbitration or litigation (including any enforcement action of an arbitration award or any action to compel arbitration or change venue), the prevailing party shall be reimbursed for all reasonable costs, including, but not limited to, reasonable attorneys' fees.

Section 6.13 Waiver of Jury Trial. EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, INCLUDING TO ENFORCE OR DEFEND ANY RIGHTS HEREUNDER, AND AGREES THAT ANY SUCH ACTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

Section 6.14 Severability. If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

Section 6.15 Usage. All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" and "including" shall mean "including without limitation.

Section 6.16 Confidentiality.

(A) Sellers acknowledge that certain of the information that has been and will be made available pursuant to this Agreement may be proprietary and include confidential information. Sellers shall hold all such information about Purchaser in confidence and shall not disclose it to any person (other than to their respective representatives, attorneys, accountants, advisors, Affiliates, consultants, members and employees, so long as those representatives agree to keep any such information in confidence) without the approval of Purchaser; provided, however, that the foregoing restriction shall not apply to any information that is, through no fault of Sellers, publicly known or which is lawfully obtained from a third party, or to any disclosure required by any Legal Requirement or in connection with the enforcement of Sellers' or Purchaser's rights under this Agreement or as required in connection with the matters before the Bankruptcy Court.

(B) Purchaser acknowledges that certain of the information that has been and will be made available pursuant to this Agreement may be proprietary and include confidential information. Purchaser shall hold all such information about Sellers in confidence and shall not disclose it to any Person (other than to their respective representatives, attorneys, accountants, advisors, Affiliates, consultants, members and employees, so long as those representatives agree to keep any such information in confidence) without the approval of Sellers; provided, however, that the foregoing restriction shall not apply to any information that is, through no fault of Purchaser, publicly known or which is lawfully obtained from a third party, or to any disclosure required by any Legal Requirement or in connection with the enforcement of Purchaser's or Sellers' rights under this Agreement or as required in connection with the matters before the Bankruptcy Court.

(C) This Section 6.16 shall survive the Closing or the earlier termination of this Agreement.

Section 6.17 Sale Order Provisions

(A) The Sale Order is incorporated herein by reference. If any conflict exists between this Agreement and the Sale Order, the Sale Order controls.

(B) Except as explicitly stated herein, nothing in this Agreement survives Closing. The parties have no post-Closing liabilities to each other except for the explicitly stated Assumed Liabilities and post-Closing obligations regarding the license transfer process. Notwithstanding the foregoing, Article II (Transfer of Operations) shall survive Closing to the extent necessary to effectuate the transfer of operations and the obligations thereunder.

(C) Purchaser is a good faith purchaser under Section 363(f) of the Bankruptcy Code as provided in the Sale Order.

(D) Purchaser has no successor liability as confirmed in the Sale Order.

(E) The Chapter 11 Trustee shall segregate and maintain all proceeds received in connection with this sale transaction and shall not distribute any portion thereof without further order of the Court after notice and a hearing, except as specifically required by the Sale Order.

*[signature page follows]*

IN WITNESS WHEREOF, Sellers and Purchaser have each caused this Agreement to be executed by its duly authorized officer all as of the day and year first above written.

Sellers:

Praesum Healthcare Services, LLC,
a Florida limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Evolve Recovery Center, LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Evolve Recovery Center at Millbury LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detox Alpharetta, LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detox Brentwood, LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

*[Signature Page to Asset Purchase Agreement]*

Sunrise Detox Cherry Hill, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detox Duluth, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detox III, L.L.C.,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detox Millbury, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detox Orlando, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detox Toms River, LLC,

a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Cherry Hill, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Clark, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Duluth, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Fair Lawn, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Freehold, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

*[Signature Page to Asset Purchase Agreement]*

The Counseling Center at Middlesex, LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Robbinsville, LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Roswell, LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Roxbury, LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at the Brunswicks, LLC,
a Delaware limited liability company

Signed by:
By: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Toms River, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at West Caldwell, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

The Counseling Center at Yorktown Heights, LLC,
a Delaware limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Beacon Point Recovery Center LLC,
a Pennsylvania limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detoxification Center, LLC,
a Florida limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Sunrise Detox II, LLC,
a New Jersey limited liability company

By: Signed by: Robert C. Furr 547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

*[Signature Page to Asset Purchase Agreement]*

The Counseling Center at Millbury, LLC,
a Massachusetts limited liability company

By: Signed by: Robert C. Furr
547BDE4B112A407...
Name: Robert C. Furr
Title: Chapter 11 Trustee

Purchaser:

Mandi Mayfair Group LLC,
a New Jersey limited liability company

By: DocuSigned by: [signature] 583E37DC13DF447...
Name: Isidore Bleier
Title: Managing Member

Exhibit 1

**Defined Terms**

As used herein, the following terms have the respective meanings set forth below or set forth in the section hereof following such term:

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person, including with respect to any Seller any manager, managing member, director or officer of the such Seller.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"Business" means the business and operations conducted at the Facilities by Sellers including, without limitation, the detox, residential and/or outpatient drug and alcohol treatment conducted at the Facilities and all ancillary services related thereto.

"Business Day" means any day except Saturday, Sunday and any legal holiday or a day on which banking institutions in Florida, generally are authorized or required by Law or other governmental actions to close.

"Change of Control/Facility Transfer Process" means the process undertaken by Purchaser or its Affiliates in order to receive (i) written approval or other reasonable assurances from the applicable licensing Governmental Authority for the issuance of non-contingent and non-provisional operating licenses of the applicable Facility in the name of Purchaser or its Affiliate, (ii) confirmation of the assignment and assumption of all Assumed Payor Agreements so that Purchaser may bill the applicable payor in its name or in the name of its Affiliates, and (iii) all other Required Approvals necessary for Purchaser to assume the operation of each Facility as of the applicable Facility Transfer Effective Date.

"Chapter 11 Trustee" means Robert C. Furr, the duly appointed chapter 11 Trustee for the Sellers, pursuant to the Order Approving Appointment of Chapter 11 Trustee [Dkt. No. 529], entered in the Bankruptcy Cases.

"Contracts" mean all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"DIP Facility" means a senior secured, multi-draw debtor-in-possession financing facility provided to Debtors by GG Praesum, LLC pursuant to the Second Interim DIP/Sale Order.

"DIP Lender" means GG Praesum, LLC in its capacity as lender under the DIP Facility.

"DIP Obligations" means all amounts owed to the DIP Lender under the DIP Facility, including principal, interests, fees, expenses, and the Alternative Transaction Fee (referenced in the Sale Order), as set forth in the Second Interim DIP/Sale Order.

"Employee Plans" means (i) any "employee welfare benefit plan" or "employee pension benefit plan" or "multiemployer plan" as those terms are respectively defined in sections 3(1), 3(2) and 3(37) of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("ERISA"), or (ii) any other retirement or deferred compensation plan, incentive compensation plan, stock plan, unemployment compensation plan, vacation pay, severance pay, bonus or benefit arrangement, or any other fringe benefit arrangement for any current or former employee or other service provider, that is or has been sponsored or maintained by any Seller or an ERISA Affiliate thereof, or under which any Seller or an ERISA Affiliate thereof has or may have any Liability.

"ERISA Affiliate" means, with respect to any of the Sellers, any entity which, together with such Seller, would be treated as a single employer under Code Section 414 or ERISA Section 4001(b).

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governing Documents" means: (i) in the case of a corporation, its certificate of incorporation (or analogous document) and bylaws and shareholders agreement; (ii) in the case of a limited liability company, its certificate of formation (or analogous document) and limited liability company operating agreement; or (iii) in the case of a Person other than a corporation or limited liability company, the documents by which such Person (other than an individual) establishes its legal existence or which govern its internal affairs.

"Governmental Authority" means the government of any nation, state, city, locality or other agency, department or political subdivision of any thereof, any entity or instrumentality exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, regulation or compliance, including any contractor thereof and any state or local public utility commission and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing, and including any governmental authority having jurisdiction over the certification, licensing, evaluation or operation of the Facilities.

"Intellectual Property Rights" means all worldwide intellectual property rights (common law, statutory or otherwise), including patents (including all reissues, divisions, continuations and extensions), trademarks, service marks, trade names, copyrights, and registrations and applications for any and all of the foregoing, internet domain names, formulae, algorithms, designs, inventions, methodologies, specifications, know-how, trade secrets, computer software programs and code (both object and source), development tools and proprietary

information, technologies and processes, and all documentation and media describing or relating to the above, in any format.

"Sellers' Knowledge" means, for purposes of Article III only, the actual knowledge of the Chapter 11 Trustee, in his capacity as chapter 11 trustee, based on information reasonably available to him through the Debtors' books and records and the bankruptcy proceedings, without any obligation to conduct independent investigation or inquiry beyond review of reasonably available documents

"Law" or "Legal Requirement" means any foreign, federal, state and local law, statute, ordinance, rule, regulation, code, order, decree or similar edict enacted, adopted, issued or promulgated by any Governmental Authority.

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by the Sellers.

"Leases" means all leases, subleases, licenses, concessions and other agreements pursuant to which the Sellers hold any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of the Sellers.

"Letter of Intent" means that certain binding Letter of Intent dated January 16, 2026, between Mayfair/Mandi Group et al. and the Debtors, together with the Addendum to Binding Letter of Intent/Term Sheet dated January 16, 2026, both of which were filed with the Bankruptcy Court on January 16, 2026 [Dkt. No. 510-1], setting forth the material terms and conditions of the Sale Transaction and incorporated by reference into the Sale Order.

"Liabilities" means liabilities or obligations of any nature, whether asserted or unasserted, liquidated or unliquidated, absolute or contingent, including all claims (as defined in Bankruptcy Code Section 101(5).

"Lien" means, with respect to any property or asset, any lien, security interest, mortgage, pledge, charge, claim, lease, or any other encumbrance.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Entity.

"Ordinary Course of Business" means an action taken, or omitted to be taken, by any Person in the ordinary course of such Person's business consistent with past practice.

"Permits" means all permits, licenses, approvals, immunities, registrations, agreements, determinations, certificates, entitlements and other authorizations from any Governmental Authority, required for the ownership, use, operation or maintenance of the Facilities or Business, or to provide healthcare or related services at the Facilities.

"Permitted Liens" mean collectively (i) statutory liens not yet delinquent relating to any Assumed Liability; (ii) Liens granted pursuant to an Assumed Equipment Lease or financing expressly assumed by Purchaser, or (iii) as otherwise specifically permitted herein.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Authority.

"Provider Agreement" means any payor agreement with Third Party Payors relating to the Business including Medicare provider agreements, Medicaid provider agreements and managed care Contracts.

"Required Approvals" means collectively all required approvals, authorizations or consents of, or granting or issuance of any Permit by, a Governmental Authority as necessary for Purchaser to operate the Business and Facilities as presently operated by Sellers as detox, residential and/or outpatient drug and alcohol treatment facilities, including the completion of the Change of Control/Facility Transfer Process.

"Sale Order" means the Order (I) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (II) Granting Related Relief entered by the United States Bankruptcy Court for the Southern District of Florida on January 19, 2026 [Dkt. No. 516].

"Second Interim DIP/Sale Order" means the Amended and Restated Second Order (I) Approving Amended and Restated Binding Term Sheet; (II) Authorizing Debtors to Incur and Enter into Postpetition Senior Secured Priming Superpriority DIP Facility on an Interim Basis; (III) Approving Sale and Certain Related Procedures; and (IV) Granting Related Relief [Dkt. No. 500].

"Tax" means any taxes, charges, fees, levies, imposts, duties or other assessments, including income, gross receipts, excise, employment, sales, use, transfer, bulk sales, recording license, payroll, franchise, severance, documentary, stamp, occupation, windfall profits, environmental, customs duties, profits, withholding, Social Security, single business, unemployment, disability, real property, personal property, registration, ad valorem, value added, alternative or add-on minimum, escheat, unclaimed property, estimated, or other tax or governmental fee of any kind whatsoever, imposed or required to be withheld by any Governmental Authority, whether disputed or not, including any interest, penalties, and additions imposed thereon or with respect thereto, and any tax Liability as transferee or successor.

"Third Party Payor" means Medicare, Medicaid, Tricare, Veteran's Administration, commercial and private insurers, managed care company, employee assistance programs, HMOs,

preferred provider organizations and any other governmental, commercial, or other organization which maintains a healthcare reimbursement program or policy.

"Transaction Documents" means this Agreement and all other agreements, certificates and instruments executed and delivered by any Party pursuant to this Agreement.

"Transfer Taxes" means all sales, use, transfer, stamp, documentary, registration, recording, conveyancing, and similar taxes and fees (including any penalties and interest thereon) arising out of or in connection with the transactions contemplated by this Agreement, but excluding any income, franchise, or capital gains taxes.

Exhibit 2

Interim Management Agreement

See attached.

Exhibit A

Form of Bill of Sale

**BILL OF SALE AND GENERAL ASSIGNMENT[1]**

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Bill of Sale") is made as of ______________, 20___, by and between __________________, a __________________ ("Seller"), and __________________, a __________________ ("Purchaser").

RECITALS:

WHEREAS, Seller, Purchaser and others have entered into that certain Asset Purchase Agreement dated _____________ (as amended, the "Purchase Agreement"). All terms used but not defined herein shall have the meanings given to such terms in the Purchase Agreement.

WHEREAS, Seller wishes to execute and deliver this Bill of Sale for the purposes of transferring to and vesting in the Purchaser all right, title, interest and benefit in and to the Acquired Assets (as defined in the Purchase Agreement) pertaining to the Facility operated by Seller.

AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Assignment. Seller hereby absolutely, irrevocably and unconditionally gives, grants, bargains, sells, transfers, sets over, assigns, conveys, releases, confirms and delivers to Purchaser each of the Acquired Assets. Notwithstanding anything to the contrary contained in this Bill of Sale, Seller is not giving, granting, bargaining, selling, transferring, setting over, assigning, conveying, releasing, confirming or delivering to Purchaser any interest in or liabilities relating to the Excluded Assets.

2. Further Assurances. Seller hereby covenants that Seller will, at any time and from time to time upon written request therefor, execute and deliver to Purchaser, Purchaser's successors, nominees or assigns, such documents as Purchaser or they may reasonably request in order to fully assign and transfer to and vest in Purchaser or Purchaser's successors, nominees and assigns, and protect Purchaser's or their right, title and interest in and to each of the Acquired Assets and the rights of Seller intended to be transferred and

assigned hereby, or to enable Purchaser, Purchaser's successors, nominees and assigns to realize upon or otherwise enjoy such rights and property.

3. Conflicts. In the event of any conflict between this Bill of Sale and the Transfer Agreement, the Transfer Agreement shall control.

4. Miscellaneous. This Bill of Sale (a) may be executed in counterparts and delivered by email as a PDF or other electronic transmission, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument, (b) shall be governed by and construed in accordance with the laws of the State of Florida, and (c) may not be modified or amended except by written agreement signed by both Seller and Purchaser.

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale and General Assignment as of the date first above written.

**SELLER:**[2]

____________________, a ____________________

By: ____________________
Name:
Title:

**PURCHASER:**

____________________, a ____________________

By: ____________________
Name:
Title:

______________________________

Exhibit B

Form of Assignment and Assumption Agreement[3]

**ASSIGNMENT AND ASSUMPTION OF ASSUMED CONTRACTS**

THIS ASSIGNMENT AND ASSUMPTION OF ASSUMED CONTRACTS (this "Assumption Agreement") is dated as of ________________, 20__, by and between ______________________, a ______________________ ("Assignor"), and ______________________, a ______________________ ("Assignee"). Capitalized terms used, but not otherwise defined, in this Assumption Agreement shall have the meanings assigned to such terms in that certain Asset Purchase Agreement dated ____________, by and between Assignor and Assignee (as amended, the "Transfer Agreement").

For good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows:

(a) Assignor hereby assigns and transfers to Assignee all of Assignor's right, title and interest in and to the Facility's Assumed Payor Agreements, the Patient Agreements and those certain Assumed Facility Contracts (if any) that Assignee has elected to assume as identified on Schedule A hereto (collectively, the "Assumed Contracts").

(b) Assignee hereby accepts the foregoing assignment and hereby assumes and agrees to satisfy or perform all of the Assumed Contracts arising after the Closing Date as provided in the Transfer Agreement. Except as expressly set forth in the Transfer Agreement, Assignee is not assuming, in connection with the transactions contemplated by the Transfer Agreement, any liability or obligation of Assignor whatsoever, and Assignor shall retain responsibility for and shall discharge in the Ordinary Course of Business all liabilities and obligations of Assignor whether or not accrued and whether or not disclosed.

(c) From time to time after the date of this Assumption Agreement, at any party's reasonable request and without further consideration, Assignor and Assignee will execute and deliver or cause to be executed and delivered such further instruments of conveyance, assignment and transfer, and will take such other action as the other party may reasonably request, in order to effectively carry out the purposes of this Assumption Agreement.

(d) This Assumption Agreement will be governed by and construed in accordance with the laws of the State of _______. This Assumption Agreement has been executed, delivered and construed in accordance with the Transfer Agreement. This Assumption Agreement may be executed in any number of counterparts, each of which will be deemed to be an original and all of which together will constitute one instrument. Signatures of the

[3] To be updated and delivered at each Facility Transfer Effective Date.

parties transmitted by facsimile or other electronic transmission shall be deemed to be their original signatures for all purposes.

[Signature Page Attached]

IN WITNESS WHEREOF, the undersigned have executed this Assignment and Assumption of Assumed Contracts as of the date first written above.

**ASSIGNOR:**

________________________,
a ________________________

By: ______________________________
Name:
Title:

**ASSIGNEE:**

________________________,
a ________________________

By: ______________________________
Name:
Title:

SCHEDULES TO ASSET PURCHASE AGREEMENT

| | |
|---|---|
| Schedule 1 | Sellers and Facilities |
| Schedule 1.02(A)(7) | Trade Names |
| Schedule 1.02(B)(1) | Assumed Contracts |
| Schedule 1.02(B)(2) | Assumed Real Property Leases |
| Schedule 1.02(B)(3) | Assumed Payor Agreements |
| Schedule 1.02(B)(4) | Assumed Equipment Leases |
| Schedule 1.02(B)(5) | Assumed Patient Agreements |
| Schedule 1.07(D) | Purchase Price Allocation |
| Schedule 3.04(B) | Leased Real Property |
| Schedule 3.05(B) | Governmental Authority Notices |
| Schedule 3.09 | Affiliate Transactions |
| Schedule 3.10 | Material Contracts |
| Schedule 3.11 | Intellectual Property Assets |
| Schedule 3.12 | Noncontravention |
| Schedule 3.13 | Insurance |
| Schedule 3.19 | Disclosure |